## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARTIN J. DONOVAN | : | |
| **Plaintiff** | : | **CIVIL ACTION NO.:** |
| | : | **3:12 CV00549 (VLB)** |
| **vs.** | : | |
| | : | |
| YALE UNIVERSITY | : | |
| | : | |
| **Defendant** | : | **March 6, 2013** |

### MEMORANDUM IN SUPPORT OF MOTION FOR EXTENSION
### OF TIME TO FILE MOTION FOR SUMMARY JUDGMENT

Defendant, YALE UNIVERSITY, requests an extension of time up to and including April 25, 2013 within which to file a Motion for Summary Judgment in this matter. The reason for this request is that the parties were unable to schedule the deposition of the plaintiff until March 5, 2013. The deposition is now concluded, and the defendant believes that summary judgment is warranted because there is no evidence of age discrimination.

At his deposition, the plaintiff made it clear that his claim of age discrimination is nothing more than speculation. He testified that there were two physicians, Dr. Cynthia Walker and Dr. James Tsai, who were responsible for terminating him from his position as Clinical Administrator of the Department of Ophthalmology. Dr. Tsai was Chairman of the Department of Ophthalmology, and Dr. Walker was Dr. Tsai's immediate supervisor.

Mr. Donovan testified in his deposition that he had no discussions with Dr. Tsai about retirement. There was one occasion (he could not recall the timeframe) when Dr. Tsai made a comment about Mr. Donovan's age. Another

DONAHUE, DURHAM & NOONAN, P.C.
CONCEPT PARK  •  741 BOSTON POST ROAD
GUILFORD, CONNECTICUT 06437
TEL:  (203) 458-9168  •  FAX: (203) 458-4424
JURIS NO. 415438

physician in the department had announced that he was leaving Yale University to take a position elsewhere. Dr. Tsai allegedly commented that that was appropriate, since he was getting too old to continue doing research. Mr. Donovan testified that he responded that the physician in question was younger than Mr. Donovan, to which Dr. Tsai allegedly replied that he did not believe that Mr. Donovan could be in his 60's. Mr. Donovan indicated that he was, in fact, in his 60's. Mr. Donovan indicated that at the time of this conversation, he did not regard it as evidence of age discrimination, and he understood the comment to be an indication that Dr. Tsai thought that Mr. Donovan looked younger than his actual age. Mr. Donovan testified that he had no other discussions with Dr. Tsai about his age, that he never talked with Dr. Tsai about his retirement, and that there was no other comment from Dr. Tsai which he was claiming as evidence of age discrimination.

With regard to Dr. Walker, Mr. Donovan testified that he had just one conversation with her which he thought was relevant to his claim of discrimination. In April of 2010, Mr. Donovan met with Dr. Walker to discuss certain matters relating to the Department of Ophthalmology. At the end of the meeting, Dr. Walker allegedly asked whether Mr. Donovan had plans to retire. He responded that he did not, and in fact planned to work until age 70. According to Mr. Donovan, Dr. Walker responded with words to the effect: "That's good. We don't want to lose you." Mr. Donovan testified that he did not regard this comment as evidence of age discrimination at the time it was made, and he further testified that no other comments were made by Dr. Walker to suggest age discrimination. He further testified that there had been "a rumor" going around

that he might be retiring.  He did not know where this rumor started.  He did acknowledge that there was a "buy out plan" for some Yale University employees at that time, and some employees were discussing it.

Within a few weeks of this meeting with Dr. Walker, Mr. Donovan testified that there was a budget meeting in either May or June of 2010.  Those present included the Dean of the Medical School, Dr. Walker, Dr. Tsai and Mr. Donovan. There was considerable discussion about the fact that the Ophthalmology Department was "still in the red."  It was then suggested that the Yale Medical Group perform a review of the department to make recommendations regarding the operation of the Department.  That review took place over a six to eight week period.  The review was conducted by the Yale Medical Group ("YMG").  The lead person on the review was Sally Chesney, with whom Mr. Donovan testified he had worked for eight years.  He regarded himself as having a "good relationship" with Ms. Chesney, and he testified that he had no reason to believe that she was guilty of age discrimination.    Mr. Donovan also testified that Ms. Chesney had performed similar reviews on several other departments at the Medical School.  At the conclusion of the review, YMG produced a 35 page report, a copy of which is attached hereto as Exhibit A.

The report notes that 71 employees of the Department of Ophthalmology were interviewed.  Mr. Donovan stated that this would likely represent every employee, both staff and faculty.  The report states:  "The Clinical Administrator is not well-respected by faculty or staff.  They stated that he occasionally walks around the practice, doesn't smile or acknowledge anyone.  Faculty stated that he is 'the money guy.'   His knowledge of clinical operations is weak and his

management style very hands-off and non-confrontational, yet somewhat dictatorial." See Exhibit A at p. 4.

The report was not just critical of Mr. Donovan.  Rather, the report states: "Overall, Clinical Operations management is extremely weak at all levels:  Clinical Administrator, Practice Manager, Clinical Supervisor, Front Desk Supervisor and Photography Supervisor."   Id. at 8.   The report continues:   "There are underperforming and unfriendly staff that have not been properly disciplined.  The Practice is not properly staffed for all operating hours.  Almost every day patient flow comes to a halt because of unavailable exam rooms that are assigned to specific positions yet exam rooms in other locations are empty.   One photographer can be overwhelmed with patient tests, while the other is not."  Id. at p. 8.  The report details a large number of managerial deficiencies, including a lack of communication, lack of discipline for inappropriate staff behavior and sub-standard performance, lack of appropriate staff coverage for all operating hours of the Practice, uneven work assignments among employees performing the same functions, inadequate training of new employees and inappropriate use of some employees' time.  Id. at pp. 3 – 7.  As one example of inappropriate use of management resources, the report notes that the Practice Manager (who is the second highest administrator immediately below the Clinical Administrator) was spending 60% of her time filling in at the front desk, during which time she answered phones and greeted patients.  Id. at p. 5.   Mr. Donovan agreed at the deposition that this would not be a good use of her time.

When Mr. Donovan was asked about these issues at his deposition, he agreed that these were all items which could legitimately lead to dismissal of the

Clinical Administrator; however, he disagreed with the conclusions drawn by the YMG report.  At the same time, he did not believe that Ms. Chesney was guilty of age discrimination.  He did testify that it was his view that Dr. Tsai was trying to "cover his backside" with the Dean, because Dr. Tsai had made "unrealistic" promises to the Dean about increasing the profitability of the Department.  Mr. Donovan believes that Dr. Tsai blamed Mr. Donovan for all of the Department's failings in order to deflect attention from his own shortcomings.  Of course, if that theory is correct, the motivation for Dr. Tsai would have nothing to do with Mr. Donovan's age.  In fact, Mr. Donovan stated in his deposition that it was his view that Dr. Tsai would have blamed him "irrespective of [Mr. Donovan's] age."

Given the testimony of Mr. Donovan and the report of the YMG, defendant believes that this case can be disposed of by summary judgment, thereby sparing the Court a substantial number of trial days.  It usually takes between two and three weeks to obtain a transcript of a deposition.  Defendant therefore requests that it be allowed until April 25, 2013 to file its Motion for Summary Judgment. Defense counsel has inquired by telephone, by email twice and by asking Attorney Palmieri's associate as to plaintiff's position as to this motion.  Attorney Palmieri has not responded to the emails or telephone call, and his associate indicated that she does not have authority to comment on the matter.

THE DEFENDANT
YALE UNIVERSITY

BY: ___/s/ Patrick M. Noonan  (#ct00189)
     Patrick M. Noonan
     Donahue, Durham & Noonan, P.C.
     741 Boston Post Road
     Guilford, CT 06437
     (203) 458-9168

## CERTIFICATION

I hereby certify that, on the above-written date, a copy of the foregoing Appearance was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

                                        /s/
                            Patrick M. Noonan

# EXHIBIT A



# Yale Medical Group

## THE PHYSICIANS OF YALE UNIVERSITY

# Department of Ophthalmology
### *Clinical Operations Assessment*

July 2010

## I. Overview of Project:

At the request of the Deputy Dean of Clinical Affairs and the Chairman of the Department of Ophthalmology in April 2010, the Yale Medical Group (YMG) initiated a clinical operations assessment to identify opportunities to improve staffing, organization, management, clinical operations, billing and collections. This report highlights observations and recommendations as a result of that review.

## II. Goals:

Key YMG and department representatives met to review the financial history of the department. Although billings have increased dramatically with the recent recruitment and ramp-up of new faculty, the increase in collections has not exceeded the increase in expenses, and the department continues to operate with a deficit. It was noted that the department has an unusually high overhead due to the University job classifications and recent upgrade from D level to E level of their technical staff. At that meeting the group outlined the following goals of this review:

A. Identify the appropriate staff model and organizational structure to support the practice. Match staff skills, abilities and licensing to the appropriate tasks.

B. Identify opportunities to improve efficiencies in workflow to control costs. Increase use of technology to minimize error. Ensure completion of daily quantifiable tasks within 24 hours – "A day's work in a day's time".

C. Assess physician productivity, especially with regard to part-time faculty members and use of facility and staff resources.

D. Analyze payer mix, reimbursement rates, and self pay collections. Ensure capture and correct coding of all billable services.

## III. Process:

Interviews were held with 71 departmental faculty, residents, fellows, administration, clinical operations and billing staff to obtain their input on current process and responsibilities and suggestions for areas in need of improvement. Practice operations were observed via walk-throughs and attendance at the waiting room, front desk and within a physician session.

This project has yielded recommendations for improvement in the following areas explored in detail below:

A. Organizational Structure, Practice Management & Staffing

B. Practice Operations

C. Clinical Operations

D. Physician Productivity

E. Billing & Collections

## IV. Organizational Structure, Practice Management & Staffing

A. Observations:

1. The Yale Eye Center (YEC) primarily provides services to patients with medical eye conditions.  Routine eye and contact lens services were recently introduced. Several new faculty members have joined the practice in recent years with more expected. The current faculty and practice support staff is energized by this growth.  Many newer staff members have experience in efficient, productive private practices – they like to learn and be busy!  Most staff appear patient focused, genuinely devoted to the practice and love the work they do.  Faculty and staff stated that for the most part, there is a good, skilled team in place, but agreed that improvements in workflow, structure and oversight would help the practice function much better.  Several physicians described more efficient and productive academic practices that they experienced during their residency, fellowship or previous work engagements.

2. The staff and physicians shared the details of situations that have led to frustration in the workplace:

   - Infrequent or absent communication at all levels: within workgroups, e.g. technical staff or front desk; between workgroups, e.g. between technicians and front desk staff; or between staff and management, e.g. changes in physician work schedules, new outside study protocol starting with one day notice to staff, lack of follow up on requests for new uniforms and name badges, emailing staff of the YMG engagement instead of discussion at a staff meeting; no recognition or acknowledgement of staff by some faculty or Administration. (Not even a Hello!)

   - Several faculty, residents and/or fellows were completely unaware of the practice organizational structure, e.g. who directly supervises technical or front desk staff; who to bring issues on staff performance to; what the Front Desk Supervisor or Practice Manager or Clinical Administrator's role is.

- Undocumented, unenforced and/or inconsistencies in processes, e.g. use of different documentation templates by attending physicians; incomplete documentation and encounter forms; non-use of out-guides for medical records.

- Lack of discipline for inappropriate staff behavior and sub-standard performance, e.g. referring patients outside the practice; technical staff reading email or on Facebook during business hours; technical staff documenting results of tests not conducted.

- Lack of appropriate staff coverage for all operating hours of the practice, e.g. medical records staff who cover each other take lunch together; physician session starts at 8:00 am, assigned technician starts at 9:00 am (technician has agreed many times to come in early on those days but Administration has not properly addressed this, the response is "no overtime").

- Evidence and perception of uneven work assignments among similar staff, e.g. technicians – one technician may see 20+ patients per session, another 3 to 5; main front desk sees 440 patients weekly on average with 3-4 staff, while the boutique front desk sees 140 patients weekly with 2 assigned staff.

- Insufficient training for new employees (especially when new faculty with different sub-specialties join the practice) and lack of continuing education opportunities for technical staff. They want to keep up their skills and feel confident that they are performing well.

3. The current organizational chart (Exhibit A) illustrates the management/reporting silo structure that exists for clinical oversight of the Practice. All clinical activity flows up to the Clinical Administrator/Business Manager, who reports to the Chairman.

4. The Department Chairman is quite active clinically, well-respected for the changes he has made since his arrival 4 years ago and admired by faculty and staff. He is easily approachable and encourages staff input. Any practice issues that may arise are brought directly to the Chairman, Clinical Administrator or Practice Manager and discussed at regular faculty meetings. There is an appointed Clinical Chief but he does not appear to be actively engaged in the daily operations of the Clinical Practice.

5. The Clinical Administrator is not well respected by faculty or staff. They stated that he occasionally walks around the practice, doesn't smile or acknowledge anyone. Faculty stated that he is "the money guy". His knowledge of clinical operations is weak and his management style very hands-off and non-confrontational, yet somewhat dictatorial. He told us that the Practice Manager was responsible for any clinical operations functions, yet he also stated that he was in charge - everything needs to go through him. Those who report to him stated he delegates work and does little himself except make decisions. Faculty consistently voiced concern about lack of resolution to issues repeatedly brought to his attention. It is strongly felt that his inability to address specific situations such as those described below may have contributed to the loss of a faculty member in September this year:

4

a. Poor performance of the Residency Program Coordinator. She was reassigned to this position when the Chairman came 4 years ago. The current Program Director reports that she does things she wants to do instead of what she is supposed to do. She violated the privacy of applicants by mass-mailing an email with names of residency applicants not invited for interviews. She refuses to learn how to use University mandated system for storing evaluation data. Without consulting the Program Director, she told a resident he could finish on June 29th instead of June 30th so he could attend a family function. On every reported incident the response from the Clinical Administrator is always the same – "He will speak to her".

b. The Front Desk Supervisor repeatedly refers patients to an outside competitor. As long as 3 years ago she and other YEC staff had services by a former faculty member and when patients asked, they told them who did the surgery and handed out his business cards. Patients recently seen in the YEC practice were later seen in the operating room (OR) having surgery with the same outside physician. The Clinical Administrator said without hard evidence, there is nothing that he can do.

c. There have been consistent and repeated complaints by faculty and technical staff about the poor performance of the RN Supervisor. She cannot properly schedule technicians to cover the hours of the physicians practice; in 3 years of employment she has still not learned basic ophthalmic skills to support the practice; she is flighty and allegedly has shown evidence of substance abuse. The Administrator's response regarding management of the technical staff is that his hands are tied because they are union staff and we can't change their hours. Although he stated that she had been disciplined about her performance, there has clearly been no positive change as a result.

We also witnessed his lack of clinical operations knowledge. The faculty receives monthly dashboard reports that illustrate their productivity compared to peer institutions and the Clinical Administrator meets with them to address any questions that they may have. In one meeting we attended, he was unsure of the sub-specialties that the physicians were being compared to and if they were a direct match for the YMG faculty being measured. Overall, we found errors in how some faculty were represented both in terms of sub-specialty benchmarks and reported CFTE.

6. The Practice Manager is well-liked but her role was unclear to many. She stated that she spends most (60%) of her time filling in at the front desk in the practice, greeting patients, and answering phones. Faculty stated that she is visible in the Practice, "puts out fires" but is ineffective at determining root cause of issues or affecting positive change and resolution. She stated that frequently "her hands were tied". For example, she is expected to discipline staff, but cannot work directly with Human Resources, since the Clinical Administrator has designated himself as the only point of contact. She is generally and obviously unhappy. She has resigned her position effective June 30, 2010.

7. The Front Desk Supervisor directly supervises front desk and patient phone reception staff, medical records staff and the surgical coordinators. She spends most of her time working at the front desk, completing her assigned supervisory work, e.g. GE scheduling maintenance, as well as greeting patients and answering phones. Some of her staff felt that was not appropriate for a supervisor to be doing their clerical & technical (C & T) work on a regular basis. Faculty and staff described her as abrasive, unfriendly and indiscreet when discussing sensitive employee issues – never using her office. She appears to be technically savvy and on top of the daily tasks that help keep the practice running as smoothly as she is capable of. However, she is clearly not an effective manager, given the inefficiencies in processes that she is responsible for and the continuing staff performance issues. Some are consistently reported to be unproductive, unskilled, disrespectful and unfriendly to their peers, faculty and patients.

8. The Clinical RN Supervisor is not at all respected by her direct reports or faculty due to her lack of technical skills and lack of desire to learn. She is responsible for supervising and scheduling all technical staff (not photography), yet every day there are issues raised about lack of coverage, poor performance, patients backing up, etc. Her management skills are weak and she does not have a clear sense of how to improve overall practice operations. She pulls in residents to help cover the patient flow more as a rule than an exception. She is also responsible for triaging calls of a clinical nature, yet frequently needs to consult with the technicians to resolve the calls. She gets anxious when stressed and does not always provide a calming presence with patients.

9. The Photography Manager is very well-liked but does not appear to really manage anything. He is very helpful, taking on tasks that need to be done, fixing technical issues and filling in for the other 2 photographers wherever needed. He reports that he spends 75% of his time on direct patient care and 25% supporting all the technical needs of the Practice. He also manages the faculty on-call schedules. Faculty stated that photography services frequently get backed up and the staff could be more productive.

10. The Technical Support Staff are either Certified Ophthalmic Assistants (COA) or Technicians (COT), depending upon the amount of training, experience and testing they have had. The University upgraded these positions in 2005 or so, but no distinction was made between the levels of certification. So D's became E's due to the complexity of the testing and other procedures they do. Faculty consistently praised many of the technical staff with the exception of two underperformers. They use the union as an excuse to not work over their scheduled hours or assist their peers if not busy. The two technicians with the best work ethic (as named by the residents) happen to be those who are YNHH –leased. The technicians are assigned to work with specific sub-specialty physicians, and as a result they do not have routine exposure to all types of diagnostic testing that they were trained to do

11. The Administrative Support staff is located near the faculty offices. They spend the majority of their time on clinical support tasks for assigned faculty, however

6

some have non-clinical tasks assigned, e.g. medical students and fellowship recruitment. They report to the Chairman's Executive Assistant who is primarily devoted to non-clinical tasks to support the Chairman. She is located on a completely different floor than the Administrative Assistants, so they are largely unsupervised. From our observations, these individuals do not appear at workload capacity. Based on their estimates, this is how their time is spent:

|  | Transcription | Telephone Reception | Scheduling & Pre-Certs | Medical Records | Non-Clinical Work | Cash Deposit/ Billing Support | TOTAL |
|---|---|---|---|---|---|---|---|
| Sandy | 0.20 | 0.20 | 0.10 | 0.10 | 0.40 | | 1.00 |
| Bonnie | 0.20 | 0.50 | 0.10 | 0.10 | 0.10 | | 1.00 |
| Paula | 0.50 | 0.20 | 0.10 | 0.20 | | | 1.00 |
| Lisa | 0.30 | 0.20 | 0.40 | 0.10 | | | 1.00 |
| Marina | 0.10 | 0.10 | 0.15 | | 0.20 | 0.45 | 1.00 |
| TOTAL | 1.30 | 1.20 | 0.85 | 0.50 | 0.70 | 0.45 | 5.00 |

B. Recommendations:

1. Organizational Chart: Refer to Exhibit B for a proposed organizational chart that includes some recommended changes in reporting structure. According to the Medical Group Management Association (MGMA) staffing benchmarks, (2009 Cost Survey, Multispecialty by Geographic Section, not Hospital or IDS owned, Eastern U.S.), the table below summarizes the staff required to support the listed functions based on:

   - Reported 10.3 CFTE represented by 23 different providers (includes full time and part time attending, fellows and the optometrist)

   - Total work RVU's for FY10 = 74,727.

   - Number of unique patients (12,246 as of 6/24/10).

   This analysis does not take into account the following Administrative, Accounting or Clinical Trials support staff: Sarah, Marina, Erica, Alice, Maria, Julieann, and Jennifer. Refer to Exhibit C for the full analysis.

|  | Benchmark Category | Current Positions | MGMA per CFTE | MGMA per work RVU | MGMA per Patient |
|---|---|---|---|---|---|
| 1 | Phone & Front Desk Reception, Appointment | *9.0 | 12.2 | 11.0 | 9.8 |

| | | | | | |
|---|---|---|---|---|---|
| | Scheduling | | | | |
| 2 | Medical Records | 2.0 | 3.2 | 2.5 | 2.5 |
| 3 | Secretarial & Transcription Support | 4.0 | 1.0 | 0.7 | 0.8 |
| 4 | Charge Entry/Billing | *3.0 | 1.8 | 1.6 | 1.8 |
| 5 | Practice Management | *2.0 | 2.8 | 2.2 | 1.7 |
| | **Sub Total Operations Staff** | 20.0 | 21.0 | 18.0 | 16.6 |
| 6 | Clinical Support Staff | **14.0 | 11.9 | 10.0 | 11.5 |
| | **TOTAL Staff** | 34.0 | 32.9 | 28.0 | 28.1 |

* Includes 1 open Receptionist position, 1 open Clinical Practice Specialist position, 2 part-time billing casuals and 1 open Practice Manager position.

**Includes the Temple Technicians, RN Supervisor and all Photographers.

2. This benchmark analysis shows that overall **the practice is more than adequately staffed to support the number of reported CFTE**. Elimination of current inefficiencies in assignment of work and workflows can support increased patient volume and associated work without adding to staff. **The current open receptionist and Clinical Practice Specialist positions do not need to be filled. A full time charge entry person is needed and can replace the 2 part-time billing casuals. The Practice Manager position needs to be filled.** The practice should consider keeping some casual help over the summer if the recommendations for process improvement in this report are implemented.

3. Overall, clinical operations management is extremely weak at all levels: Clinical Administrator, Practice Manager, Clinical Supervisor, Front Desk Supervisor and Photography Supervisor. There are underperforming and unfriendly staff that have not been properly disciplined. The Practice is not properly staffed for all operating hours. Almost every day patient flow comes to a halt because of unavailable exam rooms that are assigned to specific physicians, yet exam rooms in other locations are empty. One photographer can be overwhelmed with patient tests, while the other is not.

4. It is recommended that the Clinical Administrator be replaced. The Clinical Administrator needs to have a firm understanding of what is required to run an efficient, productive practice. They must effectively delegate responsibility for daily operations, however immediately address any issues that may negatively affect physician productivity or patient care. They must be completely engaged in the development of best practices and Quality Assurance procedures when systems fail.

5.  An effective, empowered Clinical Practice Manager is also needed to bring all the components of this busy Practice together.  The right person must have the knowledge, skills and ability to ensure safe and smooth daily operations of the clinical practice.  It is recommended that the Practice Manager be a Grade 26 YMG managed employee who is physically located within the clinical practice.  All reception staff, medical records staff and surgical coordinators should report directly to this person.  The Front Desk Supervisor position can be eliminated and the current employee reassigned.

The Practice Manager's responsibilities include:

Management and direct support of the daily clinical practice operations, including documentation and enforcement of YMG Practice Standards and Processes including but not limited to:

- Patient Access and Scheduling
- Telephone and Front desk reception
- Communication with Referring physicians
- Billing Compliance – coding, documentation and training
- Patient Accounts Management – encounter form reconciliation and self pay collections
- Financial Counseling

Documentation and enforcement of clinical operational policies, e.g. standard protocols and use of templates and forms such as informed consents; new patient packets; reconciliation of orders; review of results and notification to patients, etc.

Reviewing the daily practice schedule to ensure that there is sufficient management, technical and administrative staff coverage and overlap for all operating hours of the practice.  Stagger hours, rotate early / late shifts, and work assignments based on anticipated patient volume and with consideration for individual service needs of faculty and patients.  Ensure that this schedule is communicated to all faculty and staff.

Maximizing the productivity of physicians by:

- Managing physician schedules – maximizing space, time and staff.
- Monitoring daily patient flow and immediately addressing any backlogs
- Monitoring physician attendance, tardiness and efficiency.
- Monitoring physician billing and documentation compliance.

Ensuring that staff has standard attire, lab coats, scrubs, etc with name tags to clearly identify their names and level of licensure.  It was suggested that the front desk staff wear more professional attired, like white blouses and khakis, to distinguish from technical staff who wear scrubs.  The faculty should also be distinguished from resident and fellows by color of lab coats for example.

9

Documenting and enforcing personnel policies, giving performance feedback to all staff. They must work within Union guidelines to counsel and discipline staff.

Ensuring that staff has proper training, continuing education and access to all technology available to facilitate their workflow. For example, the YNHH technician needs access to SCM, the residents need read only access to IDX scheduling to help with practice workflow and for off-hours call coverage and if adopted, all staff will need read only access to GE Centricity EMR to view notes.

Encouraging a Team-oriented, Customer Service-focused environment by improving communications among the various faculty and staff in the practice. Regular staff meetings are critical in not only disseminating information critical to individual work flow, but allow the opportunity for staff to share ideas and work collaboratively on designing solutions to issues that arise in the workplace.

6. The Clinical Chief should work in close collaboration with the Practice Manager and Clinical Supervisor on any day-to-day workflow issues that may arise such as scheduling conflicts, personality or performance issues of faculty or technical staff. They can help to ensure that faculty needs are being met as well as those of the practice, e.g. adherence to YMG Practice Standards such as timely completion of documentation and coding of services. The daily presence of a Clinical Chief would allow for more immediate resolution and offload this responsibility from the Chairman.

7. A strong, Ophthalmology trained, Clinical Supervisor who effectively manages the clinical practice schedule is needed. One of the current technical staff may be a good, willing candidate to fill this role. Consideration for direct patient care time must be considered if the Orthoptist assumes this responsibility. A lead technician may also be needed to step in if the Supervisor is not readily available

It is not clear that a full-time RN is needed in the practice. The State of Connecticut requires that injections be administered by a physician or RN. According to the number of Fluoroscein Angiography (FA) services billed in FY10 it is estimated that 3-4 injections are required each day. These can be administered by the physicians, fellows or residents. Another option would be to sub-contract for nursing services with another YMG practice in the Temple facility. A third option would be to schedule these services in specific sessions and employ a part-time RN to administer the injections.

It is also recommended that for consistency, the Clinical Supervisor should be directly responsible for the Photography Services and manage their work schedules and workflow. The focus of the Clinical Supervisor should be on daily monitoring of patient flow, exam room utilization and technical support, and provide hands-on technical assistance wherever needed. Specifically, this position:

a. Oversees daily patient schedule by physician, technician, photography, etc. to ensure proper staff coverage to identify and address potential bottlenecks before they occur.

b. Ensures that adequate technical staff is available for all operating hours of the practice.

c. Ensures that any clinical support staff is responsible for and functioning within their scope of practice.

d. Manages inventory of supplies and medications.  Keep track of stock, ordering and dispensing.

e. Manages staff schedule for rotating coverage of daily clinical call triage (if adopted).

f. Oversees training schedules for new staff, re-training of existing staff and cross training within functional units.  Ensure exposure to all elements of the practice operations before allowing new individuals to work independently.

g. Works in collaboration with the Practice Manager on standardization and improvements in work processes, e.g. maximizing use of facility, staff and other resources to increase patient flow and physician productivity.

8. Clinical Operations Support Staff:

General recommendations for distribution of primary work assignments in the table below is supported by internal YMG or MGMA benchmarks.

|   | Job Title or Function | Daily Volume Estimates | YMG Benchmark | Proposed |
|---|---|---|---|---|
| 1 | Telephone Reception & Scheduling | 138 | *60 calls/day | 2.5 |
| 2 | Front Desk Check In & Check Out | 120 patients, 240 encounters | 50 patients to check in or out/day | 5.0 |
| 3 | Financial Coordinator/Insurance Precerts/Surgical Coordinators | See below | See below | 3.5 |
| 4 | Medical Records | 126 | 55 charts/day | 2.0 |
| 5 | Billing Review & Charge Entry | MGMA | MGMA | 2.0 |
| 6 | Transcription & Other Admin. Support | MGMA | MGMA | 1.0 |
| 7 | Practice Management | na | na | 2.0 |
|   | TOTAL Practice Support Staff | | | 18.0 |

* Established benchmark is 100 calls per day for pure reception and triage.  Many calls in this practice require scheduling of new patients so the true benchmark is less.

11

It is recommended that four of the five Administrative Support staff (Sandy, Paula, Lisa and Bonnie) and all clinical work currently done by them be incorporated into the practice workflow, e.g. telephone reception, scheduling and medical records. They should report directly to the Practice Manager. Tremendous efficiencies in their workflow can be gained by implementing an outside transcription service (addressed later in this report). Marina can help support the non-clinical work currently performed by the other administrative staff. The billing support she currently provides (sorting encounter forms) can be eliminated by improving the encounter form reconciliation and completion process.

9. Surgical Coordinators: A survey of other academic institutions indicates that YEC should allocate more resources to this function:

| Institution | # of Surgical Schedulers | # of Physicians (not CFTE) | Annual # Surgeries | # Surgeries per Coordinator |
|---|---|---|---|---|
| Maryland | 1.0 | Not reported | 700 | 700 |
| Ohio State | 4.0 | 29 | Not reported | |
| New Mexico* | 1.0 | 5 | 1,000 | 1,000 |
| Washington | 3.0 | 22 | 1,440 – 1,680 | 520 |
| YALE** | *2.0 | 11 | 1,500 | 750 |

* New Mexico is planning to add 0.5 FTE – will reduce work to 667 surgeries per coordinator.

** Does not include the surgical scheduling work effort done by one technician. Surgery volume annualized as of 4/30/10.

10. Financial Counselor: It is recommended that a Financial Counselor position is created within the current staff structure. This person is responsible for ensuring that financial arrangements are in place for reimbursement of all complex, experimental or non-insurance covered services provided by the practice. They obtain member benefits, preauthorization's and meet with patients to counsel them on self pay services, set up budget or pre-payment plans, etc. Since this function is not currently assigned to one individual and instead provided by many, e.g. the Practice Manager, technicians, the front desk supervisor and the Clinical Practice Specialist, it is difficult to judge how much work this will generate. It is not expected to be a full time position, however, so this person can also work as a team with and back up the surgical coordinators. It is expected that the Practice Manager would also cover for the Financial Counselor. The current Front Desk Supervisor has the skill-set to perform this function, however her suitability for

the position based on her customer service skills and past performance would need to be evaluated.

11. Billing & Reimbursement Staff: There is no need at this time to replace the shared Clinical Practice Specialist position. Reimbursement responsibilities such as appeal of denied services and accounts receivable management and analysis can be provided centrally by YMG. A full time charge entry person should be hired. Some of the current temporary staff should be retained until efficiencies can be gained with workflow improvements on encounter form completion. The current Billing Specialist should be responsible for:

   a. Supervising charge entry, including hands-on support as needed, e.g. end of month.

   b. Communication with YMG for all billing and reimbursement related functions, e.g. response to PPIF.

   c. Auditing records and providing coding education to physicians and staff.

   d. Collaborating with YMG to provide faculty training on coding

   e. Collaborating with the Practice Manager on the development and enforcement of self pay collections practices.

12. Technical Staff: Existing COAs who were grandfathered into the E level position should be encouraged to obtain COTs. This involves 50% of the current staff. The Department should set timelines, fund training and allow time for this. COT level certification should be required for any future technical hires. The generous paid time off benefits provided to Clerical & Technical employees creates a management challenge. If a technician were to take all time off allotted to them, it is estimated that one person generates 0.82 FTE work effort (Exhibit D). According to the MGMA benchmarks, the practice is sufficiently staffed with technical support. Operational improvement and changes in work assignments should allow them the opportunity to be more productive.

## V. Practice Operations

### A. General

1. Observations:

   a. The practice was located adjacent to YNHH until approximately five years ago when it moved to the current location. There are 2 distinct patient care "sides" to the practice where patients can enter and check in. Physicians are generally assigned to each area based on their sub-specialty. Frequently patients show up at the wrong desk. The main reception area services retina, pediatrics, cornea and glaucoma. It is a high traffic area and there is no signage to direct patients specifically where to go for check in or check out, although it is physically structured with different areas for these functions. There is only one sign that firmly states that they do not validate parking. There are no privacy limits so patients easily overhear the conversations of

13

others. The boutique reception area primarily provides oculo-plastic and refractive services, has less patient volume and 2 receptionists. The main reception area has a place for 4 receptionists, one of which is occupied by the Front Desk Supervisor due to a staff vacancy.

b. Patients frequently have difficulty maneuvering the front door as it heavy and does not have an automatic opening feature. The main area has two large waiting rooms that are not optimally spaced to accommodate the typical volume of patients, visitors, wheelchairs and strollers. If one waiting room is full, patients may go to another one nearby. Technicians or physicians will call out patient names trying to locate them because there is no other means to communicate where they are.

c. It was estimated that 20% of the patient population is Spanish speaking. No staff and only a few physicians are Spanish-speaking.

d. Two surgical coordinators book surgeries for patients brought to them by the technicians. They have developed a surgical booking sheet used by all technicians that has facilitated their busy workflow. They organize the surgical charts and meet with patients in a small shared office to review pre-operative instructions. They coordinate schedules with the operating rooms, patients and physicians. Pre-authorizations for surgeries are obtained by the administrative assistants located adjacent to the faculty offices.

e. Patients checking out at either front desk can have return visits booked by the front desk staff. No appointment or business cards are available to give to patients. Technicians may book diagnostic procedures, obtain pre-authorizations and some book surgeries for patients. The Front Desk Supervisor indicated that her staff collects cash due for that date of service but are not trained on how to collect past balances. She was not aware of the new Clinical Practice Boot Camp training that YMG is currently offering to reception staff.

f. The medical records staff covers the front desk at the beginning of day, lunchtime and end of day. One noted that she made 3 separate cash collections that required 3 deposits and cash outs so she didn't have to carry the cash around with her all day. If not greeting patients, reception staff also prepares new blank charts and work on daily reports such as the past pending and managed care referrals, and Televox cancellation reports.

g. Several faculty and staff complained that the front desk staff is generally unhappy, unprofessional and unfriendly. Some individuals are good to work with, but not all. They wear telephone headsets so it is difficult to know if they are on a call or not when you approach them and they do not acknowledge anyone in front of them if they are on a call.

h. Front desk staff complained that they are not informed when the physician is running late. They indicated that they may have patients waiting up front and may need to let them know what is happening. On the few occasions spent in the waiting room, we witnessed several patients waiting up to 30

14

minutes or more, without any acknowledgement by staff, although the front desk was not busy.  Several faculty and staff also shared instances where patients were forgotten in the waiting room, because they did not officially check in, or their appointment status was not updated in the system for technical staff to know they had arrived.

2.  Recommendations:

a.  All staff should attend Customer Service Training.  All reception staff should attend Front Desk Boot Camp Training.

b.  Establish clear signage to direct patients to the correct location for their appointment.  If physicians see patients in more than one location, use removable name plates and update daily according to where they see patients.

c.  Add signage to the reception areas to clearly identify areas for patient to check-in and check-out.  Highlight appropriate waiting areas near the desk (e.g. imprints of feet or a line on the floor with an explanatory notice) to address HIPAA privacy guidelines.

d.  Install TV monitors in waiting rooms.  Provide educational videos tailored to those services that Yale provides.  Provide reading materials and informative posters.  Make it fun – many wait a long time.  Offer pencils and checklists of "Questions for my Doctor" to remind patients of their needs before they see their physician.

e.  Segregate front desk check-in and check-out from telephone reception.  Greeting patients face-to-face while talking on the telephone is not providing good customer service to either recipient.  It is important to have the most pleasant and informed staff on the front line answering incoming calls because this first impression a caller receives of the practice is frequently a lasting one.  Staff cannot be distracted by having to juggle multiple tasks such as checking in patients, collecting cash or looking for medical records.

f.  Incorporate current administrative staff into the telephone reception workflow.  Assign primary tasks to individuals, but cross train all staff to perform all check-in, check-out, medical records, telephone reception and scheduling functions.  Develop clear protocols for scheduling new patients into the practice, clearly defining what situations require urgency or escalation to clinical staff or management.  Having dedicated, knowledgeable telephone receptionists will ensure that new patient scheduling is properly managed.  Ensure all referred records are obtained in advance of the first visit. If the administrative staff stays in their current location make partitions higher to alleviate noise.  Ideally they should be located adjacent to the medical records room.

g.  Implement a check-out routing form for every patient seen.  The check-out form should contain instructions for follow-up tests or visits needed.  This will eliminate many of the scheduling changes needed to change visit types.  Ensure that the patients stop at the check-out desk with their completed check-out and encounter forms before leaving the practice.  All patients should

15

be required to do this, whether they have follow up work needed or not, as this is a way to close the loop consistently for each patient encounter. Ask the patients if they have any other questions before they leave! Ensure they have appropriate reminder notices or patient instructions, in English or Spanish.

h. Provide appointment reminder and/or faculty business cards to patients as appropriate.

i. Reconcile all encounter forms to the daily arrived patient visit list. Follow up with physicians prior to the end of the clinical day to complete any missing information.

j. The practice frequently provides services that require self pay collections at the time of service. It is recommended that a Financial Counselor position be established. This person can meet directly with patients who are likely to have large out-of-pocket expenses such as refractive surgeries, off label treatments, premium services such as lenses. They can obtain financial waivers or advanced beneficiary notices, and set up payment plans as well as inform reception staff of what should be collected at each visit. In collaboration with the Practice Manager they can establish systems to ensure the proper collection protocol is followed at the time of service. This person should be cross-trained with the Surgical Coordinators so they can cover for one another.

k. Implement the GE Front Desk application to allow posting of cash payments directly into the system. This eliminates the cumbersome paper process currently in place.

## B. Telephone

1. Observations:

a. There are two queues off the main incoming telephone line to the practice. The front desk reception staff answers the patient press. The Administrative Assistants located near the faculty offices answer the physician press. They all indicated receiving calls other than those intended for them. Pharmacists don't have a press option so they typically press one. Faculty complained of the length of the telephone tree message and that there is no option to just speak to someone in the practice.

b. In addition to answering the main telephone line for patient calls, the front desk staff checks patients in and out, schedule follow-up visits and collect cash. If they take a call that requires a clinical call back to the patient, they will take a message and then leave the desk to go retrieve that chart and record the call on the telephone log for the RN Supervisor to resolve. If she gets backed up (usually every day) then the Practice Manager and Photography Manager will step in to help.

16

c. Frequently insufficient information is obtained on the initial call so the patient is called back for clarification, or just to let them know that their call was received and that it is being researched.  Reasons for calls are:

- Questions about appointments
- Prescription refills
- Pre-op instructions
- Clinical questions, e.g. how to use eye drops

d. A technician is typically needed to resolve the questions that the RN Supervisor cannot.  Residents are on call after the practice closes and said they sometimes need to follow up on clinical calls received during the day that remained unresolved.  Patients also may call the evening of or day after an appointment to ask questions about their treatment, request refills of prescriptions, etc.

2. Recommendations:

a. Eliminate the 2 phone queues for patients and doctor calls.  Re-engineer the phone tree and processes for managing all types of phone inquiries.  Utilize voice mail boxes to more efficiently triage all calls to the practice. Phone presses should be for specific tasks, not physicians, with specific staff assigned to respond to each press. Communicate to patients wherever and whenever possible of the expected turn around time for responses to their messages.

b. Install IDVR to monitor staff performance and patient compliance.

c. Use a voice mail box for routing prescription refills.  Identify specific staff who are responsible to pick up messages at designated times per day.  This allows them to pull medical records for physician review and then follow up on the requests more efficiently.

d. Rotate assignment of technicians on a daily or weekly basis to handle clinical call backs.  Assign a tech to take and only respond to calls and voice mails of a purely clinical nature throughout the day.

e. Install a courtesy phone for patients to use to make local calls for rides.

C. Scheduling:

1. Observations:

a. The Front Desk Supervisor is responsible for maintaining the physician scheduling templates.  The onus is placed on individual physicians to communicate changes needed in their templates if they encounter problems with their schedules.  However there does not appear to be global oversight to assess the impact on the overall clinical workflow when individual schedules change in conjunction with room assignments, technical assignments, photography, other resource needs and patient volume.  Frequently technicians are faced with 5 or 6 patients arriving at the same time that they

17

need to prep for the physician. This puts them immediately behind. Ideal ratios of new to return patients is not well maintained by physician, or patients are booked heavily on Friday AM but light in PM – so staff can leave on time! One physician personally reviews her schedule in advance to ensure that she will have the proper amount of time and technical resources to manage the patients that are scheduled. She knows how much time certain visits take and how many simultaneous patients can be processed when she is alone or has help.

b. New patient scheduling is handled by the front desk receptionists who also check patients in and out for their visits. The Chairman's Executive Assistant arranges VIP appointments but must work with other staff to get the appointments booked into GE.

c. Multiple similar visit types exist based on the length of visit each physician wants. Some procedure visits are directly scheduled in GE if the scheduler knows in advance the tests the patient will have. Some patients routinely have a battery of tests done at each visits, although many faculty and staff said some could be done on a subsequent date. For example, required visual field testing is performed as a convenience on the same day a patient is dilated for exam, although this is not clinically ideal. Most procedures performed are not centrally logged or scheduled in to GE system. This can lead to missed billing, as there is nothing to reconcile missed charges to.

d. Administrative Assistants obtain pre-certifications for surgeries. They keep away-schedules for physicians and inconsistently communicate changes to the Front Desk Supervisor to coordinate with their practice schedules. This results in cancelling patient appointments with little notice. Technical and Front Desk staff do not have one source to determine where a physician may be on a particular day, especially if their schedules have changed.

e. Appointment visit statistics for FY10 to date as of 6/22/10 show a very high number of cancellations (11,058) compared to the number of arrived visits (24,820):

| Category | # Cancelled | % Canc. On/after appt. date | % Canc. Within 1 day of Appt. | % Not Rescheduled | % visits orig sched > 180 days |
|---|---|---|---|---|---|
| Pt. Cancel no Reason given | 7,649 | 25% | 13% | 33% | 12% |
| *Change Pt. Visit Type | 1,371 | n/a | n/a | n/a | n/a |
| MD Bump | 841 | 25% | 15% | 43% | 8% |
| Televox Cancel | 633 | 6% | 9% | n/a | 17% |
| Pt. Cancel with Reason | 487 | 53% | 21% | 36% | 9% |

18

| | | | | | |
|---|---|---|---|---|---|
| Pt. left | 50 | 100% | 0% | 60% | 4% |
| Deceased | . 27 . | 19% | 15% | n/a | 26% |
| TOTAL | 11,058 | | | | |

    f.  Many of the Patient Cancelled without a reason given were for appointments that were booked, cancelled and rescheduled on the same date. Further explanation was that the patient changed their mind when talking to the scheduler or the patient was booked with the wrong visit type, e.g. post-op when it should be return or new. Change patient visit type category was used for similar circumstances. This category also contains appointments that were originally booked as a clinical trial visit but the patient was no longer enrolled in the study.

2.  Recommendations:

    a.  The physician scheduling templates need to be better thought out to integrate with the clinical work flow and utilization of space. Better management and consolidation of visit types and oversight of the daily schedule of patients is best accomplished by a collaboration of front desk and clinical management staff. Physicians should not need to spend their time managing their schedules. Visit types can be designed to block appropriate time and resources in a way to better manage the patient and work flow.

    b.  Establish specific schedules for photography, visual field testing, minor procedures, injections and any other high volume/dollar procedures to assist with anticipating staff needs and enhance revenue capture. Schedule all required tests known at the time of check out to be needed at the return visit. Add-on services through-out the day, e.g. procedures, photos, should be scheduled in GE directly as they are ordered. As services are provided, the appointment status should be updated to reflect what has occurred, i.e. arrived, no show, canceled or rescheduled. The past pending report should be reconciled daily. This process is important to generate a reconciliation list to ensure capture of all billable services.

    c.  The current visit types need to be reviewed with an effort to simplify yet reflect the true time needed for each service the patient will have. All patient visits should be entered directly into GE by the person making the arrangement with the patient.

    d.  All follow up scheduling and pre-certifications should be obtained by front desk personnel as part of the check-out process. Visits can be scheduled at check-out while the patient is still present, but pre-certs can be obtained at a later time. Organize work schedules and locations of staff to complete this work on a daily basis. Any work generated should be completed within 24 hours to avoid a back log.

19

e. Schedule elective or non-urgent testing as a specific type of return visit if there is no inconvenience to the patient. This will ensure charge capture and ease patient flow.

f. Limit return visits to six months and instead book reminder call visits beyond that. Staff can work from lists to call patients and book appointments at that time. This should reduce the number of cancelled visits.

g. Create an interpreter-needed visit type and book these to use as a reminder that the appropriate resources are available at the time of the patient's visit.

h. Develop clear protocols for scheduling new patients into the practice. Advise them on the true length of time that visits will take. Establish a standard process that all staff follows to obtain outside medical records in advance and send out information packets, directions, new patient history sheet. Provide similar information on the practice website. Having dedicated telephone reception staff will ensure that all records are received in advance of the patient's visit. Identify a central fax number for records instead of separate faxes in clinical area.

i. Implement the GE Patient Tracking application to improve communication between the reception areas and clinical staff on patient flow. Staff can keep track of where the patient is physically located (e.g. waiting room, exam room, testing), and physician workflow to keep patient informed of progress. Inform patients of the wait standard, (e.g. 15 or 20 minutes) and acknowledge any who have been waiting longer than that.

j. Utilize shared Outlook calendars to track overall physician schedules.

D. Medical Records:

1. Observations:

a. Each physician writes their progress notes directly into the paper chart, and consult letters are dictated. Different templates and forms may be used by different physicians of the same sub-specialty. Administrative assistants transcribe the consult letters and manage the copying and mailing out to referring physicians. Each of the five administrative staff estimate 10 – 50% of their time is spent on transcription and mailing, depending on the physicians they support. Some of the physicians were allowing their administrative assistant to rubber stamp their documents. The administrative assistants store copes of all transcribed documents on their individual hard drives. They also process requests for copies of medical records for patient, attorneys, etc.

b. All staff spends a considerable time looking for medical records. Not all records are available at the time of the patient visits, so technical staff will search after patient's check in. Sometimes the patient is seen without a record in hand. Frequently records are found in the faculty offices because documentation is not completed. When a record is available for an MD

appointment, the documents are not always assembled or attached. Frequently charts are missing when a patient arrives for their visit and the chart is found filed in the medical records room. New patient referred records are frequently missing at the time of the patient's visit.

c. Yellow out-guides are supposed to hold loose filing, however staff finds stray papers in many locations throughout the practice. Red out-guides are supposed to be in place when a chart is removed. There is not 100% compliance with this practice either.

d. A dummy record is created for all surgical cases. Copies of progress notes, specific forms and orders for the surgery are maintained there. The record is with the physician for the procedure. When the procedure has been completed the documents are then refiled back into the main medical record.

e. Documentation in the record is not always complete. Medical record staff and surgical coordinators review each document to ensure completeness, and even checking content. Each document requires MRN, patient name, etc

2. Recommendations:

a. Implement a transcription service (e.g. ASP.MD or Phoenix Medcom) to allow web access to correct, sign notes, auto fax to referring and view in Centricity EMR (CEMR) or on the web. Dictated notes are available the next day for review and sign off via the internet. ASP.MD will also auto email, fax or mail letters and/or progress notes to referring physicians. All of this data is then readily available in the CEMR. If this solution is not implemented, all documents currently stored on the individual desktops of the administrative staff will need to move to a secure shared drive according to University policy for compliance with the HITECH act.

b. Medical records staff must be 100% devoted to medical records and not be pulled to cover other positions on a regular basis. Every chart must be located on the day before a patient appointment, reviewed for completeness, with all papers fastened and in order. All medical records should be returned to the file room by the end of each day. Enforce the use of out guides to track unfiled records. Allergy stickers should be present on all patient records.

c. It is anticipated that the new Epic EMR solution will not be implemented in YMG for at least a year or two. In the meantime, it is recommended that all clinical and billing staff have read-only access to CEMR. This will enable them to view YNHH lab results and 3rd party vendor transcribed patient notes. This will especially help physicians who are off-site.

d. Develop consistent standards for documentation templates and forms used by the various sub-specialists. Monitor physician compliance with completing and signing documentation in a timely manner. All charts must be returned to designated areas within the practice at the end of each day. They should not remain in physician offices.

## VI.   Clinical Operations

A. Observations:

1. There are a total of 28 exam rooms organized into 3 "pods" of activity based on the sub-specialists assigned to each area. There is one larger procedure room, 2 photography rooms and 5 special testing rooms available to service all patients.

|  | Avg. daily pts | MDs per day | Techs | Exam Rooms | Procedure Rooms | Photo Rooms | Special Testing Rooms |
|---|---|---|---|---|---|---|---|
| *Boutique | 28 | 1-2 | 1-2 | 6 | 1 | 0 | 0 |
| Retina/Peds | 47 | 2-4 | 1-3 | 10 | 0 | 1 | 4 |
| Glaucoma/Cornea | 41 | 2-4 | 2-3 | 12 | 0 | 1 | 1 |

*There are only 3 sessions a week with 2 physicians assigned to the Boutique area.

2. There are 3 main waiting rooms that frequently get over-filled with patients, their guests and wheelchairs. There is a significant number of sub-waiting areas throughout the practice. These create trip hazards if patients or guests stretch their feet into the hallways. Patients have limited eyesight and do not maneuver well.

3. The 2 pediatric rooms and the procedure room are the only rooms certified for clinical trial use. There is one baby room in the retina pod that has a stretcher. Every section except retina has a sliding chair to accommodate wheelchairs. Physicians need to unlock and move chairs to access the back of the patient.

4. Exam rooms are stocked by the technicians based on the sub-specialty assigned so set-up is inconsistent and do not contain all supplies & forms needed for all physicians. Some staff indicated that they hide certain supplies so they are always available to them.

5. Physicians are assigned at least one technician and sometimes two per session. The patient volume/assigned workload per technician is inconsistent:

| Provider | PT/FT | Primary Specialty | Type | Office Sess/wk | Prime Tech | Second Tech | Location | Average Arrived Visits | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  | BTQ | Cornea | Retina | TOTAL |
| Bernardino | Assoc. Prof. | Oculoplastics | Surg | 4.5 | Judy Br | Any | Boutique | 53 |  |  | 53 |
| Mayer | Asst.Prof. | Glaucoma | Surg | 4.0 | Janet R | Judy Ba | Boutique | 52 |  |  | 52 |
| Lee | Asst.P | Cornea | Surg | 6.0 | Janet | Any | Btq/Co. | 17 | 33 |  | 50 |

22

| | rof. | | | | R | | rn | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Shayegani | PT | Cornea | Surg | 3.0 | Judy Ba | Janet R | Btq/Corn | 17 | 8 | | 25 |
| Forster | PT | Comp | Med | 1.0 | Judy Ba | Any | Corn/Glau | | 6 | | 6 |
| Tsai | Chair/Prof | Glaucoma | Surg | 3.0 | Lori D | Gail G | Corn/Glau | | 36 | | 36 |
| Shields | Professor | Glaucoma | Med | 4.0 | Lori D | Gail G | Corn/Glau | | 36 | | 36 |
| Loewen | Asst.Prof. | Glaucoma | Surg | 3.0 | Lori D | Gail G | Corn/Glau | | 24 | | 24 |
| Walsh | PT | Neuro-Ophth | Med | 2.0 | Any | | Corn/Glau | | 11 | | 11 |
| Anderson | PT | Low Vision | Med | 1.0 | Any | | Corn/Glau | | 1 | | 1 |
| Parke | PT | Low Vision | Med | 2.0 | Any | | Corn/Glau | | 3 | | 3 |
| Tarud | Instructor | Contact Lens | Med | 8.0 | Deb F | | Corn/Glau | | 45 | | 45 |
| Salchow | Asst.Prof. | Strabismus | Surg | 4.5 | Pam R | Peggy | Pedi Ret | | | 45 | 45 |
| Huang | Assoc. Prof. | Retina | Surg | 5.0 | Vicki | Any/RN | Retina | | | 97 | 97 |
| Adelman | Assoc. Prof. | Retina | Surg | 4.0 | Vicki | Any/RN | Retina | | | 48 | 48 |
| Stoessel | Assoc. Prof. | Retina | Med | 7.0 | Jaime | | Retina | | | 23 | 23 |
| Kempton | PT | Retina | Surg | 2.0 | Vicki | | Retina | | | 7 | 7 |
| Seth | Fellow | Retina | n/a | 1.0 | Vicki | | Retina | | | 6 | 6 |
| Materin | Asst.Prof. | Oncology | Surg | 3.0 | Vicki or Jaime | | Retina | | | 10 | 10 |
| *Gaudio | PT | Uveitis | Med | 1.0 | Vicki | | Retina | | | 0 | 0 |
| *Abrahams | PT | Uveitis | Med | 1.0 | Vicki | | Retina | | | 0 | 0 |
| | | | | | | | TOTALS | 139 | 203 | 236 | 578 |

*Patients for Drs. Gaudio and Abrahams are booked into Dr. Huang's schedule, so their arrived patient volume is reflected in Dr. Huang's total.

6. Technicians may be pulled at various times throughout the day or week, e.g. early morning or late in the day, to cover other areas, e.g. if patient flow gets backed up or someone has called out sick (typically on Fridays), or perform specific tasks. For example, Lori and Vicki perform all UBM procedures and Vicki is certified to perform clinical trial procedures. While fully trained in all types of ophthalmic testing, the technicians do not fully cross cover each other due to their work assignments with certain sub-specialists or their personal preference. There is one technician who is constantly pulled to perform visual field testing because none of the other techs like or want to do that.

7. Some technicians start early or come in late/stay late but this does not always coincide with the physicians' schedule. One physician also commented that, as is required in the operating room, two physicians and/or clinical staff members should be performing a quality check prior to performing a patient's office procedure to confirm the procedure, correct eye, etc. This process does not occur due to lack of available staff.

8. Most staff coming from private practices experienced a model of 2 technicians (with at least 2 exam rooms per technician) and sometimes an additional scribe to support each physician. In a survey of some other academic institutions, residents or fellows also take on the role of a technician, so the ratio of techs to physician may be different:

| Institution | Provider or Office Based | Staffing Criteria | Tech to MD 1 : 1 | 2 : 1 | Residents & Fellows used as Techs? | Use Scribes? | Comments |
|---|---|---|---|---|---|---|---|
| Maryland | Provider Based | General Ophthalmology, Plastics, Pediatrics | YES | no | Yes, as needed | No | |
| | | Retina, Glaucoma, Cornea | no | YES | | | |
| Ohio State | Provider Based | 10 patients/session | YES | no | Not routinely but expected to help | No | Separate visual field and photography techs |
| | | 15-20 patients/session | no | YES | | | |
| New Mexico | Provider Based | 9 techs for 6 providers at any given time, or 1.5 techs per MD | | | No | No | |
| Washingt | Provider | 9.4 techs for 22 faculty (no full time) in 3 locations. Assigned | | | Yes. Residents | No they | |

24

| on | Based | based on specialty and patient volume. | repeat the work of the techs. | directly document ent in EPIC | |
|---|---|---|---|---|---|
| Yale Eye Center | Office Based | 10 techs for 23 faculty & fellows (10.4 CFTE) or approx.1.0 tech per CFTE MD | Yes | No | Separate Photography |

9. For most of the sub-specialties, there are many steps in the process of seeing patients and movement from room to room. There is a high degree of testing generated by this practice. The fellows and residents also perform technical services. Some physicians order excessive testing, others less so. Very few tests are scheduled in advance making it difficult for techs to plan out their day. Procedure add-ons create patient backlogs if certain equipment needed is not available. Patient preparatory work required of the technician is dependent upon the sub-specialty service. In retina, for example, the technicians "work-up" patients in an exam room and then bring them to a sub-waiting area. The patient returns to the exam room where they may be seen by a resident and/or fellow, then their attending physician. The physician may then order more testing that requires another special room or a return to sub-waiting. They may return again to the exam room for final review. A cornea patient may see the physician three times between refraction and dilation procedures performed by the technician.

10. As a result, there is a significant amount of human traffic in the practice. There is no signage for way-finding but since many patients have limited eyesight, it is appropriate for staff or faculty to guide them along the way. The technicians may obtain consent forms for procedures, schedule referred tests, (e.g. radiology) obtain insurance pre-certifications and may schedule surgeries and/or provide financial counseling for their patients. The physicians would like to incorporate into their work follow – arranging for patients to view educational video about their disease, treatment or planned surgeries.

11. Some physicians complained that they frequently need to look for a technician when they need another test after seeing the patient, and there is no consistent way to locate them. Pagers don't work. Some physicians utilize the light communication system that can signal them when a patient is ready to be seen. Others call out for their assigned technician by name. Some physicians noted that techs are seen at their desks when they should be available near the exam rooms. Some staff check email or Facebook if they think there is no more room to see patients. Some techs are not motivated to work and also perform work of questionable quality. Complaints that no techs available at lunchtime if MD running over morning session.

12. Two photographers and the photography manager provide photography services. Some physicians perform their own testing for consistency. Photography services frequently get delayed for several reasons:

a. Although photography testing is ordered in the medical record for the patient's next visit, the tests are not scheduled as an actual visit type, but may be indicated in the scheduling comments. The tests are ordered once the patient has arrived.

b. The 2 main photography rooms and staff are not adjacent to one another so they do not know what each other's patient volume is like, although they will on occasion go check. If they assist with each other's work, patients need to walk to the other location for the test. Elderly or debilitated patients may need to be escorted.

c. The newer Cirrus OCT camera that many physicians prefer is located in a room with other equipment. The OCT may not be available if the other equipment is in use.

d. Only one photographer is certified to see clinical trial patients.

e. Only one photographer does FA testing because the other states that her room is too small to accommodate tests requiring injections. In the event of an emergency there is not enough room to care for the patient with an adverse reaction.

f. Photographers can get slowed down if they need to escort patients back to a distant waiting room or exam room after their photography service.

13. Refer to Exhibit E for the full analysis of exam room assignments by physician. The following chart illustrates the limits to physician productivity imposed by the current room assignments and unique needs, e.g. clinical trials, pediatrics, babies.. It is impossible to assign 4 rooms per physicians as some sessions are already at maximum capacity – this explains why some physicians are already feeling the pinch (e.g. retina).

|  | Boutique | Cornea/Glaucoma | Retina |
|---|---|---|---|
| *Available exam sessions/day | 7 | 12 | 10 |
| Available exam sessions/wk | 70 | 120 | 100 |
| Scheduled MD sessions/wk | 13 | 29 | 29 |
| % Utilization - 2 rooms per MD | 37% | 48% | 58% |

26

| % Utilization - 3 rooms per MD | 56% | 73% | 87% |
|---|---|---|---|
| % Utilization - 4 rooms per MD | 74% | 97% | 116% |

\* Includes Boutique procedure room

14. There has been a recent emphasis to increase the number of funded clinical trials, and as a result more patients are being enrolled and seen. These do create challenges in daily workflow due to the specific requirements of each study. The services provided are largely sponsor paid services. Patients are scheduled throughout the day with other non-trial patients and spend a significant amount of time at each visit. Technicians and rooms must be certified for the studies. If a patient shows up that technician must be pulled to go work them up. New outside studies (those where the Primary Investigator is not an Ophthalmologist) have started without any of the technicians knowing in advance. They need to read the study protocols and learn specific techniques, in some cases this has had to occur on the day the patient is arriving.

B. Recommendations:

1. The technicians need to be 100% dedicated to performing the direct patient care tasks they were trained to do. Shift non-technical work such as obtaining pre-certifications and stocking rooms to other support staff. Their primary focus is to keep the physicians as efficient as possible – prepare the patients for exam and keep them moving! Ensure that sufficient technical support, ideally 1.5 or 2 technicians per physician, based on specialty and volume is available for every physician visit. Get them more directly involved in the care of the patient if possible, by explaining and viewing videos, as it is an opportunity for them to learn more as well. They can ensure written instructions, e.g. pictures of eyedrops, are given to patients on their disease, treatment or surgery.

2. Pool technical resources, stagger work hours to adequately cover the workday and assign technicians by "pods" or waiting room to support faculty based on patient volume. Enforce use of the light system to signal ready patients to the physicians. This would eliminate the need for pagers since the staff would be working together in close proximity to the physicians in that pod.

3. Cross-train all technicians to perform all procedures, with few exceptions. All should be able cover each other at any time in order to efficiently process patients. Rotate techs responsible for clinical call triage on a weekly basis. Certification for clinical trial testing should be required by at least one technician per pod. Some individual consideration should also be given for specialization with certain procedures e.g. visual fields, or pediatric patients. The Optometrist should always have at least one technician assigned when she is seeing patients. Assign

27

administrative support to perform the work that they both currently provide to manage the contact lens business.

4. The photographers, including the Manager should all be cross-trained to perform all procedures, including certification for clinical trial testing. Centralized services should be considered, if the facility can be re-designed to accommodate that. Unless required for building code, photography rooms do not need sinks and should not have windows. Consider purchase of another new Cirrus camera for the Glaucoma/Cornea section.

5. Employ Medical Assistants to perform visual field testing and non-technical work currently provided by the technicians such as cleaning and stocking the exam rooms, ordering and receiving supplies and medications. They can also be utilized to escort patients to/from waiting or exam rooms as needed. They can assist with contact lens ordering, shipping and receiving.

6. Stock all exam rooms in a similar manner to allow cross-use by physicians. Utilize standard forms for all subspecialists. Develop inventory lists of minimum/maximum requirements for all stocked items and monitor levels daily or weekly. Develop a uniform order sheet to indicate items that are low.

7. Make any physical changes necessary to improve physician efficiency, e.g. moving chairs away from wall and recalibrating; install sliding chair in retina section, etc. Physician productivity can be enhanced by re-assignment of physician sessions to maximize current facility and technical resources. Highly productive sub-specialists should have at least 4 exam rooms available with 2 technicians (supported by residents) assigned. However, the practice is close to maximizing the available exam room capacity.

8. Further investigation is needed to assess the following opportunities for increasing patient care space:

   a. Designate a specific technician room (not an exam room) for preparing retinal patients, (check vision, check pressure, dilate). The exam rooms would only be used by the resident, fellow and/or attending physician.

   b. Combine the Clinical Supervisor & Photography Manager offices and use the other room as a consultative space for seeing patients not needing technical services.

   c. Possibly move medical records near the administrative assistants. Move cornea/glaucoma photography into medical records space. Use photography room for exam or procedural functions.

   d. Adjacent space occupied by the Sleep Study Center would be ideal for expanding Ophthalmology services. In addition to more exam rooms, the opportunity for providing treatment infusions should be investigated.

   e. Identify a low volume room (not pediatrics) to certify for clinical trial use. The clean utility room was suggested.

9. Clinical trial research patients should be scheduled into specific blocked sessions as much as possible. Utilize specific visit types to indicate the number of procedures and testing that will be required for that visit. Communication on upcoming new trials or patient visits needs improvement. The Practice Manager and Clinical Supervisor must collaborate to allow sufficient lead time for staff to get acquainted with the specifics of each study.

## VII. Physician Productivity:

A. Observations:

1. 23 different physicians are providing the clinical equivalent work of 10.3 reported CFTE.

| Physician | SubSpecialty | Work Outside Temple | Scheduled Temple Sessions per Week | Reported CFTE | UHC Imputed CFTE based on FY10 Work RVU @ 5.31.10 | Imputed as a % of reported CFTE |
|---|---|---|---|---|---|---|
| Bernardino | Oculoplastics Surgery | OR | 4.5 | 0.60 | 0.71 | 118% |
| Huang | Retinal Surgery | OR | 5.0 | 0.80 | 0.84 | 105% |
| *Kempton | Retinal Surgery | VA | 2.0 | 0.20 | 0.16 | 80% |
| Salchow | Pediatric Surgery | OR | 4.5 | 0.80 | 0.59 | 74% |
| *Forster | Comprehensive | YHP | 1.0 | 0.10 | 0.07 | 70% |
| Adelman | Retinal Surgery | OR | 4.0 | 0.80 | 0.56 | 70% |
| Mayer | Glaucoma Surgery | OR | 4.0 | 0.80 | 0.53 | 66% |
| Lee, Jimmy | Corneal Surgery | OR | 6.0 | 0.80 | 0.52 | 65% |
| *Shayegani | Corneal Surgery | | 3.0 | 0.40 | 0.26 | 65% |
| Tsai | Glaucoma Surgery | OR | 3.0 | 0.40 | 0.26 | 65% |
| *Walsh | Neuro-Ophth | | 2.0 | 0.20 | 0.13 | 65% |
| Shields | Glaucoma Medical | N/A | 4.0 | 0.40 | 0.21 | 53% |
| Materin | Oncology Surgery | OR | 3.0 | 0.60 | 0.29 | 48% |
| Seth | Retina | 2nd Yr Fellow | 1.0 | 0.30 | 0.14 | 47% |
| Stoessel | Retina Medical | N/A | 7.0 | 0.80 | 0.36 | 45% |
| Loewen | Glaucoma Surgery | Research | 3.0 | 0.60 | 0.22 | 37% |
| Tarud | Optometry | N/A | 8.0 | 0.80 | 0.24 | 30% |
| Joshi | Glaucoma | Fellow | 0.0 | 0.20 | 0.05 | 25% |

29

| | | | | | | |
|---|---|---|---|---|---|---|
| *Parke | Low Vision | | 2.0 | 0.20 | 0.03 | 15% |
| Lee, Shelly | Retina | 1ˢᵗ Yr Fellow | 0.0 | 0.20 | 0.03 | 15% |
| *Anderson | Low Vision | | 1.0 | 0.10 | 0.01 | 10% |
| *Gaudio | Uveitis | | 1.0 | 0.10 | 0.01 | 10% |
| *Abrahams | Uveitis | | 1.0 | 0.10 | 0.00 | 0% |
| TOTAL | | | 70.0 | 10.30 | 6.22 | 60% |

\* Part-Time Faculty

2. Eight part-time faculty represent 1.4 reported CFTE. Some of these physicians provide expertise in the subspecialties that the practice is lacking. Some are full-time at the VA or YHP. Typically more resources are required to manage multiple physician schedules and practice styles.

3. The University Healthcare Consortium conducts a quarterly survey to produce comparative productivity and performance data for specific participating academic specialties. The 4ᵗʰ Quarter 2009 Ambulatory Clinics Scorecard productivity results for Yale were not favorable; however patient satisfaction results were very high:

| Measure | Yale Eye Center | Mean | 75% | 90% |
|---|---|---|---|---|
| Encounters per Exam per Session | 1.4 | 2.2 | 2.5 | 3.2 |
| Visits per Session – Attending & Resident or Fellow | 4.4 | 12.9 | 13.6 | 22.5 |
| Patient Satisfaction - Overall | 93.8% | 80.2% | 90.0% | 93.8% |
| Patient Satisfaction – with Provider | 96.5% | 84.4% | 93.4% | 95.6% |
| Patient Satisfaction – Recommend to Others? | 97.1% | 84.0% | 93.3% | 95.4% |

4. Some physicians said that with additional exam rooms and technical resources, they could increase the number of patients seen per session, and not sacrifice teaching time with students, residents or fellows. Others felt that their academic time was more a priority and slowed them down. Most indicated that increasing productivity was their focus.

5. Concern was expressed about the lack of referrals from Yale Health Plan (YHP). The perception is that most cataract patients are being referred to a community physician who used to be at Yale.

6. Some physicians were very concerned about steerage of new patient referrals and the negative effect on their practice. They either experience episodic or systemic low volume of new consults or may see large numbers of low pay or uninsured patients. They questioned how new consults were assigned, since they thought staff were supposed to be distributing new patients equally amongst the faculty.

7. Additional concern was voiced about the loss of faculty. It was stated that in order to attract and retain faculty, the practice needs to provide:

   a. Competitive salary and support staff, especially for young faculty who need to build a practice.

   b. More rapid promotions

   c. Research opportunities - to publish and develop patents

B. Recommendations

1. Only 2 physicians have met or exceeded their productivity benchmark. To increase productivity the practice must maximize the use of available space and resources. Investigate opportunities to increase patient care space within the practice, e.g. more exam and photography rooms. There is already an active plan in place to replace some part-time physicians with fulltime faculty.

2. Several physicians indicated that they would be willing to extend their hours to see patients on a Saturday morning or perhaps a weekday evening. This would be a relatively simple way to increase customer satisfaction and favorably impact the payer mix by limiting these sessions to the working patient population. This would also compensate for limitations of space during the day. Investigate the cost/benefit; staff could be rotated to cover additional hours.

3. Do a marketing analysis of referral pattern changes — may be due to new faculty — where are patients coming from?

4. Better oversight of new patient scheduling is required. As previously discussed, segregating front desk functions and telephone reception, re-assigning staff under the Practice Manager and establishing a consistent workflow for uniform assignment of new patient referrals should improve scheduling equity.

VIII.   Billing & Self Pay Collections:

A. Observations:

1. The following chart illustrates the differences in charge payer mix and gross collection rate by sub-specialty (Billing Area):

| FY10 as of May 31, 2010 | % of FY10 Coll. | Gross Coll Rate | Medic are | Medic aid | Mana ged Care | Anthe m BCBS | Self Pay | Other | Non-Contr acted | Worke rs Comp. |
|---|---|---|---|---|---|---|---|---|---|---|

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Refractive Surgery | 0% | 93% | | | | | 100% | | | |
| Contact Lens | 4% | 54% | 16% | 12% | 28% | 30% | 9% | 3% | 1% | 1% |
| Uveitis | 0% | 44% | 16% | 44% | 28% | 12% | 0% | 0% | | |
| Low Vision | 0% | 43% | 73% | 13% | 6% | 6% | 0% | 0% | 1% | |
| Neuro-Ophthalmology | 1% | 42% | 25% | 36% | 18% | 15% | 2% | 3% | 2% | 0% |
| Strabismus | 6% | 37% | 8% | 38% | 23% | 23% | 3% | 3% | 1% | 0% |
| Cornea | 9% | 35% | 43% | 18% | 24% | 9% | 5% | 1% | 0% | 0% |
| *Ocular Oncology | 4% | 35% | 30% | 9% | 26% | 29% | 3% | 2% | 1% | |
| Retina | 38% | 33% | 39% | 24% | 18% | 14% | 3% | 2% | 1% | 0% |
| Glaucoma | 22% | 33% | 50% | 13% | 19% | 14% | 1% | 2% | 0% | 0% |
| Oculoplastics & Orbital Surgery | 11% | 31% | 35% | 19% | 24% | 18% | 2% | 1% | 1% | 1% |
| Comprehensive | 4% | 31% | 57% | 8% | 17% | 17% | 0% | 1% | 1% | 0% |
| **Department Overall** | 100% | 33% | 39% | 20% | 20% | 15% | 3% | 2% | 1% | 0% |

* <12 months of data

2. Lag Days measures the time it takes a charge to get posted from the date of service. The lag days as of the end of April 2010 were as follows:

| Location | YMG Std. | April 2010 Department | | | Surgeon | | Medical | |
|---|---|---|---|---|---|---|---|---|
| | | April | High | Low | Best | Worst | Best | Worst |
| Inpatient | 5 days | 36 | 40 | 20 | 29 | 79 | na | na |
| Outpatient | 2 days | 19 | 34 | 18 | 3 | 36 | na | na |
| Office | 2 days | 12 | 16 | 8 | 9 | 15 | 6 | 12 |

3. Lag days can be affected by missing and incomplete encounters, including PQRI. The billing staff has a cumbersome and costly workflow to follow up on an estimated 50% of the encounter forms that come to them incomplete. This is delayed significantly for part-time physicians who are only in the practice once per week. Missing encounter forms are found in patient's charts or on physician desks.

4. Charge entry is further complicated by the unique self pay fee schedule and confusion as to what services were rendered and what amount was collected from the patient in some cases. The practice has a 3-tiered self pay fee schedule based on specialty. The intent is for staff to collect a portion of the cost of services at the time of service, without exceeding the amount due so as to avoid posting credits on patient accounts. However, the fees only address the MD visit and do not completely cover the cost of any additional testing the patient may have.

5. The missing charge report is run monthly by the charge entry staff. At the time of this review a missing charge report was run that indicated many outstanding charges for pending or arrived patient visits. For the very few procedures that were scheduled, it is questionable whether all services were billed. For example, as of May 11th, 38 ERG tests were scheduled, but only 33 had been billed.

6. The physicians have an incentive based salary system that is directly affected by their knowledge of coding, the efficiency of practice processes such as charge capture and reconciliation, and the efficiency of the overall billing and collections processes both in the department and at YMG. They were generally unaware of their billing and collections activity, how much is collected, what their contracted rates are and complained of insufficient communication with their reimbursement and billing staff.

7. Yale Eye Center owns all equipment and employs or leases all technical staff. As a result, they bill globally as a physician office-based practice for all services rendered in the Temple location. Of the 32 participants in the UHC Ambulatory Clinic Scorecard Survey, 20 or 63% indicated they are provider-based, billing for only the professional component of ophthalmology services, with their associated hospital covering the overhead costs and billing the technical fees. 12 or 38% were physician office-based, billing globally.

B. Recommendations:

1. The department's gross collection rate compares favorably with other YMG departments with a similar payer mix. The ophthalmology sub-specialties with the best collection rates and payer mix have the least volume. Reasonable efforts should be made to encourage the growth of services such as contact lens. This program needs administrative support to accurately monitor the purchase, receipt, distribution and exchange of lenses. Detailed accounting of the purchase price, overhead cost and actual reimbursement must be maintained. Due to the complexity of individual member benefit plans and insurance payment policies, it is recommended that the department not participate with insurance plans for these supplies.

2. All physicians should be held accountable to complete encounter forms for all the services they provide. Reconcile all office based encounters to the timed reception list of arrived patients daily. Follow up on missing encounter forms prior to the end of the business day. Typically Medical Assistants are responsible for this task.

3. All encounters must be reconciled against a daily log of services/tests performed to ensure capture of all billable services. It is recommended that all photography

33

procedures and high volume tests such as visual fields are scheduled in GE to reconcile billing encounters to. If not scheduled in GE, then a log of all tests performed should be generated from each work area that the encounters can be reconciled against.

4. All billing providers should have comprehensive initial (when new to the practice) and annual refresher training to ensure they are properly documenting and billing for all billable services they provide. YMG has already initiated monthly meetings with individual faculty to review their encounter forms, collection analysis reports, and specific billing issues for their subspecialty and discuss opportunities to improve their collections based on the services they provide.

5. Set the self pay collection schedule as a percent of charges to make is simpler for staff to collect at the time of service. Engage all billing, front desk, and clinical staff in understanding the collections process so they can consistently inform the patient at all opportunities. Outline and enforce policies to allow exceptions to self-pay protocols for certain high-risk patients or specific diagnoses (e.g. aphakia,)

6. The Financial Counselor is critical to ensure communication and enforcement of all collection processes in the practice, including but not limited to:

Obtaining Medicare Advanced Beneficiary Notices (ABN) and non-Medicare financial waivers when the patient will receive:

- Off label use of drugs
- Experimental therapies
- Cosmetic services
- Services with potential to be deemed not medically necessary

Coordinating with YMG in negotiating discounts for surgeries and obtaining financial estimates and agreement with the patient. Ensuring compliance with the agreement and canceling or post-poning surgeries if terms not met.

Discussing all out-of pocket costs of special procedures and treatments with patients at the time of their visit.

Setting up pre-pay and budget plans for:

- Contact lens services
- Non-participating services such as routine eye services
- Non-covered services such as lenses, refractions
- Cataract bank to prepay installments within set # of months then have   surgery

7. Further investigation is needed to assess the benefit of office based billing vs provider (hospital) based billing:

a.  What procedures are currently performed by technician vs. a physician?

b.  Can a YNHH-employed technician-supplied service be billed incident to the YMG physician?

c.  What are the costs that fall under the hospital under a provider-based model? Does this include the supply of drugs if administered by a YMG physician?



Yale Medical Group
THE PHYSICIANS OF YALE UNIVERSITY

Proposed Ophthalmology Organization Chart July 8, 2010

Exhibit B