UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARTIN J. DONOVAN | : | |
| | : | |
| PLAINTIFF, | : | |
| | : | |
| VS. | : | NO. 3:12-cv-00549 (VLB) |
| | : | |
| YALE UNIVERSITY | : | |
| | : | |
| DEFENDANT. | : | SEPTEMBER 30, 2013 |

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT

I.      INTRODUCTION

The plaintiff, Martin Donovan, is an adult male over the age of sixty years, who has suffered employment discrimination due to his age.  He has brought the instant Complaint sounding in three Counts: violation of the Age Discrimination in Employment Act; age discrimination in contravention of the Connecticut Fair Employment Practices Act; and the intentional infliction of emotional distress.

The defendant has moved for summary judgment in the instant case.  While it admits that it terminated the plaintiff on March 31, 2011, defendant claims that plaintiff's April 8, 2011 filing with CHRO is untimely.  Defendant further admits that plaintiff was employed by it for thirty-two (32) years, and from 2006 to 2011 held the position of Administrator for the Department of Ophthalmology and Visual Science, yet claims that the plaintiff was not "qualified" for the position he held for five years.  The defendant also claims no inference of age discrimination

1

here, although it confronted the plaintiff with false claims that he was going to retire, and shortly after plaintiff informed defendant that he had no intention to do so, defendant claimed to find fault in plaintiff's job performance.

As set forth in greater detail below, the claims of the defendant are without merit. For the reasons set forth below, summary judgment is inappropriate, and the defendant's motion must be denied in its entirety.

## II.   STATEMENT OF FACTS

The following facts are set forth under oath in the Plaintiff's Affidavit of Illegal Discriminatory Conduct, April 1, 2011, filed April 8, 2011 (hereinafter, "A") and in Plaintiff's Deposition, March 5, 2013 (hereinafter "T").

During all times mentioned in this action, the plaintiff, Martin Donovan was and is an adult citizen of the United States residing in, Connecticut.  The plaintiff was born on December 23, 1948.  A; T4.

At all times relevant to the instant complaint, the defendant Yale University was and is an employer located in New Haven, employing more than one hundred persons.  A.

At all times referenced herein, the Yale Medical School and the Yale Medical Group were and are departments of the defendant University.  A.

The defendant Yale has adopted, ratified, sanctioned or otherwise accepted as its own the actions, omissions, words and conduct of the Yale Medical School, the Yale Medical Group, their agents, officers or employees.  The defendant University has thereby incurred liability for the for the acts, omissions,

2

statements and conduct of the said departments and their agents, officers or employees.  A.

The plaintiff is a highly skilled and exceedingly well qualified individual with a strong educational and business background.  A.

The plaintiff was employed by the defendant in the Yale-New Haven Medical Center for 32 years.  For the first 20 years of the plaintiff's employment, the plaintiff worked in the Yale-New Haven Hospital.  For the past twelve years to his termination, the plaintiff was by the defendant in the Yale University School of Medicine.   A.

Initially, the plaintiff was Director of Finance for the Yale Medical Group, ("YMG") of the defendant's School of Medicine.  The YMG is the administrative, billing and collecting arm for the School's various clinical practices.  A.

During the plaintiff's eight years as Director of Finance, the plaintiff played a significant role in turning the YMG organization from a deficit organization to one that operated with a surplus.  A.

Due to the excellence of the plaintiff's work, in February, 2006, the plaintiff was asked to become the interim Administrator for the Department of Ophthalmology & Visual Science in addition to the plaintiff's role in the YMG.  A.

The plaintiff did this from February, 2006 until August, 2006.  Due to the excellence of the plaintiff's work and the plaintiff's proficiency at this position, the plaintiff was asked to take the position of Administrator on a permanent basis.  On October 1, 2006, the plaintiff joined the newly appointed chairman of

3

the Department, James C. Tsai, M.D.  A.

The plaintiff's annual reviews have always been excellent, and the plaintiff's working relationships with all staff have always been excellent.  In the plaintiff's annual reviews, it was noted that "Marty is genuinely respected by Faculty and Staff".  A.

The Department has been in deficit for approximately 20 years.  The goal of Dr. Tsai was to turn the deficit into a surplus.  As the result of the plaintiff's hard work, the deficit was decreasing annually, although not at the rate Tsai promised to the Dean's Office of the defendant.  A.

In March 2010, the Billing Manager, Mary Schwall, left the defendant University.  After she left, it was discovered that Ms. Schwall had hidden $300,000 worth of invoices, and failed to act on the collection of these invoices.  Once this was discovered the plaintiff immediately informed Dr. Tsai.   A.

Under the plaintiff's direction, YMG staff immediately began working the previously hidden invoices so that the funds due from the secreted invoices could be collected.  A.

As the plaintiff's Department was exceeding previous years clinical collections and was nearly 20% ahead of the previous year, there were no indications that Schwall was hiding invoices and that they were not being collected.  The plaintiff informed the defendant of this, and it had no reply.  A.

In May, 2010, the Assistant Dean for Finance of the defendant, Carrie Capezzone, contacted the plaintiff and informed the plaintiff that at a meeting of

4

the defendant it was stated that the plaintiff was planning on retiring.  A; T22-23.

The Assistant Dean for Finance of the defendant was the plaintiff's superior.  A.

The plaintiff was shocked and alarmed, as the plaintiff had no intention of retiring, and had never stated to anyone that he was even considering retirement. A; T22-23.

Assistant Dean Capezzone contacted the plaintiff and asked the plaintiff when he was going to retire.  The plaintiff stated in no uncertain terms that he was not planning to, nor did he intend to retire.  The plaintiff told Capezzone that the defendant's claim that the plaintiff was planning on retiring was categorically untrue.  The plaintiff informed Assistant Dean Capezzone that he had never stated to anyone that he was even considering retirement.  Id.

The plaintiff asked Assistant Dean Capezzone who in the defendant claimed that the plaintiff was considering retiring.  Capezzone would not reveal to the plaintiff where or from whom this statement came.  Id.  Several days later, the plaintiff was summoned to meet Capezzone's boss, the Deputy Dean for Finance and Administration of the defendant, Cynthia Walker.  A.

Deputy Dean for Finance and Administration of the defendant, Cynthia Walker is the head of the Finance and Administration department.  T12-13. Deputy Dean Walker reports directly to the Dean of the defendant's Yale School of Medicine.  The Dean of the School of Medicine reports directly to the President of the defendant University.   A.

During this meeting, Walker questioned the plaintiff about the plaintiff's supposed intention to retire.  A; T18-21.  The plaintiff informed Walker in no uncertain terms that he was not planning to, nor did he intend to retire.  Id.  The plaintiff told Walker that the defendant's claim that the plaintiff was planning on retiring was categorically untrue.  Id.  The plaintiff informed Deputy Dean Walker that he had never stated to anyone that he was even considering retirement.  Id. The plaintiff informed Walker that he intended to continue working until he was seventy (70) years old; he was then sixty-two (62) years old.  Id.; T4.

Shortly after this meeting, in which Deputy Dean Walker inquired about the plaintiff's fictitious plans to retire, Walker stated that the defendant had "lost confidence in the plaintiff as a leader."  A.

During this same time, Dr. Tsai also subjected the plaintiff to age discriminatory conduct:

    10    Q.   Now, how about Dr. Tsai, did he ever say

    11    anything to you that caused you to believe that he

    12    was acting out of age discrimination?

    13      A.   During my time with Dr. Tsai, there were

    14    numerous conversations in which he made remarks

    15    about the age of either faculty, me, staff.  We had

    16    an assistant dean -- assistant chairman, vice

    17    chairman of the department, who was head of the

    18    research operation, and he announced he was leaving

6

19   to go to another school.

20     Q.  And who was that, by the way?

21     A.  Colin Barnstable -- and Colin is younger

22   than me.  And Tsai made the comment, "Well, you

23   know, he's getting too old for his research to be

24   valid."  And I made the comment, I said, "You know,

25   Colin is younger than me."  And he said, "Oh,


27


1   you're not in your 60s."  So ...

2     Q.  And what did you say to that?

3     A.  At the time I was.  I said "Yes, I am."

T26-27.

        Tsai's attitude toward persons in their 60's, such as the plaintiff, was that

they were too old to do their jobs properly and effectively, and "ashould just

retire."  T27-29.

     Q.  Okay.  Now, you said there was also a

8   comment made by an accountant who you described as

9   an older woman.  Do you remember anything else

10   about her, other than that she was older?

11     A.  Not really.  I had just started in the

12    department.

13     Q.   And what do you remember about Dr. Tsai's

14    comments about this accountant?

15     A.   Again, that it was good for her to leave so

16    that we could get someone younger in there.

 . . .

23    Q.  Do you remember -- with regard to the

24    accountant, do you remember the exact words that

25    Dr. Tsai said?


                              31

1     A.   As I said, that, you know, "She was older,"

2    and that, you know, "her leaving was good because

3     we could get someone younger in that position."

T30-31.

        Commencing after the false claims that the plaintiff was intending to retire,

and the plaintiff's strident assertions to the contrary, the defendant began to

falsely and unfairly criticize and scrutinize the plaintiff's work.  AT43.

        The defendant falsely accused the plaintiff of to failing to investigate the

allegations that staff were handing out the business cards of a physician who

once worked in the practice, but had since left.  A; T44-45.

        This is completely false.  The plaintiff had immediately investigated the

allegations, and found them to be baseless.  A.

When the allegations were first brought to the plaintiff's attention, the Practice Manager, Pamela-Jean Berkheiser, and the plaintiff met with the front desk personnel and inquired whether this was being done.  It was not.  A.

The plaintiff instructed staff that if patients called or asked for information regarding physicians who were no longer part of the practice, they were simply to say that the physicians now practice elsewhere in the New Haven area.  A.

As part of his investigation of this allegation, the plaintiff interviewed the Clinical Supervisor and instructed her that at no time were any of her staff to give out information regarding physicians currently in competition with the Department.  A; T60-65.

To further address the allegations, the plaintiff brought the defendant's own Human Resources Department into the investigation.  A representative from that department of the defendant, Elena McHugh, met with two of the physicians making the accusations, Dr. Nils Loewen and Dr. C. Roberto Bernardino.  Neither of them offered proof that anyone was handing out business cards.  A.

The plaintiff's thorough and diligent investigation, in conjunction with defendant's Human Resources Department, revealed that the claims were untrue.

The defendant's own Human Resources Department determined that there was no evidence to substantiate the claims.  A.

Nevertheless, the plaintiff was falsely blamed for Dr. Bernardino's leaving the Department.  The defendant falsely claimed that the departure was due to the

9

plaintiff's handling of the claims that staff were handing out a competitor's business cards, which the defendant knew to be unsubstantiated.  A.

The defendant further falsely claimed that fee schedule changes were not implemented, resulting in lost revenue to the Department.  A; T109-111.  This, too, is totally false statement.  The plaintiff verified with the former Practice Manager that the changes were indeed implemented.  Id.

The defendant further falsely alleged that the plaintiff allowed the Practice Manager, Pam Berkheiser, to leave at 4:00 p.m. daily.  This too was untrue.  A; T60-65.

The false claims of the defendant were pretextual reasons to conceal the true, discriminatory nature of the defendant's conduct.  A.  Several physicians and other employees with whom the plaintiff worked stated in verbally and in writing that the plaintiff was excellent at his job.  T54-57.  Others stated that the plaintiff had been railroaded and mistreated by Tsai and the defendant.  T55-57.

On July 23, 2010, after the unlawful, age related statements about the plaintiff's fictitious intent to retire, the defendant ordered the plaintiff into a meeting with Tsai and Walker.  A.

At that meeting, Tsai and Walker claimed that there was concern for the plaintiff's performance, but no specifics were explained.  Tsai and Walker claimed to have a "report" about the plaintiff's work at the defendant.  When the plaintiff asked to see the report and about specific information, the plaintiff was not allowed to see any report.  When the plaintiff asked when the plaintiff would be

10

able to see the supposed report, the plaintiff was told by that they would look into it.  A.

The report was valueless and done by a nonprofessional from within the University.  T117-118.  In the past, the defendant had used the same person to create a report about a department to serve its own purposes.  Id.

Each of the claims of weakness or inadequacy on the part of the plaintiff are false, and were created by defendant as pretext to terminate the plaintiff.  T60-76.  The administration was not weak; nearly all administrators are the same now as when the plaintiff was employed.  Id.  In each instance, the plaintiff addressed or attempted to address every problem at the workplace.  Id.  Often, Tsai himself prevented the plaintiff from acting, and protected employees from termination that the plaintiff, as administrator, wanted to terminate.  Id.

When presented with the question whether Walker was simply trying to turn around a department in financial straits, the plaintiff responded:

   Q   Is that also what Dr. Walker was trying to

    9  do?

    10     A   I would say that, except that then things

    11  don't add up together.  You would have to take me

    12  down a long road from excellent reviews, you're

    13  doing your job, to all of a sudden you are a

    14  complete incompetent.

    15     Q   What intervened between those two

16  things --

17      A    Was that discussion about retirement.

T117.

Prior to the unlawful, age related statements about the plaintiff's fictitious intent to retire, the plaintiff was never informed of any concerns about the plaintiff's work performance.  the plaintiff's performance reviews were always excellent.  A.

Prior to the unlawful age based conduct of the defendant, and the plaintiff's strong protestations that he had no intent to retire, the defendant never disciplined the plaintiff.  The defendant had never even complained about the plaintiff's work performance, his managerial style or the plaintiff's interactions with staff and other employees of the defendant.  A.

As the plaintiff states:

20  A    I believe the report is what they used as

21  their response to get rid of me.  But I think, had I

22  gone into Cynthia's office and said, "I am going to

23  retire," none of this conversation would have taken

24  place.

T118.

After the defendant's statements about the plaintiff's claimed retirement and his objections thereto, however, Tsai informed the plaintiff that the defendant has "no confidence" in the plaintiff and that the plaintiff was "in a lot of trouble".

A.

      After the statements, Walker stated that the plaintiff should be concerned about his job.  A.

      Shortly after meeting with Tsai and Walker, the plaintiff had a meeting with Dr. M. Bruce Shields, Chairman Emeritus, of the defendant.  At that meeting, Dr. Shields asked if the plaintiff was coming to meet with him to ask for a letter of recommendation.  The plaintiff told him the plaintiff didn't know that the plaintiff needed one.

      On August 23, 2010, the defendant issued the plaintiff a written warning.  A.

      In that written warning, the defendant removed the plaintiff from the plaintiff's position as Clinical Administrator.  The defendant demoted the plaintiff to a temporary assignment with the Medical School Financial Operations Department of the defendant.  A.

      The defendant stated that "At the end of the 90-day reassignment, your employment with Yale University will terminate."  A.  The defendant, however, did not terminate the plaintiff at that time.  A; Letter from Walker and Tsai, Def. Ex.4B, 4C.

      The defendant took this action against the plaintiff on the basis of his age, and in retaliation for his opposition to the defendant's efforts to force him to retire.  A.

      Despite its false claims to the contrary, the defendant acknowledged the plaintiff's "valuable contributions" to special projects of the defendant.  In stark

13

contradiction of its claimed reasons for the plaintiff's termination, the defendant accurately lauded the plaintiff's work performance, and extended the plaintiff's termination date to February 28, 2011.  A; Letter from Walker and Tsai, Def. Ex.4B, 4C.

Once again, contradicting its false and pretextual reasons to terminate the plaintiff, recognizing the excellence of the plaintiff's work, the defendant again extended the plaintiff's termination date to March 31, 2011.  A;  Letter from Walker and Tsai, Def. Ex.4B, 4C..

On March 31, 2011, the defendant terminated the plaintiff's employment.  A; Def. Answer, ¶¶ 53, 54.  Tsai and Walker were responsible for the plaintiff's termination.  T17-18.

On April 8, 2011, nine days after the defendant terminated the plaintiff, the plaintiff filed his Affidavit of Illegal Discriminatory Conduct in the CHRO and the EEOC.  See, Def. Ex. 2A.

Again contradicting its pretextual reasons therefor, and again recognizing the plaintiff's invaluable contributions, the defendant forced the plaintiff to accept a "casual" position, at a greatly reduced wage.  Id.; Def. Ex.

The defendant has a history of discrimination on the basis of age. The defendant treated the previous Administrator to hold the plaintiff 's former position, who was approximately the plaintiff's age, in same unlawful manner.  A.

The reasons given by the defendant for the plaintiff's demotion and termination are pretextual.  The true reason for the conduct of the defendant is

because of the plaintiff's age and in retaliation for his opposition to the
defendant's conduct.  A.


III.    ARGUMENT

    A.    Summary Judgment Standard

"The courts are in entire agreement that the moving party for summary
judgment has the burden of showing the absence of any genuine issue of
material facts, which, under applicable principles of substantive law, entitle him
to a judgment as a matter of law. The courts hold the movant to a strict standard."
DHR Construction Co., Inc. v. Thomas J. Donnelly, 180 Conn. 430, 434, 429 A.2d
908 (1980).

    When passing upon a motion for summary judgment, the court may not
resolve factual disputes or make credibility determinations, even if the case is
one which eventually will be tried without a jury.  In re Unisys Savings Plan
Litigation, 74 F.3d 420 (3d Cir. 1996).  Rather, the court must resolve any
ambiguities and draw all inferences against the moving party.  Cargill, Inc. v.
Charles Kowsky Resources, Inc., 949 F.2d 51 (2d Cir. 1991).  The evidence of the
party against whom summary judgment is sought must be believed.  Revak v.
SEC Realty Corp., 18 F.3d 81 (2d Cir. 1994).  The court must construe the
evidence in the light most favorable to the party opposing summary judgment
and deny the motion unless no construction of the evidence could support
judgment in the plaintiff's favor.  Adickes v. S. H. Kress & Co., 398 U.S. 144, 157

(1970); Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10, 14 (2d Cir. 1993);

United States v. Certain Funds on Deposit in Scudder Tax Free Investment

Account #2505103, 998 F.2d 129 (2d Cir. 1993); Union Pacific Corp. v. United

States, 5 F.3d 523, 525 (Fed. Cir. 1993); Suarez v. Dickmont Plastics Corp., 229

Conn. 99, 105 (1994); D.H.R. Construction Co. v. Donnelly, 180 Conn. 430, 434

(1980); Connell v. Colwell, 214 Conn. 242, 246-47 (1990).  "If, as to the issue on

which summary judgment is sought, there is any evidence in the record from

which a reasonable inference could be drawn in favor of the opposing party,

summary judgment is improper."  Gummo v. Village of Depew, 75 F.3d 98, 107 (2d

Cir. 1996).

        To raise a genuine issue of material fact sufficient to defeat a summary

judgment motion, the opponent need not match, item for item, each piece of

evidence proffered by the moving party.  So long as the opponent has offered

enough evidence to exceed the "mere scintilla" threshold, summary judgment is

to be denied.  In re Unisys Savings Plan Litigation, supra, 74 F.3d 420, 433.

        Even if the nonmoving party's evidence appears "implausible," the court

may not "weigh" the evidence and must proceed with the greatest caution.  R. B.

Ventures, Ltd. v. Shane, 112 F.3d 54, 58-59 (2d Cir. 1997).  "If reasonable minds

could differ as to the import of the evidence...and if...there is any evidence in the

record from any source from which a reasonable inference in the nonmoving

party's favor may be drawn, the moving party simply cannot obtain a summary

judgment."  Id. at 59, quoting Brady v. Town of Colchester, 863 F.2d 205, 211 (2d

Cir. 1988), and <u>In re Japanese Elec Prods. Antitrust Litigation</u>, 723 F.2d 238 (3d Cir. 1983) (internal quotation marks omitted).

"A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non moving party.' <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  Thus, '[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'" <u>Lazard Freres & Co. v. Protective Life Ins. Co.</u>, 108 F.3d 1531, 1535 (2d Cir. 1997).  Citing <u>Gummo v. Village of Depew</u>, 75 F.3d 98, 107 (2d Cir. 1996).

A party opposing summary judgment may do so by an affidavit clarifying that party's prior deposition testimony.  <u>Ramos v. Geddes</u>, 137 F.R.D. 11 (S.D. Tex. 1991).

Hearsay evidence, while not admissible in support of a motion for summary judgment, is sufficient to defeat a summary judgment motion so long as there is reason to believe that the evidence can be offered in an admissible form at trial. <u>McMillian v. Johnson</u>, 88 F.3d 1573, 1584 (11th Cir. 1996); <u>Williams v. Borough of West Chester</u>, 891 F.2d 458 (3d Cir. 1990); <u>Tetra Technologies, Inc. v. Harter</u>, 823 F. Supp. 1116, 1120 (S.D.N.Y. 1993); <u>Cerniglia v. LeVasseur</u>, 19 Conn. L. Rptr. No. 4, 119 (1997).

"Findings of discrimination, discriminatory intent, and causation are findings of fact." <u>Cornwell v. Robinson</u>, 23 F.3d 694, 706 (2d Cir.1994).  "At

summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer." Byrnie v. Town of Cromwell, Board of Education, 243 F.3d 93, 102 (2d Cir.2001); Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir.1999).

Courts must be mindful of the fact that summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated. Kahn v. Fairfield University, 357 F.Supp. 2d 496 (2005). Courts may only grant summary judgment at the pretext stage where the plaintiff has "provided no indication that any evidence exists that would permit the trier of fact to draw a reasonable inference of pretext." See Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir.1985)(emphasis supplied); see also Dister, 859 F.2d 1108; Norton v. Sam's Club, 145 F.3d 114 (2d Cir.1998).

The presence of a material question of fact regarding pretext is sufficient to defeat summary judgment. Kahn, supra at 504-505. Such subjective bases must be sufficiently well-articulated, however, to allow the plaintiff to rebut them.  The Second Circuit has concluded that "an employer may not use wholly subjective and unarticulated standards to judge employee performance." Knight v. Nassau County Civil Serv. Comm'n, 649 F.2d 157, 161 (2d Cir.1981).  This is because "[a]ny defendant can respond to a [discrimination charge] with a claim of some subjective preference or prerogative and, if such assertions are accepted, prevail in virtually every case." Robinson v. 12 Lofts Realty, Inc., 610 F.2d 1032, 1040 (2d

Cir.1979) (internal quotation marks omitted).   Accordingly, an "employer's explanation of its reasons must be clear and specific" in order to "afford the employee a full and fair opportunity to demonstrate pretext."   <u>Meiri v. Dacon</u>, 759 F.2d 989, 996-97 (2d Cir.1985).  Nevertheless, "[a] subjective evaluation, besides being clear and specific, must also be honest."  <u>Lieberman v. Gant</u>, 630 F.2d 60, 67 (2d Cir.1980);  <u>Byrnie</u>, 243 F.3d at 104-05.

      B.     <u>The Plaintiff Has Demonstrated Age Discrimination Under Both CFEPA and ADEA</u>

          1.  <u>Standards of Proof</u>

Two fundamental differences exist between age discrimination claims pursuant to the Connecticut Fair Employment Practices Act (CFEPA) and the Age Discrimination in Employment Act (ADEA).  First, the standard of proof of a CFEPA claim is substantially lower; age need only be a "motivating factor" in the employment decision, rather than the "but-for cause" of the decision.  Second, the method of proof of a CFEPA claim is far broader than that of an ADEA claim. A CFEPA plaintiff may prove age discrimination by proving a discriminatory motive, *or* by showing that the defendant's claimed reason for the termination was pretextual.  An ADEA plaintiff must prove that the defendant's claimed reason for the termination was pretextual *and* prove that the only reason for the action was age.  An ADEA plaintiff cannot meet his burden of proof by simply demonstrating that the defendant's claimed reason for the termination was pretextual, as can an CFEPA plaintiff.

The defendant's argument that the plaintiff has failed to sufficiently allege the elements of age discrimination claims under the federal and state statute are without merit.  Further, although recognizing the dramatically different standards of proof between the two, the defendant merely rests on its argument as to the higher, federal standard in support of its motion as to the lower, state law standard.  This argument is incorrect, is devoid of any analysis on the significantly lower standard, and indicates the unpersuasive nature of defendants' argument.  The defendant's motion as to the CFEPA age discrimination claim must be denied.

The CFEPA directs that "[i]t shall be a discriminatory practice in violation of this section[ ][f]or an employer ... to refuse to hire or employ or to bar or to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's ... age...." Conn. Gen.Stat. § 46a-60(a)(1).

The ADEA provides that "[i]t shall be unlawful for an employer ... to discharge or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA's prohibition against discrimination based on age protects employees who are at least forty years of age. 29 U.S.C. § 631(a).

Significantly, the CFEPA provides broader protection, and requires a markedly more lenient standard of proof than the ADEA.  To prevail on an CFEPA

20

age discrimination claim, a plaintiff need only show that age was a "motivating factor" in the challenged adverse employment action.  <u>Jacobs v. General Electric Co.</u>, 275 Conn. 395, 401 (2005). "*The plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.*" <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981)". <u>Jacobs v. General Electric Co.</u>, supra, at 401 (Emphasis in original).

Further, and directly contrary to the standard of proof under the ADEA, Connecticut state caselaw provides that a plaintiff may prove age discrimination under CFEPA *either* by proving directly that the defendant had a discriminatory motive in making the decision to terminate the plaintiff, *or* indirectly, by showing that the defendant's claimed reason for the termination was pretextual.  <u>Id.</u>,; <u>Jacobs v. General Electric Co.</u>, supra at 402.  The plaintiff has made both showings.  (See Section C, supra, as to pretext).

The Connecticut Supreme Court has adopted "the explicit holding in <u>Reeves</u> that evidence establishing the falsity of the legitimate, nondiscriminatory reasons advanced by the employer may be, in and of itself, enough to support the trier of fact's ultimate finding of intentional discrimination." <u>Board of Education v. Commission on Human Rights & Opportunities</u>, 266 Conn. 492, 511 (2003), citing <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142 (2000).

The <u>Jacobs</u> court explicitly stated that "there were *two* methods by which

21

the plaintiff could prove his claim of age discrimination, the first by proving directly that the defendant had a discriminatory motive in making the layoff decision, or the second by showing indirectly that the defendant's claimed reason for the layoff was pretextual."  Id., (emphasis in original).  The Jacobs court held it to be reversible error to fail to instruct the jury that it could consider *either* method of proof of age discrimination in violation of CFEPA.  Id.

As to the standard of proof in an ADEA claim of age discrimination, an employee must prove that age was the "but-for" cause behind the employer's adverse decision, and not merely one of the motivating factors.  Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343, 2349 n. 2 (2009).  In Gross, the Supreme Court raised the level of proof necessary to prevail on an ADEA claim, from demonstrating that age was a "motivating factor" to proving that age was the "but-for" cause behind the employer's adverse decision.  Gross v. FBL Fin. Servs., Inc., 129 S. Ct. 2343, 2349 n. 2 (2009).  Thus, Gross "eliminat[ed] the mixed-motive analysis that circuit courts had brought into the ADEA from Title VII cases." Gorzynski v. Jetblue Airways Corp., 596 F.3d 92, 106 (2d Cir. 2010); Hrisinko v. N.Y.C. Dep't of Educ., 369 F.App'x. 232, 234 (2d Cir. 2010) (finding that employees must now prove that "age was the 'but-for' cause behind the employer's adverse decision, and not merely one of the motivating factors.")

Prior to Gross, the final question in the analysis, after defendant had articulated a legitimate nondiscriminatory reason, was "whether the evidence in plaintiff's favor, when viewed in the light most favorable to the plaintiff, is

sufficient to sustain a reasonable finding that her dismissal was motivated at least in part by age discrimination." See, e.g., <u>Tomassi v. Insignia Financial Group, Inc.</u>, 478 F.3d 111, 114 (2d Cir.2007), citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973); <u>Gorzynski</u>, supra, at 106. <u>Gross</u> modified the burden by holding that "[a] plaintiff must prove by a preponderance of the evidence that age was the 'but-for' cause of the challenged employer decision." <u>Gross</u>, 129 S.Ct. at 2351. <u>Gross</u> thus increases a plaintiff's burden at the third stage of the <u>McDonnell Douglas</u> analysis to "raise[ ] sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that her age was a 'but for' cause of [ defendant's] decision to fire her." <u>Matera v. JPMorgan Chase Corp.</u>, 740 F.Supp.2d 561, 571 (SDNY, 2010)(applying standard to summary judgment motion); quoting <u>Gorzynski</u>, 596 F. 3d at 107.

This is directly contrary to the standard applied to the consideration of CFEPA age discrimination claims pursuant to Connecticut State law, in which a plaintiff is required only to prove that age was a "motivating factor" in the employment decision.. <u>Jacobs v. General Electric Co.</u>, supra at 402.

As to the methods of proof, in an ADEA case, once a defendant has articulated a legitimate,  nondiscriminatory reason for plaintiff's termination, a plaintiff can no longer rest on his prima facie case and must instead "raise[ ] sufficient evidence from which a reasonable jury could conclude by a preponderance of the evidence that [his] age was a 'but for' cause of [defendants'] decision to fire [him]." <u>Gorzynski</u>, 596 F. 3d at 107; see also <u>Sullivan</u>

**v. Brodsky**, 380 Fed.Appx. 21, 21 (2d Cir.2010) ("Proceeding to the final step of the analysis, plaintiff must adduce sufficient evidence to allow a rational fact finder to conclude that age was the 'but-for' cause of the challenged adverse employment action and not just a contributing or motivating factor");  **Holowecki v. Federal Express Corp.**, 382 Fed.Appx. 42, 44 (2d Cir.2010) ("In order to satisfy their burden at the final stage, plaintiffs must offer evidence that age discrimination was the 'but-for' cause of the challenged actions").

Thus, a court considering an ADEA claim of age discrimination must determine "whether plaintiff can produce evidence casting doubt on defendant's proffered reasons . . .  namely whether defendant's reason is mere pretext for discrimination." **Gorzynski**, 596 F. 3d at 107.  "Because [defendant employer] has produced evidence that it acted for non-discriminatory reasons, [plaintiff] may no longer simply rely on having made out a prima facie case." **Gorzynski**, 596 F. 3d at 107.  The court "must, therefore, determine, by looking at the evidence [plaintiff] has proffered and the counter-evidence [defendant] has presented, whether [plaintiff] has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that [plaintiff's] age was a "but for" cause of [defendant's] decision to fire [the plaintiff]. In this respect it is important to consider whether the explanations that [defendant] gave for [plaintiff's] firing were pretextual." **Gorzynski**, 596 F. 3d at 107.

In an ADEA case, therefore, a plaintiff must demonstrate both the motive of the defendant – that age was the "but for cause" of the employment action – *and*

24

prove the pretextual nature of the claimed legitimate nondiscriminatory reason. <u>Gorzynski</u>, 596 F. 3d at 107; <u>Gross</u>, 129 S.Ct. at 2351.  Failure to do *both* will result in a finding for the defendant.  In a CFEPA case, however, a plaintiff will prevail by proving *either* that the defendant had a discriminatory motive in making the decision to terminate the plaintiff, *or* by showing that the defendant's claimed reason for the termination was pretextual.  <u>Jacobs v. General Electric Co.</u>, supra at 402.

     2.   <u>Defendant's Claim of Untimely Filing In CHRO is Incorrect;</u>

     <u>Timeliness of EEOC Filing Undisputed</u>

At the outset, the defendant concedes that the plaintiff filed his EEOC claim in this matter within 300 days of August 23, 2010. 42 U.S.C. § 2000e-5(e)(1); see, Defendant's Memorandum, at 8.  Thus, the defendant's argument of timeliness of filing is directed only at the plaintiff's age discrimination claim pursuant to CFEPA; defendant does not, and cannot, raise any claim as to plaintiff's ADEA claim.

The defendant is incorrect in its analysis of the commencement date of the age discrimination cause of action pursuant to CFEPA; and thus, the date by which such action may properly have been filed.

It is undisputed that the plaintiff was terminated from his employment with the defendant on March 31, 2011.  The defendant admits this in its Answer. Answer, ¶¶ 53, 54.  However, the defendant here attempts to rely upon its August 23, 2010 written warning letter as the commencement of the limitations period

within which to file a claim at CHRO.  For a variety of reasons, including legal, factual, and the text of the letter itself, such a position is incorrect.

First, the plain language of the letter states that the punishment meted out to the plaintiff on August 23, 2010 was removal from his position.  Letter, 8/23/10, Def Ex. 4A.  Termination, from the *entire* defendant University, the letter states, would happen ninety days from August 23, 2010.  Id.  That date was Sunday, November 21, 2010.  2010 calendar.  It is undisputed that the November date came and went – and the plaintiff remained employed by the defendant.  Letter, 11/15/10, Def Ex. 4B; A; T.  Thus, the August 23, 2010 letter was not notice of plaintiff's termination, as that event did not occur in the time or manner stated in the letter.  Id.; T35-36.  Further, the statements contained in the letter were not accurate in detailing the punishment imposed upon the plaintiff, nor were they accurate in describing the underlying reasons therefor, that is, the plaintiff's alleged incompetence.  Id.

On November 15, 2010, the author of the August letter, Walker, stated the following in writing to the plaintiff: "Dear Marty: Based on your valuable contributions to the clinical accounts receivable and other projects, I am pleased to inform you that your last day at Yale has been extended to February 28, 2011. I appreciate your help with these special projects as you continue to search for a permanent position."   Letter, 11/15/10, Def Ex. 4B.  As this second letter makes plain, the defendant was now asserting that February 28, 2011, rather than Sunday, November 21, 2010 was to be the plaintiff's termination date.  Id.

Obviously, this is different from the date stated in the August 23, 2010 letter.
Letter, 8/23/10, Def Ex. 4A.  Further, this second letter
accommodates the plaintiff's "search for a permanent position", unrestricted by
the language in the previous letter.  Id.

Further, the glowing terms used toward the plaintiff, and his retention –
highly unusual to say the least for a purportedly incompetent employee –
undermine both defendant's assertion of a legitimate, nondiscriminatory reason
for plaintiff's termination, and the finality of the claimed termination in the August
letter.

Yet, the ambiguity of the August letter and the facts marshaling against the
defendant's argument does not end here.  On February 21, 2011, the same author,
Walker, again changed the terms and conditions of the plaintiff's employment
and departure therefrom.  Letter, 2/21/11, Def Ex. 4C.  Once again, in laudatory
terms, the defendant changed the date of the plaintiff's departure from his
employment.  "Dear Marty: Based upon your continued contributions to the
clinical accounts receivable and other projects, I am pleased to inform you that
your last day at Yale has been extended to March 31, 2011. I appreciate your help
with these special projects as you continue to search for a permanent position
and wish you all the best. Cynthia."  Letter, 2/21/11, Def Ex. 4C.   Clearly, this third
letter is different from both the first and the second; not only does it materially
differ in tone and substance, it is *the only notice received by the plaintiff which
accurately states his date of termination*.  Id.; T78-79.

27

Finally, the plaintiff obtained retirement benefits from Yale.  T78-79.  This allowed the plaintiff to continue working at the defendant in a temporary capacity beyond even the actual termination date of March 31, 2011, and in fact, to do so at present.  This is substantially different from the statements made in the August 23, 2010 letter; thus, that letter cannot as a matter of law and fact constitute notice of the outcome of the plaintiff's employment with the defendant.

That the August 23, 2010 letter did not mark the commencement of the 180 period within which to file in CHRO is supported by the two cases cited by the defendant itself.   Of the defendant's two cases, one addresses EEOC, and not CHRO limitations, and the other is a summary order upholding the *denial* of summary judgment on the argument the defendant advances here.  <u>Hurtgam v. Lyndonville Cent. Sch.</u>, 446 Fed.Appx. 385, 386 (2d Cir. 2011);  <u>Santiago v. Owens Illinois,</u>

<u>Inc.</u>, 477 F.Supp.2d 493, 497 n. 2 (D.Conn. 2007) (Arterton, J.).  In all of the cases relying upon the date of notice of termination as the commencement date of the time to file an administrative claim, the plaintiffs have been provided *actual, unambiguous notice*.  Such is not the case here in the August 23, 2010 letter or the November 15, 2010 letter.  Only on February 21, 2011 did the plaintiff receive unambiguous notice of his termination, and his filing with CHRO was well within the 180 period.  As in <u>Santiago</u>, the presence here of questions of fact surrounding the scope of the notice received by the plaintiff  – including when he actually received it, the effective date of termination, the date of notice, whether

28

or not the plaintiff would be rehired in another position, the parameters of the employee's departure from employment, his eligibility fro retirement – all preclude disposition on summary judgment.  Id.

      2.  <u>Plaintiff Qualified For The Position</u>

The Second Circuit has "often emphasized [that] the burden of establishing this prima facie case in employment discrimination cases is 'minimal.' " <u>McGuinness v. Lincoln Hall</u>, 263 F.3d 49, 53 (2d Cir.2001).   It cannot be seriously advanced that the plaintiff, who held the Administrator position for nearly six years, was not qualified for his position.  The plaintiff is a highly skilled and exceedingly well qualified individual with a strong educational and business background.  A.

The plaintiff was employed by the defendant in the Yale-New Haven Medical Center for 32 years.  For the first 20 years of the plaintiff's employment, the plaintiff worked in the Yale-New Haven Hospital.  For the twelve years prior to his termination, the plaintiff was employed  by the defendant in the Yale University School of Medicine.   A.

Initially, the plaintiff was Director of Finance for the Yale Medical Group, ("YMG") of the defendant's School of Medicine.  The YMG is the administrative, billing and collecting arm for the School's various clinical practices.  A.

During the plaintiff's eight years as Director of Finance, the plaintiff played a significant role in turning the YMG organization from a deficit organization to one that operated with a surplus.  A.

Due to the excellence of the plaintiff's work, in February, 2006, the plaintiff was asked to become the interim Administrator for the Department of Ophthalmology & Visual Science in addition to the plaintiff's role in the YMG.  A.

The plaintiff did this from February, 2006 until August, 2006.  Due to the excellence of the plaintiff's work and the plaintiff's proficiency at this position, the plaintiff was asked to take the position of Administrator on a permanent basis.  On October 1, 2006, the plaintiff joined the newly appointed chairman of the Department, James C. Tsai, M.D.  A.

The plaintiff's annual reviews have always been excellent, and the plaintiff's working relationships with all staff have always been excellent.  In the plaintiff's annual reviews, it was noted that "Marty is genuinely respected by Faculty and Staff".  A.

Undermining the defendant's claims of incompetence are the words and deeds of the defendant itself.  After purportedly finding the plaintiff incompetent to such a degree that it removed him from his position as Administrator, the defendant highly praised the plaintiff, lauding him for his "valuable contributions to the clinical accounts receivable and other projects."  Def Ex. 4B, 4C.  The defendant went so far as to place the plaintiff in another position, and to extend his tenure therein not once, but twice.  Id.   Thereafter, the plaintiff remained eligible to work for the defendant on a temporary basis, up to 990 hours per year, for as long as he would like.  T77-78.  After his departure from the defendant, the plaintiff took a position in the private sector at the VNA, very similar to the one he

held at the defendant.  T10-12.

           The defendant offers only factual assertions to justify the plaintiff's

termination.  Each of these assertions, claiming poor performance, rather than

lack of qualification, are nonetheless refuted by countervailing assertions of fact.

T, supra.  As such, this strictly fact-based argument of the defendant must fail,

and its motion for summary judgment be denied.

> 3.  <u>The Conduct of the Defendant Gives Rise to an Inference of</u>
>     <u>Discrimination</u>

           The Second Circuit has explained that "[a]n inference of discriminatory

intent may be established by, inter alia, ... 'the sequence of events leading to the

plaintiff's discharge.' " <u>Sassaman v. Gamache</u>, 566 F.3d 307, 312 (2d Cir.2009).

In an similar case to the case at bar, the court denied summary judgment, finding

an inference of age discrimination.  <u>Miller v. Hartford Fire Insurance</u>, 652

F.Supp.2d 220 (D.Conn. 2009).  In <u>Miller</u>, the employer became aware that the

plaintiff, a long term employee, was eligible for retirement.  Id.  Miller had never

expressed any intention to retire Id.  Thereafter, the employer scrutinized Miller,

and placed him on a performance improvement plan.  Id.  The warning identified

several alleged areas of deficiency, although Miller's work had always been

excellent prior.  Id.  When Miller refused to retire, the defendant claimed that

Miller had failed to properly do his job, and terminated him.  Id.  The court found

that this sequence of events was sufficient to deny summary judgment, and to

present the ADEA and CFEPA claims to the jury.  Id.

In the instant case, nearly a nearly identical sequence of events demonstrates that a genuine dispute of material facts exists regarding an inference of discrimination.  Id.

In May, 2010, the Assistant Dean for Finance of the defendant, Carrie Capezzone, contacted the plaintiff and informed the plaintiff that at a meeting of the defendant it was stated that the plaintiff was planning on retiring.  A; T22-23.  The Assistant Dean for Finance of the defendant was the plaintiff's superior.  A.

The plaintiff was shocked and alarmed, as the plaintiff had no intention of retiring, and had never stated to anyone that he was even considering retirement.  A; T22-23.

Assistant Dean Capezzone contacted the plaintiff and asked the plaintiff when he was going to retire.  The plaintiff stated in no uncertain terms that he was not planning to, nor did he intend to retire.  The plaintiff told Capezzone that the defendant's claim that the plaintiff was planning on retiring was categorically untrue.  The plaintiff informed Assistant Dean Capezzone that he had never stated to anyone that he was even considering retirement.  Id.

The plaintiff asked Assistant Dean Capezzone who in the defendant claimed that the plaintiff was considering retiring.  Capezzone would not reveal to the plaintiff where or from whom this statement came.  Id.

Several days later, the plaintiff was summoned to meet Capezzone's boss, the Deputy Dean for Finance and Administration of the defendant, Cynthia Walker.  A.  Deputy Dean for Finance and Administration of the defendant,

Cynthia Walker is the head of the Finance and Administration department.  T12-13.  Deputy Dean Walker reports directly to the Dean of the defendant's Yale School of Medicine.  The Dean of the School of Medicine reports directly to the President of the defendant University.   A.

During this meeting, Walker questioned the plaintiff about the plaintiff's supposed intention to retire.  A; T18-21.      The plaintiff informed Walker in no uncertain terms that he was not planning to, nor did he intend to retire.  Id.  The plaintiff told Walker that the defendant's claim that the plaintiff was planning on retiring was categorically untrue.  Id.  The plaintiff informed Deputy Dean Walker that he had never stated to anyone that he was even considering retirement.  Id.  The plaintiff informed Walker that he intended to continue working until he was seventy (70) years old; he was then sixty-two (62) years old.  Id.; T4.

Shortly after this meeting, in which Deputy Dean Walker inquired about the plaintiff's fictitious plans to retire, Walker stated that the defendant had "lost confidence in the plaintiff as a leader."  A.

During this same time, Dr. Tsai also subjected the plaintiff to age discriminatory conduct:

10     Q.   Now, how about Dr. Tsai, did he ever say

11   anything to you that caused you to believe that he

12   was acting out of age discrimination?

13     A.   During my time with Dr. Tsai, there were

14   numerous conversations in which he made remarks

33

15   about the age of either faculty, me, staff.  We had

16   an assistant dean -- assistant chairman, vice

17   chairman of the department, who was head of the

18   research operation, and he announced he was leaving

19   to go to another school.

20      Q.   And who was that, by the way?

21      A.   Colin Barnstable -- and Colin is younger

22   than me.  And Tsai made the comment, "Well, you

23   know, he's getting too old for his research to be

24   valid."  And I made the comment, I said, "You know,

25   Colin is younger than me."  And he said, "Oh,

                              27

1   you're not in your 60s."  So ...

2      Q.   And what did you say to that?

3      A.   At the time I was.  I said "Yes, I am."

T26-27.

        Tsai's attitude toward persons in their 60's, such as the plaintiff, was that

they were too old to do their jobs properly and effectively, and "should just

retire."  T27-29.

     Q.   Okay.  Now, you said there was also a

8   comment made by an accountant who you described as

9    an older woman.  Do you remember anything else

10   about her, other than that she was older?

11      A.   Not really.  I had just started in the

12   department.

13      Q.   And what do you remember about Dr. Tsai's

14   comments about this accountant?

15      A.   Again, that it was good for her to leave so

16   that we could get someone younger in there.

. . .

23      Q.  Do you remember -- with regard to the

24   accountant, do you remember the exact words that

25   Dr. Tsai said?

31

1      A.   As I said, that, you know, "She was older,"

2    and that, you know, "her leaving was good because

3    we could get someone younger in that position."

T30-31.

      Commencing after the false claims that the plaintiff was intending to retire, and the plaintiff's strident assertions to the contrary, the defendant began to falsely and unfairly criticize and scrutinize the plaintiff's work.  AT43.

      The defendant falsely accused the plaintiff of to failing to investigate the allegations that staff were handing out the business cards of a physician who

35

once worked in the practice, but had since left.  A; T44-45.

This is completely false.  The plaintiff had immediately investigated the allegations, and found them to be baseless.  A.

When the allegations were first brought to the plaintiff's attention, the Practice Manager, Pamela-Jean Berkheiser, and the plaintiff met with the front desk personnel and inquired whether this was being done.  It was not.  A.

The plaintiff instructed staff that if patients called or asked for information regarding physicians who were no longer part of the practice, they were simply to say that the physicians now practice elsewhere in the New Haven area.  A.

As part of his investigation of this allegation, the plaintiff interviewed the Clinical Supervisor and instructed her that at no time were any of her staff to give out information regarding physicians currently in competition with the Department.  A; T60-65.

To further address the allegations, the plaintiff brought the defendant's own Human Resources Department into the investigation.  A representative from that department of the defendant, Elena McHugh, met with two of the physicians making the accusations, Dr. Nils Loewen and Dr. C. Roberto Bernardino.  Neither of them offered proof that anyone was handing out business cards.  A.

The plaintiff's thorough and diligent investigation, in conjunction with defendant's Human Resources Department, revealed that the claims were untrue.

The defendant's own Human Resources Department determined that there was no evidence to substantiate the claims.  A.

36

Nevertheless, the plaintiff was falsely blamed for Dr. Bernardino's leaving the Department.  The defendant falsely claimed that the departure was due to the plaintiff's handling of the claims that staff were handing out a competitor's business cards, which the defendant knew to be unsubstantiated.  A.

The defendant further falsely claimed that fee schedule changes were not implemented, resulting in lost revenue to the Department.  A; T109-111.  This, too, is totally false statement.  The plaintiff verified with the former Practice Manager that the changes were indeed implemented.  Id.

The defendant further falsely alleged that the plaintiff allowed the Practice Manager, Pam Berkheiser, to leave at 4:00 p.m. daily.  This too was untrue.  A; T6-65.

The false claims of the defendant were pretextual reasons to conceal the true, discriminatory nature of the defendant's conduct.  A.  Several physicians and other employees with whom the plaintiff worked stated in verbally and in writing that the plaintiff was excellent at his job.  T54-57.  Others stated that the plaintiff had been railroaded and mistreated by Tsai and the defendant.  T55-57.

On July 23, 2010, after the unlawful, age related statements about the plaintiff's fictitious intent to retire, the defendant ordered the plaintiff into a meeting with Tsai and Walker.  A.

At that meeting, Tsai and Walker claimed that there was concern for the plaintiff's performance, but no specifics were explained.  Tsai and Walker claimed to have a "report" about the plaintiff's work at the defendant.  When the plaintiff

37

asked to see the report and about specific information, the plaintiff was not allowed to see any report.  When the plaintiff asked when the plaintiff would be able to see the supposed report, the plaintiff was told by that they would look into it.  A.

The report was valueless and done by a nonprofessional from within the University.  T117-118.  In the past, the defendant had used the same person to create a report about a department to serve its own purposes.  Id.

Each of the claims of weakness or inadequacy on the part of the plaintiff are false, and were created by defendant as pretext to terminate the plaintiff.  T60-76.  The administration was not weak; nearly all administrators are the same now as when the plaintiff was employed.  Id.  In each instance, the plaintiff addressed or attempted to address every problem at the workplace.  Id.  Often, Tsai himself prevented the plaintiff from acting, and protected employees from termination that the plaintiff, as administrator, wanted to terminate.  Id.

When presented with the question whether Walker was simply trying to turn around a department in financial straits, the plaintiff responded:

Q   Is that also what Dr. Walker was trying to

 9  do?

10      A   I would say that, except that then things

11  don't add up together.  You would have to take me

12  down a long road from excellent reviews, you're

13  doing your job, to all of a sudden you are a

14  complete incompetent.

15    Q   What intervened between those two

16  things --

17    A   Was that discussion about retirement.

T117.

Prior to the unlawful, age related statements about the plaintiff's fictitious intent to retire, the plaintiff was never informed of any concerns about the plaintiff's work performance.  the plaintiff's performance reviews were always excellent.  A.

Prior to the unlawful age based conduct of the defendant, and the plaintiff's strong protestations that he had no intent to retire, the defendant never disciplined the plaintiff.  The defendant had never even complained about the plaintiff's work performance, his managerial style or the plaintiff's interactions with staff and other employees of the defendant.  A.

As the plaintiff states:

20    A   I believe the report is what they used as

21  their response to get rid of me.  But I think, had I

22  gone into Cynthia's office and said, "I am going to

23  retire," none of this conversation would have taken

24  place.

T118.

After the defendant's statements about the plaintiff's claimed retirement

and his objections thereto, however, Tsai informed the plaintiff that the defendant has "no confidence" in the plaintiff and that the plaintiff was "in a lot of trouble". A.

After the statements, Walker stated that the plaintiff should be concerned about his job. A.

Shortly after meeting with Tsai and Walker, the plaintiff had a meeting with Dr. M. Bruce Shields, Chairman Emeritus, of the defendant. At that meeting, Dr. Shields asked if the plaintiff was coming to meet with him to ask for a letter of recommendation. The plaintiff told him the plaintiff didn't know that the plaintiff needed one.

On August 23, 2010, the defendant issued the plaintiff a written warning. A. In that written warning, the defendant removed the plaintiff from the plaintiff's position as Clinical Administrator. The defendant demoted the plaintiff to a temporary assignment with the Medical School Financial Operations Department of the defendant. A.

The defendant stated that "At the end of the 90-day reassignment, your employment with Yale University will terminate." A. The defendant, however, did not terminate the plaintiff at that time. A; Letter from Walker and Tsai, Def. Ex.4B, 4C.

The defendant took this action against the plaintiff on the basis of his age, and in retaliation for his opposition to the defendant's efforts to force him to retire. A.

Despite its false claims to the contrary, the defendant acknowledged the plaintiff's "valuable contributions" to special projects of the defendant.  In stark contradiction of its claimed reasons for the plaintiff's termination, the defendant accurately lauded the plaintiff's work performance, and extended the plaintiff's termination date to February 28, 2011.  A; Letter from Walker and Tsai, Def. Ex.4B, 4C.

Once again, contradicting its false and pretextual reasons to terminate the plaintiff, recognizing the excellence of the plaintiff's work, the defendant again extended the plaintiff's termination date to March 31, 2011.  A;  Letter from Walker and Tsai, Def. Ex.4B, 4C..

On March 31, 2011, the defendant terminated the plaintiff's employment.  A; Def. Answer, ¶¶ 53, 54.  Tsai and Walker were responsible for the plaintiff's termination.

The defendant has a history of discrimination on the basis of age. The defendant treated the previous Administrator to hold the plaintiff 's former position, who was approximately the plaintiff's age, in same unlawful manner.  A.

The reasons given by the defendant for the plaintiff's demotion and termination are pretextual.  The true reason for the conduct of the defendant is because of the plaintiff's age and in retaliation for his opposition to the defendant's conduct.  A.

Again contradicting its pretextual reasons therefor, and again recognizing the plaintiff's invaluable contributions, the defendant forced the plaintiff to accept

a "casual" position, at a greatly reduced wage.  Id.; Def. Ex.

    As in <u>Miller</u>, the employer here became aware that the plaintiff, a long term employee, was eligible for retirement.  Id.  The plaintiff here, as Miller, had never expressed any intention to retire Id.  Thereafter, as in <u>Miller</u>, the defendant here subjected the plaintiff to scrutiny, alleging poor work performance.  Id.  The defendant here subjected the plaintiff to a departmental review of his performance, akin to the performance improvement plan in <u>Miller</u>.  Id.  The defendant identified several alleged areas of deficiency, here and in <u>Miller</u>; in both instances the plaintiffs' work had always been excellent prior.  Id.  When the plaintiff here refused to retire, the defendant claimed that he had failed to properly do his job, and terminated him, agin, identical to <u>Miller</u>.  Id.  The court found that this sequence of events sufficient to deny summary judgment, and to present the ADEA and CFEPA claims to the jury.  Id.

    In the instant case, the highly similar series of events here, underscored by actual age discriminatory comments by the two decision makers Walker and Tsai, is more than sufficient to demonstrate a genuine dispute of material fact regarding the conduct of the defendant giving rise to an inference of discrimination.  Summary judgment must be denied on the ADEA and CFEPA claims.

    C.    <u>The Defendant's Reasons to Terminate Plaintiff Are Pretextual</u>

    Once a defendant offers a legitimate, non-discriminatory reason for its actions, the burden shifts back to the plaintiff to fulfill her ultimate burden of

proving that the defendant intentionally discriminated against her in the employment decision.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000).   In order to satisfy this burden, the plaintiff may attempt to prove that the legitimate, non-discriminatory reason offered by the defendant was not the employer's true reason, but was a pretext for discrimination.  Id. As the Supreme Court explained in Reeves:  Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive.   In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.... Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. 530 U.S. at 147 (citations omitted).

Evidence that an employer's reason is false, combined with the evidence presented to establish a prima facie case is sufficient to sustain a plaintiff's burden, and a plaintiff need not have further evidence of discrimination.  Id.;  see also Zimmermann v. Assoc. First Capital Corp., 251 F.3d 376, 381-82 (2d Cir.2001).  Ultimately, a finder of fact may consider the strength of the prima facie case, the probative value of the proof that the defendant's reason is pretextual, and any other evidence presented in the case when determining if the plaintiff has sustained her burden.  Zimmermann, 251 F.3d at 381-82.

43

Courts must be mindful of the fact that summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated.  <u>Kahn v. Fairfield University</u>, 357 F.Supp. 2d 496 (2005).  Courts may only grant summary judgment at the pretext stage where the plaintiff has "provided no indication that any evidence exists that would permit the trier of fact to draw a reasonable inference of pretext." See <u>Meiri v. Dacon</u>, 759 F.2d 989, 997 (2d Cir.1985)(emphasis supplied);  see also <u>Dister</u>, 859 F.2d 1108;  <u>Norton v. Sam's Club</u>, 145 F.3d 114 (2d Cir.1998).

 the basis for her termination.

For reasons similar to those presented in support of an inference of discrimination, the defendant's explanation is unworthy of credence.  <u>Reeves</u>, supra.

The plaintiff was employed by the defendant in the Yale-New Haven Medical Center for 32 years.  For the first 20 years of the plaintiff's employment, the plaintiff worked in the Yale-New Haven Hospital.  For the past twelve years to his termination, the plaintiff was by the defendant in the Yale University School of Medicine.   A.  Initially, the plaintiff was Director of Finance for the Yale Medical Group, ("YMG") of the defendant's School of Medicine.  The YMG is the administrative, billing and collecting arm for the School's various clinical practices.  A.  During the plaintiff's eight years as Director of Finance, the plaintiff played a significant role in turning the YMG organization from a deficit organization to one that operated with a surplus.  A.

44

Due to the excellence of the plaintiff's work, in February, 2006, the plaintiff was asked to become the interim Administrator for the Department of Ophthalmology & Visual Science in addition to the plaintiff's role in the YMG.  A.

The plaintiff did this from February, 2006 until August, 2006.  Due to the excellence of the plaintiff's work and the plaintiff's proficiency at this position, the plaintiff was asked to take the position of Administrator on a permanent basis.  On October 1, 2006, the plaintiff joined the newly appointed chairman of the Department, James C. Tsai, M.D.  A.

The plaintiff's annual reviews have always been excellent, and the plaintiff's working relationships with all staff have always been excellent.  In the plaintiff's annual reviews, it was noted that "Marty is genuinely respected by Faculty and Staff".  A.

The Department has been in deficit for approximately 20 years.  The goal of Dr. Tsai was to turn the deficit into a surplus.  As the result of the plaintiff's hard work, the deficit was decreasing annually, although not at the rate Tsai promised to the Dean's Office of the defendant.  A.

In March 2010, the Billing Manager, Mary Schwall, left the defendant University.  After she left, it was discovered that Ms. Schwall had hidden $300,000 worth of invoices, and failed to act on the collection of these invoices.  Once this was discovered the plaintiff immediately informed Dr. Tsai.   A.

Under the plaintiff's direction, YMG staff immediately began working the previously hidden invoices so that the funds due from the secreted invoices could

45

be collected.  A.

As the plaintiff's Department was exceeding previous years clinical collections and was nearly 20% ahead of the previous year, there were no indications that Schwall was hiding invoices and that they were not being collected.  The plaintiff informed the defendant of this, and it had no reply.  A.

In May, 2010, the Assistant Dean for Finance of the defendant, Carrie Capezzone, contacted the plaintiff and informed the plaintiff that at a meeting of the defendant it was stated that the plaintiff was planning on retiring.  A; T22-23.

The Assistant Dean for Finance of the defendant was the plaintiff's superior.  A.

The plaintiff was shocked and alarmed, as the plaintiff had no intention of retiring, and had never stated to anyone that he was even considering retirement.  A; T22-23.

Assistant Dean Capezzone contacted the plaintiff and asked the plaintiff when he was going to retire.  The plaintiff stated in no uncertain terms that he was not planning to, nor did he intend to retire.  The plaintiff told Capezzone that the defendant's claim that the plaintiff was planning on retiring was categorically untrue.  The plaintiff informed Assistant Dean Capezzone that he had never stated to anyone that he was even considering retirement.  Id.

The plaintiff asked Assistant Dean Capezzone who in the defendant claimed that the plaintiff was considering retiring.  Capezzone would not reveal to the plaintiff where or from whom this statement came.  Id.  Several days later, the

plaintiff was summoned to meet Capezzone's boss, the Deputy Dean for Finance and Administration of the defendant, Cynthia Walker.  A.

 Deputy Dean for Finance and Administration of the defendant, Cynthia Walker is the head of the Finance and Administration department.  T12-13.  Deputy Dean Walker reports directly to the Dean of the defendant's Yale School of Medicine.  The Dean of the School of Medicine reports directly to the President of the defendant University.   A.

During this meeting, Walker questioned the plaintiff about the plaintiff's supposed intention to retire.  A; T18-21.        The plaintiff informed Walker in no uncertain terms that he was not planning to, nor did he intend to retire.  Id.  The plaintiff told Walker that the defendant's claim that the plaintiff was planning on retiring was categorically untrue.  Id.  The plaintiff informed Deputy Dean Walker that he had never stated to anyone that he was even considering retirement.  Id. The plaintiff informed Walker that he intended to continue working until he was seventy (70) years old; he was then sixty-two (62) years old.  Id.; T4.

Shortly after this meeting, in which Deputy Dean Walker inquired about the plaintiff's fictitious plans to retire, Walker stated that the defendant had "lost confidence in the plaintiff as a leader."  A.

During this same time, Dr. Tsai also subjected the plaintiff to age discriminatory conduct:

    10    Q.  Now, how about Dr. Tsai, did he ever say

    11   anything to you that caused you to believe that he

12    was acting out of age discrimination?

13      A.   During my time with Dr. Tsai, there were

14    numerous conversations in which he made remarks

15    about the age of either faculty, me, staff.  We had

16    an assistant dean -- assistant chairman, vice

17    chairman of the department, who was head of the

18    research operation, and he announced he was leaving

19    to go to another school.

20      Q.   And who was that, by the way?

21      A.   Colin Barnstable -- and Colin is younger

22    than me.  And Tsai made the comment, "Well, you

23    know, he's getting too old for his research to be

24    valid."  And I made the comment, I said, "You know,

25    Colin is younger than me."  And he said, "Oh,


                               27


 1    you're not in your 60s."  So ...

 2      Q.   And what did you say to that?

 3      A.   At the time I was.  I said "Yes, I am."

T26-27.

        Tsai's attitude toward persons in their 60's, such as the plaintiff, was that

                               48

they were too old to do their jobs properly and effectively, and "ashould just

retire." T27-29.

    Q.  Okay.  Now, you said there was also a

   8  comment made by an accountant who you described as

   9  an older woman.  Do you remember anything else

  10  about her, other than that she was older?

  11    A.  Not really.  I had just started in the

  12  department.

  13    Q.  And what do you remember about Dr. Tsai's

  14  comments about this accountant?

  15    A.  Again, that it was good for her to leave so

  16  that we could get someone younger in there.

 . . .

23    Q.  Do you remember -- with regard to the

  24  accountant, do you remember the exact words that

  25  Dr. Tsai said?


                 **31**

   1    A.  As I said, that, you know, "She was older,"

   2  and that, you know, "her leaving was good because

   3  we could get someone younger in that position."

T30-31.

Commencing after the false claims that the plaintiff was intending to retire, and the plaintiff's strident assertions to the contrary, the defendant began to falsely and unfairly criticize and scrutinize the plaintiff's work.  AT43.

The defendant falsely accused the plaintiff of to failing to investigate the allegations that staff were handing out the business cards of a physician who once worked in the practice, but had since left.  A; T44-45.

This is completely false.  The plaintiff had immediately investigated the allegations, and found them to be baseless.  A.

When the allegations were first brought to the plaintiff's attention, the Practice Manager, Pamela-Jean Berkheiser, and the plaintiff met with the front desk personnel and inquired whether this was being done.  It was not.  A.

The plaintiff instructed staff that if patients called or asked for information regarding physicians who were no longer part of the practice, they were simply to say that the physicians now practice elsewhere in the New Haven area.  A.

As part of his investigation of this allegation, the plaintiff interviewed the Clinical Supervisor and instructed her that at no time were any of her staff to give out information regarding physicians currently in competition with the Department.  A; T60-65.

To further address the allegations, the plaintiff brought the defendant's own Human Resources Department into the investigation.  A representative from that department of the defendant, Elena McHugh, met with two of the physicians making the accusations, Dr. Nils Loewen and Dr. C. Roberto Bernardino.  Neither

of them offered proof that anyone was handing out business cards.  A.

The plaintiff's thorough and diligent investigation, in conjunction with defendant's Human Resources Department, revealed that the claims were untrue.

The defendant's own Human Resources Department determined that there was no evidence to substantiate the claims.  A.

Nevertheless, the plaintiff was falsely blamed for Dr. Bernardino's leaving the Department.  The defendant falsely claimed that the departure was due to the plaintiff's handling of the claims that staff were handing out a competitor's business cards, which the defendant knew to be unsubstantiated.  A.

The defendant further falsely claimed that fee schedule changes were not implemented, resulting in lost revenue to the Department.  A; T109-111.  This, too, is totally false statement.  The plaintiff verified with the former Practice Manager that the changes were indeed implemented.  Id.

The defendant further falsely alleged that the plaintiff allowed the Practice Manager, Pam Berkheiser, to leave at 4:00 p.m. daily.  This too was untrue.  A; T6-65.

The false claims of the defendant were pretextual reasons to conceal the true, discriminatory nature of the defendant's conduct.  A.  Several physicians and other employees with whom the plaintiff worked stated in verbally and in writing that the plaintiff was excellent at his job.  T54-57.  Others stated that the plaintiff had been railroaded and mistreated by Tsai and the defendant.  T55-57.

On July 23, 2010, after the unlawful, age related statements about the

plaintiff's fictitious intent to retire, the defendant ordered the plaintiff into a meeting with Tsai and Walker.  A.

At that meeting, Tsai and Walker claimed that there was concern for the plaintiff's performance, but no specifics were explained.  Tsai and Walker claimed to have a "report" about the plaintiff's work at the defendant.  When the plaintiff asked to see the report and about specific information, the plaintiff was not allowed to see any report.  When the plaintiff asked when the plaintiff would be able to see the supposed report, the plaintiff was told by that they would look into it.  A.

The report was valueless and done by a nonprofessional from within the University.  T117-118.  In the past, the defendant had used the same person to create a report about a department to serve its own purposes.  Id.

Each of the claims of weakness or inadequacy on the part of the plaintiff are false, and were created by defendant as pretext to terminate the plaintiff.  T60-76. The administration was not weak; nearly all administrators are the same now as when the plaintiff was employed.  Id.  In each instance, the plaintiff addressed or attempted to address every problem at the workplace.  Id.  Often, Tsai himself prevented the plaintiff from acting, and protected employees from termination that the plaintiff, as administrator, wanted to terminate.  Id.

When presented with the question whether Walker was simply trying to turn around a department in financial straits, the plaintiff responded:

Q   Is that also what Dr. Walker was trying to

9  do?

10     A   I would say that, except that then things

11  don't add up together.  You would have to take me

12  down a long road from excellent reviews, you're

13  doing your job, to all of a sudden you are a

14  complete incompetent.

15     Q   What intervened between those two

16  things --

17     A   Was that discussion about retirement.

T117.

Prior to the unlawful, age related statements about the plaintiff's fictitious intent to retire, the plaintiff was never informed of any concerns about the plaintiff's work performance.  the plaintiff's performance reviews were always excellent.  A.

Prior to the unlawful age based conduct of the defendant, and the plaintiff's strong protestations that he had no intent to retire, the defendant never disciplined the plaintiff.  The defendant had never even complained about the plaintiff's work performance, his managerial style or the plaintiff's interactions with staff and other employees of the defendant.  A.

As the plaintiff states:

20   A   I believe the report is what they used as

21   their response to get rid of me.  But I think, had I

22  gone into Cynthia's office and said, "I am going to

23  retire," none of this conversation would have taken

24  place.

T118.

After the defendant's statements about the plaintiff's claimed retirement and his objections thereto, however, Tsai informed the plaintiff that the defendant has "no confidence" in the plaintiff and that the plaintiff was "in a lot of trouble".  A.

After the statements, Walker stated that the plaintiff should be concerned about his job.  A.

Shortly after meeting with Tsai and Walker, the plaintiff had a meeting with Dr. M. Bruce Shields, Chairman Emeritus, of the defendant.  At that meeting, Dr. Shields asked if the plaintiff was coming to meet with him to ask for a letter of recommendation.  The plaintiff told him the plaintiff didn't know that the plaintiff needed one.

On August 23, 2010, the defendant issued the plaintiff a written warning.  A.

In that written warning, the defendant removed the plaintiff from the plaintiff's position as Clinical Administrator.  The defendant demoted the plaintiff to a temporary assignment with the Medical School Financial Operations Department of the defendant.  A.

The defendant stated that "At the end of the 90-day reassignment, your employment with Yale University will terminate."  A.  The defendant, however, did not terminate the plaintiff at that time.  A; Letter from Walker and Tsai, Def. Ex.4B,

4C.

The defendant took this action against the plaintiff on the basis of his age, and in retaliation for his opposition to the defendant's efforts to force him to retire.

A.

Despite its false claims to the contrary, the defendant acknowledged the plaintiff's "valuable contributions" to special projects of the defendant.  In stark contradiction of its claimed reasons for the plaintiff's termination, the defendant accurately lauded the plaintiff's work performance, and extended the plaintiff's termination date to February 28, 2011.  A; Letter from Walker and Tsai, Def. Ex.4B, 4C.

Once again, contradicting its false and pretextual reasons to terminate the plaintiff, recognizing the excellence of the plaintiff's work, the defendant again extended the plaintiff's termination date to March 31, 2011.  A;  Letter from Walker and Tsai, Def. Ex.4B, 4C..

On March 31, 2011, the defendant terminated the plaintiff's employment.  A; Def. Answer, ¶¶ 53, 54.  Tsai and Walker were responsible for the plaintiff's termination.  T17-18.

On April 8, 2011, nine days after the defendant terminated the plaintiff, the plaintiff filed his Affidavit of Illegal Discriminatory Conduct in the CHRO and the EEOC.  See, Def. Ex. 2A.

Again contradicting its pretextual reasons therefor, and again recognizing the plaintiff's invaluable contributions, the defendant forced the plaintiff to accept

a "casual" position, at a greatly reduced wage.  Id.; Def. Ex.

The defendant has a history of discrimination on the basis of age. The defendant treated the previous Administrator to hold the plaintiff 's former position, who was approximately the plaintiff's age, in same unlawful manner.  A.

The reasons given by the defendant for the plaintiff's demotion and termination are pretextual.  The true reason for the conduct of the defendant is because of the plaintiff's age and in retaliation for his opposition to the defendant's conduct.  A.

"Findings of discrimination, discriminatory intent, and causation are findings of fact."  Cornwell v. Robinson, 23 F.3d 694, 706 (2d Cir.1994).   In order for a plaintiff's claims to survive a motion for summary judgment, she must show that there is an issue of material fact about whether the employer discriminated against her on the basis of her sex.   See St. Mary's Honor Center, 509 U.S. at 511; Fisher v. Vassar College, 114 F.3d 1332, 1336 (2d Cir.1997) (en banc ).  "At summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer."  Byrnie v. Town of Cromwell, Board of Education, 243 F.3d 93, 102 (2d Cir.2001);  Bickerstaff v. Vassar College, 196 F.3d 435, 448 (2d Cir.1999).

The plaintiff was highly experienced, dedicated and accomplished employee of the defendant.  Through his excellent work he earned consistent promotion and excellent reviews.  He attained an held the position of Administrator of a troubled

department, in financial and administrative disarray when he arrived.  For nearly

six years he worked to make the department profitable, along the way

encountering employee misfeasance in secreting hundreds of thousands of

dollars of uncollected bills;  substance abusing and adulterous employees; poor

morale; inefficient scheduling and customer service; lackadaisical faculty and

staff; ambitious, overreaching Chairman and Deans; and a variety of other

workplace issues.  T, supra.  All of these issues the plaintiff dealt with to the

extent that his supervisors permitted him.  Id.

The plaintiff's work, under adverse circumstances, remained excellent.

When his age became an issue, the defendant brought up the issue of retirement.

The plaintiff immediately and unequivocally stated that he had no intention to

retire.  The plaintiff intended to continue working until he was seventy at least; at

the time the defendant brought u retirement, the plaintiff was sixty-two years old.

As soon as the plaintiff indicated that he had no intention of retiring, the

defendant delegated one of its own, unqualified personnel to do a "study" of the

plaintiff's department.  The defendant used this report – never, to the present

shown to the plaintiff – to remove him from his position.

The two persons responsible for the plaintiff's removal are Cynthia Walker

and James Tsai.  Walker is the supervisor of the plaintiff who questioned him on

his retirement "plans".  Tsai has a history of stating that he disfavors older

employees, and removes them, replacing them with younger employees.  He has

even stated this to the plaintiff.  Before turning his discriminatory animus on the

57

plaintiff, he was under the mistaken impression that the plaintiff had not yet turned sixty years old, and he told the plaintiff as much.  Only after the plaintiff informed Tsai that he was over sixty years old did Tsai for the very first time begin to claim that the plaintiff's work performance was subpar.  After learning the plaintiff's age and that he did not intend to retire, Tsai told the plaintiff that he was in trouble.

Thereafter, Walker and Tsai removed the plaintiff from his position, in a letter detailing several alleged shortcomings.  The first letter seemed to forbid the plaintiff from any employment with the defendant in any position.

The pretextual nature of the reasons given by the defendant are particularly apparent by the statements of the defendant and its course of action after removing the plaintiff from his position as Administrator.  Despite its false claims to the contrary, the defendant acknowledged the plaintiff's "valuable contributions" to special projects of the defendant.  In stark contradiction of its claimed reasons for the plaintiff's termination, the defendant accurately lauded the plaintiff's work performance, and extended the plaintiff's termination date to February 28, 2011.  A; Letter from Walker and Tsai, Def. Ex.4B, 4C.

Once again, contradicting its false and pretextual reasons to terminate the plaintiff, recognizing the excellence of the plaintiff's work, the defendant again extended the plaintiff's termination date to March 31, 2011.  A;  Letter from Walker and Tsai, Def. Ex.4B, 4C..

On March 31, 2011, the defendant terminated the plaintiff's employment.  A;

58

Def. Answer, ¶¶ 53, 54.  Tsai and Walker were responsible for the plaintiff's termination.

The defendant has a history of discrimination on the basis of age. The defendant treated the previous Administrator to hold the plaintiff 's former position, who was approximately the plaintiff's age, in same unlawful manner.  A.

The reasons given by the defendant for the plaintiff's demotion and termination are pretextual.  The true reason for the conduct of the defendant is because of the plaintiff's age and in retaliation for his opposition to the defendant's conduct.  A.

Again contradicting its pretextual reasons therefor, and again recognizing the plaintiff's invaluable contributions, the defendant forced the plaintiff to accept a "casual" position, at a greatly reduced wage.  Id.; Def. Ex.

The plaintiff has sufficiently refuted the pretextual reasons offered by the defendant. For the reasons stated, the defendant's motion for summary judgment must be denied.

### D.    Intentional Infliction of Emotional Distress

In order to establish a claim of intentional infliction of emotional distress, the plaintiff needs to demonstrate "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress and (4) that the emotional distress sustained by the plaintiff was severe.  Petyan v. Ellis, 200

59

Conn. 243, 253 (1986).  The plaintiff only contests that the plaintiff has failed to allege facts demonstrating the second element that the defendant engaged in extreme and outrageous conduct, implicitly admitting the existence of the other three elements.

Conduct is extreme and outrageous If it goes beyond "all bounds usually tolerated by decent society."  <u>DeLaurentis v New Haven,</u> 220 Conn. 225, 267 (1991).  The mere firing of an employee is not usually so extreme and outrageous as to qualify.  <u>Venterina v Cummings & Lockwood</u>, 117 F.Supp.2d 114 (D. Conn. 1999).  However, if the plaintiff alleges that the firing was done in an a humiliating or inconsiderate manner, this may be enough to establish such a claim.  <u>Belanger v. Commerce Clearing House, Inc.,</u> 25 F.Supp.2d 83, 84-85 (D.Conn,1998).  Courts recognize that when the plaintiff is in a more vulnerable position and the defendant knows of such vulnerability that conduct which would not normal be extreme and outrageous can become so because of the victim's unusual vulnerability. *See* <u>Witt v Yale-New Haven Hosp.</u>, 977 A.2d 779 (Conn. Sup. 2008)(looking at the unusual state of heightened emotions in certain medical procedures and the hospital's awareness of this in determining that plaintiffs had stated a cause of action).

The plaintiff has demonstrated that the defendant mistreated him, including falsely accused him of incompetence and fired him, because of his age.  Such conduct is intolerable in a civilized society.

The court should deny the defendant's motion for summary judgment on

60

this count.

IV.    <u>CONCLUSION</u>

_____For the foregoing reasons, the Court should deny the defendant's Motion

for Summary Judgment.

THE PLAINTIFF


BY_____/s/_____
    **WILLIAM S. PALMIERI**
    **Law Offices of William S. Palmieri, L.L.C.**
    **Federal Bar No. ct14361**
    **129 Church Street, Suite 405**
    **New Haven, CT 06510**
    **PHONE: (203) 562-3100**
    **FAX:  (203) 909 6006**
    **EMAIL:  wpalmieri@hotmail.com**


<u>CERTIFICATION</u>

  **I hereby certify that on this date a copy of the foregoing was filed

electronically and served by mail on anyone unable to accept electronic filing.

Notice of this filing will be sent by email by email to all parties by operation of the

Court's electronic filing system or by mail to anyone unable to accept electronic

filing as indicated on the Notice of Electronic Filing.  Parties may access this filing

through the Court's CM/ECF system.**

**Patrick M. Noonan, Esq.**
**Donahue, Durham & Noonan, P.C.**
**741 Boston Post Road**
**Guilford, CT 06437**

        _____
        **WILLIAM S. PALMIERI**

61