1          UNITED STATES DISTRICT COURT
            DISTRICT OF CONNECTICUT
2                  VOLUME I

3

4      - - - - - - - - - - - - - x
5                              :
       MARTIN J. DONOVAN          :
6                              :
             Plaintiff   :
7      v.                 : CIVIL ACTION NO.:
                          : 3:12 CV00549 (VLB)
8      YALE UNIVERSITY        :
                           :
9           Defendant   :
                           :
10     - - - - - - - - - - - - x

11

12

13        Deposition of MARTIN J. DONOVAN, taken

14    pursuant to the Federal Rules of Civil Procedure,

15    before Melissa J. Kelly, RMR, CRR, Licensed

16    Shorthand Reporter #00307, and Notary Public within

17    and for the State of Connecticut, held at the

18    offices of William S. Palmieri, LLC, 129 Church

19    Street, Suite 405, New Haven, Connecticut, on March

20    5, 2013, at 10:55 a.m.

21

22

23    DEL VECCHIO REPORTING SERVICES, LLC
       PROFESSIONAL SHORTHAND REPORTERS
24         117 RANDI DRIVE
          MADISON, CT  06443
25      203 245-9583  800 839-6867
      HARTFORD     NEW HAVEN      STAMFORD

2

1   A P P E A R A N C E S:

2
    ON BEHALF OF THE PLAINTIFF:
3   KATHRYN R. SYLVESTER, ESQ.
    LAW OFFICES OF WILLIAM S. PALMIERI, LLC
4   129 Church Street, Suite 405
    New Haven, Connecticut  06510
5   (203) 562-3100
    (203) 909-6006 - Facsimile
6   wpalmieri@hotmail.com

7
    ON BEHALF OF THE DEFENDANT:
8   PATRICK M. NOONAN, ESQ.
    DONAHUE, DURHAM & NOONAN, P.C.
9   Concept Park
    741 Boston Post Road
10   Guilford, Connecticut  06437
    (203) 458-9168
11   (203) 458-4424 - Facsimile
    pnoonan@ddnctlaw.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

3

1          MARTIN J. DONOVAN,

2      of 7 Cobblestone Court, Naugatuck,

3      Connecticut, having first been duly sworn,

4      deposed and testified as follows:

5

6          DIRECT EXAMINATION

7   BY MR. NOONAN:

8     Q.  Good morning, Mr. Donovan.

9     A.  Good morning.

10    Q.  First of all, thanks for coming.  I

11   appreciate you taking the time.  You've probably

12   talked with your lawyers about the dos and don'ts

13   of the deposition, but let me mention a couple of

14   things that I think are worth repeating.  First,

15   you should be comfortable during the deposition.

16   If at any point in time you want to take a break,

17   just say so and we'll do that.  The only thing I

18   would ask is that you answer whatever question is

19   pending before you take the break.  Is that okay?

20    A.  Yup.

21      Q.   And also it's important that you understand

22   a question before you start your answer.  So if at

23   any point in time you have difficulty understanding

24   what I'm asking, just let me know that and I'll try

25   to rephrase the question and make it a better

4

1    question for you to answer.  Is that all right?

2        A.  Uh-huh.

3        Q.  And that answer gives me a good lead into

4    my next request, and that is to keep your answers

5    in words rather than saying "uh-huh," because the

6    transcript will be somewhat unclear if you nod your

7    head or say uh-huh or something of that nature.  If

8    that happens, I might say, do you mean yes or do

9    you mean no, and I just want you to know, I'm not

10   trying to give you a hard time if I do that.  I

11   just want to make sure the tran --

12       A.  I understand.

13       Q.  -- script is accurate.

14           And the final request is something that

15   everyone violates from time to time, but if you can

16   try to withhold your answer until the question is

17   completed, that also makes for a better transcript.

18           So let me start by asking a little bit

19   about yourself.  Can you tell me your date of

20   birth?

21   A.  12/23/1948.

22   Q.  A Christmas present for your parents.

23   A.  Yes.

24   Q.  And how far did you go through school?

25   A.  Partial college.

5

1    Q.  Okay.  And where was that?

2    A.  University of New Haven and Bangor

3   Theological Seminary.

4    Q.  How many years did you study at UNH?

5    A.  Three.

6    Q.  Okay.  And when did you finish the part of

7   the program you did there; when was your last year

8   there?

9    A.  Probably '78.

10    Q.  At UNH, was that a full-time program that

11   you did day-to-day or was it --

12    A.  It started full-time and then it was part

13   time at evenings.

14    Q.  And how come you ended up not finishing?

15    A.  Predominantly expenses and family issues.

16    Q.  And then -- I'm sorry.  And when you were

17   at UNH, what were you studying?

18    A.  Accounting.

19    Q.  And then you said you went to the Bangor

20   Theological Seminary?

21    A.  Seminary, yes.

22    Q.  And when was that?

23    A.  1969, 1972.

24    Q.  Okay.  So you were three years there as

25    well?

6

1   A.  Yes.

2   Q.  And did you graduate there?

3   A.  No.  That was -- Bangor is a unique

4   seminary.  It had what they called the Bangor plan.

5   For people who hadn't completed a bachelor's

6   degree, they could study towards their bachelor's

7   and their master's simultaneously.

8   Q.  Okay.  And did you end up getting a

9   bachelor's degree at Bangor?

10   A.  No.

11   Q.  What were you studying then?

12   A.  Theology.  Studying to be a minister.

13   Q.  And ultimately, you decided not to pursue

14   that path?

15   A.  That's correct.

16   Q.  Am I correct that you're married?

17   A.  Yes.

18   Q.  And what's your wife's name?

19   A.  Dorine, D-o-r-i-n-e.

20   Q.  And is she employed?

21    A.  Yes.

22    Q.  Where?

23    A.  AmWINS.

24    Q.  Can you spell that?

25    A.  A-m-W-I-N-S.

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

7

1    Q.  And what's --

2    A.  It's the Managing Agency Group in Shelton.

3    Q.  Okay.  What does she do there?

4    A.  She's an insurance broker.

5    Q.  And do you have children?

6    A.  Yes.

7    Q.  Can you tell me their names and ages and

8    what they do?

9    A.  Okay.  The oldest is Kelley.  She's 43.

10   She's a stay-at-home mom.

11    Q.  All right.

12    A.  Tracy, who is 40, and she works for

13   Computer Disaster Recovery.

14    Q.  And what does she do there?

15    A.  She's mostly like what I would call a sales

16   rep.  She sells the product.

17    Q.  And do you have any other children?

18    A.  Sarah.  Sarah is 32 and Sarah works for The

19   Agency on Aging.

20    Q.  And what does she do there?

21     A.  She is -- home visits, making sure that the

22   elderly have the services they need.

23     Q.  So you have three girls?

24     A.  Yes.

25     Q.  I've got you by one.  I have four.

8

1    A.  Want to match grandchildren?

2    Q.  You may have me on that.  I only have three

3   of those.  How many?

4    A.  I have six of those.

5    Q.  You doubled my productivity on that score.

6   It is great though, isn't it?

7    A.  Yes.

8    Q.  And where are you working at present?

9    A.  Visiting Nurse Association Northwest.

10    Q.  And what do you do there?

11    A.  I'm the director of finance.

12    Q.  How do you like it?

13    A.  I love it.

14    Q.  Do you?  Good.

15       And how long have you been there?

16    A.  Just a little over a year and a half.

17    Q.  And do you recall your starting salary?

18    A.  77,000.

19    Q.  And have you had any raises since --

20    A.  Yes.

21    Q.  And how many raises have you had?

22    A.  I've had one, one annual review.

23    Q.  And what's your salary now?

24    A.  80,500.

25    Q.  And was that a merit raise?


DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

9

1    A.  Yes.

2    Q.  Okay.  And how -- some organizations have

3    sort of a range of raises that are available, from

4    say, 3 percent to 5 percent or something of that

5    nature.  Do you know where your raise fit on the

6    scale, if there was a scale?

7    A.  Yes, there is a scale, and I would be in

8    the upper tier of that scale.

9    Q.  Upper tier meaning the top or the top

10   portion?

11   A.  Top portion, yup.

12   Q.  And do you know what the scale was and what

13   your raise was as a percentage basis?

14   A.  The range was from zero to 4.

15   Q.  Okay.  And what was your range?

16   A.  3.5.

17   Q.  And how was your review?

18   A.  Excellent.

19   Q.  It sounds like a positive review.  Good.

20       And you started the VNA when?

21    A.  May 19, 2011.

22    Q.  Did you have any period of unemployment

23  between leaving Yale and starting at the VNA?

24    A.  No.

25    Q.  And do you have any plans at this point to

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

10

1   leave the VNA?

2   A.  No.

3   Q.  And do you have any either plan or thought

4   as to when or if you might retire?

5   A.  I'm shooting for 70.

6   Q.  Okay.  And how old are you now?

7   A.  Sixty-four.

8   Q.  I gather that would sort of depend on

9   health and considerations of the family and so

10  forth?

11  A.  Yes.

12  Q.  And at the present time do you have any

13  significant health concerns?

14  A.  No.

15  Q.  And assuming you retire at 70, do you have

16  any plans on what you would do at that point?  In

17  other words, would you stay local or do you plan to

18  leave the state?

19  A.  We don't have any real plans at this time.

20  Four of the grandchildren are in Vegas, two are

21    here in Connecticut, so no real plans.

22      Q.   And can you describe what your job is at

23    the VNA at the present time?

24      A.   As director of finance, I am totally

25    responsible for all financial operations of the

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

11

1   agency -- payroll, accounts payable, accounts

2   receivable, financial statements, annual audit.

3   I'm also responsible for information technology.

4       Q.  And how many employees are there at the

5   VNA?

6       A.  Sixty-five.

7       Q.  And how does that job differ from the job

8   you were doing at Yale when you left?

9       A.  The predominant difference is that at VNA

10  Northwest, I'm hands, on handle everything.  At

11  Yale, I was predominantly responsible for the

12  operations of the clinical practice finances, but I

13  had a practice manager who was responsible for

14  running the practice every day.

15      Q.  So what did you do at Yale then?

16      A.  Finances.  The finances of the department

17  of ophthalmology.

18      Q.  So is there someone at the VNA now whose

19  job would be analogous to the job you had at Yale?

20      A.  I would say yes.

21    Q.  All right.  And what position would that

22    be?

23    A.  It's the administrator of the department of

24    ophthalmology.

25    Q.  No. No.  I mean is there someone at the VNA

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

12

1    whose job is similar to the job that you had at

2    Yale, or are you saying your job is similar?

3        A.   Yeah.  My job, yes.

4        Q.   But I thought at Yale you were the

5    administrator of the whole department, as opposed

6    to just finances?

7        A.   That would be correct.  Right.  The person

8    responsible for the entire operation at VNA

9    Northwest would be the executive director.

10       Q.   Okay.  So now you report to the executive

11   director?

12       A.   Yes, I do.

13       Q.   Okay.  When you were at Yale, your position

14   as administrator was similar to the executive

15   director job at VNA?

16       A.   To an extent, but I reported to the

17   chairman of the department and the deputy dean of

18   finance and administration.

19       Q.   And who was that, by the way, the deputy

20   dean of finance and administration?

21   A.  That's Cynthia Walker.

22   Q.  And when you were at Yale and you reported

23   to the department chair, that was Dr. Tsai, right?

24   A.  That's correct.

25   Q.  Would it be fair to say that he was sort of

13

1   in charge clinically and you were running the

2   business end of the practice?

3   A.  Yes.

4   Q.  And Dr. Tsai, in addition to being the head

5   of the department, was a clinician too?

6   A.  Yes.

7   Q.  And do you have a sense of how much time he

8   spent in clinical care as opposed to administrative

9   tasks?

10   A.  He spent one day in surgery and I'm going

11   to say three half sessions, that's half a day, in

12   clinical care.

13   Q.  So it sounds like roughly 50 percent

14   clinical care?

15   A.  Yes, maybe.

16   Q.  And I take it some time he spent on his

17   research activities?

18   A.  Yes.

19   Q.  So he devoted something less than 50

20   percent of his time to the administrative tasks in

21   the department?

22   A.  Yes.

23   Q.  I take it you were 100 percent

24   administrative?

25   A.  Yes.

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

14

1    Q.  You have no clinical --

2    A.  No.

3    Q.  Now, at Yale you were responsible for the

4    discipline -- hiring, firing, discipline of

5    employees, is that right, of staff employees?

6    A.  Yes, with Dr. Tsai's approval.

7    Q.  You would not get involved in hiring the

8    faculty members, the physicians?

9    A.  I would -- not in interviewing them as far

10   as their technical expertise.  I was involved with

11   them as far as their financial package.

12   Q.  Would you negotiate the financial package

13   with them?

14   A.  With Dr. Tsai's guidance, yes.

15   Q.  And at the VNA, are you responsible for

16   hiring, firing and disciplining employees?

17   A.  Just in the finance operation.

18   Q.  And how many are in that operation?

19   A.  There's five.  A total of six including me,

20   but five people who report directly to me.

21     Q.  And when you were at Yale, how many

22  employees were under you?

23     A.  Direct reports, probably only three.

24     Q.  And then there were people under that that

25  reported up to you, up through other people to you,

15

1   right?

2      A.   That was never really made clear.  The

3   technical end, the clerical staff and the clinic,

4   reported to the practice manager who reported to

5   me, but Dr. Tsai also felt that he managed the

6   clinical operation.

7      Q.   And how many employees were involved in the

8   clinical operation, putting aside the physicians?

9      A.   As I recall, 45.

10     Q.   Do you also receive a benefit package at

11  the VNA?

12     A.   Yes.

13     Q.   And what does that consist of?

14     A.   Well, it would consist of health insurance,

15  but I have my health insurance through my wife at

16  her -- yes.

17     Q.   So you don't use the VNA's health benefits?

18     A.   No.

19     Q.   Are there any benefits that you utilize at

20  the VNA?

21    A.   Well, we have long-term disability, the

22    standard vacation package.

23    Q.   Are those comparable to what you had at

24    Yale?

25    A.   No.


        DEL VECCHIO REPORTING SERVICES, LLC
             (203) 245-9583

16

1    Q.  How are they different?  Let's stick with

2    the LTD first.

3    A.  The LTD at Yale kicked in sooner.  The LTD

4    at VNA Northwest is active after 90 days of

5    disability.

6    Q.  Okay.  And what was Yale's?

7    A.  I'm not positive.  I'm not sure.

8    Q.  So do you think it might have been 90 days?

9    A.  I can't say.

10   Q.  I don't know how much experience you have

11   with long-term disability policies.  Is that a

12   fairly typical policy, 90 days?

13   A.  Yes.

14   Q.  So it could be that Yale's was 90 days?

15   A.  Could be.

16   Q.  And what about vacation, is vacation

17   different at the VNA?

18   A.  I get four weeks at the VNA.

19   Q.  And what did you get at Yale, do you

20   remember?

21    A.   Well, that's hard to say, because at Yale

22    you had time off, which was like 54 days a year,

23    but that covered your holidays, your vacation, your

24    sick, your personal, recess.

25    Q.   Okay.  So now you're getting, I guess, 20

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

17

1    days of vacation?

2    A.  Twenty days of vacation, nine holidays.

3    Q.  And do you get any sick time?

4    A.  Five days.

5    Q.  And do you get personal days?

6    A.  Two a year.

7    Q.  And do they accumulate?

8    A.  No.  They have to be used one within the

9    first half, one within the second half of the year.

10    Q.  And what was your final salary at Yale?

11    A.  120,700.

12    Q.  Now, who hired you into the position at the

13    ophthalmology department?

14    A.  That would be Jackie Boyden and David

15    Leffell and Bruce Shields.  Bruce was the

16    department chair before Dr. Tsai.

17    Q.  So you were hired before Dr. Tsai came into

18    the department?

19    A.  Yes.

20    Q.  And was Cynthia Walker involved at all?

21     A.  Cynthia wasn't there yet.  Jackie Boyden

22   was the deputy dean at that time.

23     Q.  And who were the people that were

24   responsible for terminating you; who was

25   responsible for terminating you?


DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

18

1    A.  Cynthia Walker and Dr. Tsai.

2    Q.  And you believe that the termination was

3    motivated by age discrimination?

4    A.  Yes, I do.

5    Q.  Do you know how old Dr. Walker is?

6    A.  No, I do not.

7    Q.  Do you have any sense of whether she's near

8    your age, older than you, younger than you?

9    A.  No, she's definitely not near my age.

10    Q.  Do you have any sense of whether she's in

11    her 40s or 50s or 60s?

12    A.  I'm going to say 40s.  That's a dangerous

13    question to ask about a woman.

14    Q.  I don't disagree with that.

15    A.  You know.  We've only met 20 minutes ago.

16    Let's call a spade a spade here.

17    Q.  You're right about that.  My mother would

18    not appreciate me asking a question like that.

19        How about Dr. Tsai?

20    A.  Dr. Tsai is in his 40s.

21    Q.  Okay.  Let me ask you about them

22  separately.

23        With regard to Dr. Walker, what is it that

24  causes you to think that she was motivated by your

25  age?

19

1     A.  During a meeting with Dr. Walker, whether

2   or not I was going to retire came up.

3     Q.  Okay.  I'm going to ask you a little bit

4   more about that.

5         Is there anything else that she did or said

6   that causes you to believe she was motivated by

7   your age when she made the decision to terminate

8   you?

9     A.  No.  I ...

10    Q.  I'm sorry.  I'm not sure whether you were

11  finished with your answer.  You said no.

12    A.  No.

13    Q.  But you sort of hesitated.  I didn't know

14  whether you wanted to add something else.

15    A.  The reviews up until that meeting had

16  always been excellent.  Her comments about my work

17  performance in that meeting were excellent, and it

18  was shortly after that meeting that then my work

19  and my credibility as the department administrator

20  began to become in question.

21     Q.  So the only thing that causes you to think

22   that Dr. Walker was motivated by age discrimination

23   was a comment she made at this meeting about

24   retirement?

25     A.  That's correct.


DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

20

1    Q.  Okay.  When did this meeting take place, do

2    you recall?

3    A.  I'm going to say it was April of 2010.

4    Q.  Okay.  And who was present at the meeting?

5    A.  Just Cynthia and myself.

6    Q.  And did you take any notes about what

7    occurred at this meeting?

8    A.  No.

9    Q.  And do you recall how long the meeting

10   lasted?

11   A.  An hour.

12   Q.  Can you -- I realize this is an hourlong

13   meeting, so I'm not suggesting you're going to

14   remember this verbatim, but can you tell me as best

15   you can what was discussed by the two of you during

16   the meeting.

17   A.  Predominantly, my plans for the department,

18   staff changes I wanted to make and the roadblocks I

19   was hitting with human resources in making them.

20   Cynthia pledged to me at that time her complete

21   cooperation to get these changes made.

22    Q.  Do you remember any other discussion at

23   that meeting beyond what you've described?

24    A.  No.

25    Q.  Well, one of the things you said before was

21

1    there was some talk about your retirement?

2      A.   At the end of the meeting, there was a

3    comment made about a rumor going around the school

4    that I was planning to retire.  I said there was no

5    truth to that rumor.

6      Q.   What do you remember, as best you can, how

7    it came up?  Was it raised by Dr. Walker, was it

8    raised by you; who mentioned that first?

9      A.   It was raised by Cynthia.

10     Q.   As best you can, can you tell me what she

11   said?

12     A.   That when she saw me on her schedule for

13   the day, she thought I was coming over to announce

14   my retirement.

15     Q.   Okay.  And then what was your response?

16     A.   I explained that I was planning to work --

17   that I had just made changes with my financial

18   advisor and I was planning to work until I was 70.

19     Q.   Okay.  And what did she say to that?

20     A.   "Oh, fine.  We didn't want to lose you."

21    Q.  Okay.  And was there any other discussion?

22    A.  No.

23    Q.  So at that point in time you didn't think

24    she was engaging in age discrimination then, is

25    that a fair statement?


DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

22

1    A.  No, I didn't.

2    Q.  Did you have any other discussions with

3  Ms. Walker after that time about either retirement

4  or your age?

5    A.  No.

6    Q.  Now, you said that there was a rumor going

7  around that you were going to be retiring.  Where

8  did you hear that?

9    A.  From the associate dean for finance and

10  administration, who works for Cynthia.  A good

11  friend of mine of many years called me one

12  afternoon out of the clear blue, and said she was

13  at a meeting across town and that the subject came

14  up.

15    Q.  And do you know when that was?

16    A.  No, I don't.

17    Q.  Was that before or after the meeting you

18  had with Cynthia Walker?

19    A.  Before.

20    Q.  Any idea as to how long before?

21     A.   Within weeks.

22     Q.   What do you remember of that conversation,

23   the conversation with Ms. Capezzone?

24     A.   Strictly that.  She called one afternoon

25   and said, "Gee, I was just at a meeting across town

23

1   and your name came up and people said that you were

2   planning to retire." And she said, "I thought we

3   were good friends and that you'd tell me first."

4   And I said, "I'm not planning tog retire."

5       Q.  And did you have any further discussion

6   with her at that time?

7       A.  No.

8       Q.  Was there an early retirement package that

9   had been offered by the university at that time?

10      A.  No.

11      Q.  And do you know the source of this rumor

12   that Ms. Capezzone talked about?

13      A.  She never revealed it to me.

14      Q.  Did you ask her?

15      A.  Yes, I did, but she never responded.

16      Q.  When you say she didn't respond --

17      A.  I mean, I think we just moved on in the

18   conversation.

19      Q.  You never really said, "Gee, who was it"?

20      A.  Yes, I said who was it.  But she said it's

21   not important and, like I said, Carrie and I have

22   been friends 25 years, so I let it go with that.

23      Q.  Was there some kind of program for people

24   to get a buyout from the university at that point?

25   This was during the recession, right?


DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

24

1   A.  Right.  Yes, there was.  Yes, there was.

2   Q.  And were there a number of people accepting

3  the golden handshake, so to speak?

4   A.  I wouldn't know that.

5   Q.  I didn't know if you knew just from talking

6  to people.

7   A.  I wouldn't know that.

8   Q.  And do you know if you were eligible for

9  the program at that point?

10   A.  I don't believe I was.

11   Q.  Do you remember if Ms. Capezzone said she

12  actually didn't recall anymore who it was who

13  specifically told you?

14   A.  No, I don't.

15   Q.  Do you know if that's something she might

16  have said to you?  Do you have a memory she didn't

17  say that, or do you just not know one way or the

18  other?

19   A.  No.  I'm saying she didn't say that.

20   Q.  So what did she say when you asked her, "So

21   who told you that I might be retiring?"

22      A.  As I said, just that's not important and

23   then we moved on to other subjects.

24      Q.  Now, you mentioned that she's been a friend

25   for 25 years.

25

1    A.  Yes.

2    Q.  Is she still a friend?

3    A.  Yes.

4    Q.  Do you still communicate with her?

5    A.  During football season.

6    Q.  Okay.  She's a football fan?

7    A.  Yes, a Bears fan.  I don't hold it against

8  her.

9    Q.  So you're not a Bears fan?

10    A.  No, I am not.

11    Q.  So when you talk with her during football

12  season, it's about football.  Is that what you're

13  talking about?

14    A.  Yes.

15    Q.  Is she someone whose word you can trust

16  when you talk with her?

17    A.  Yes.

18    Q.  Have you ever had any reason to doubt her

19  integrity?

20    A.  No.

21     Q.   So when you had this discussion with

22   Dr. Walker in April of 2010, where at the end of

23   the meeting she commented that she thought you

24   might be coming to tell her about your

25   retirement --