26

1    A.  Yes.

2    Q.  -- did she say anything about Carrie

3    Capezzone at that point?

4    A.  No.

5    Q.  So she didn't indicate why she thought you

6    might be announcing your retirement?

7    A.  No, she did not.

8    Q.  And you didn't ask?

9    A.  No.

10    Q.  Now, how about Dr. Tsai, did he ever say

11    anything to you that caused you to believe that he

12    was acting out of age discrimination?

13    A.  During my time with Dr. Tsai, there were

14    numerous conversations in which he made remarks

15    about the age of either faculty, me, staff.  We had

16    an assistant dean -- assistant chairman, vice

17    chairman of the department, who was head of the

18    research operation, and he announced he was leaving

19    to go to another school.

20    Q.  And who was that, by the way?

21      A.   Colin Barnstable -- and Colin is younger

22   than me.  And Tsai made the comment, "Well, you

23   know, he's getting too old for his research to be

24   valid."  And I made the comment, I said, "You know,

25   Colin is younger than me."  And he said, "Oh,

27

1    you're not in your 60s."  So ...

2      Q.  And what did you say to that?

3      A.  At the time I was.  I said "Yes, I am."

4      Q.  So Dr. Tsai thought you were younger than

5    you actually were?

6      A.  Yes.

7      Q.  Did you regard that as some evidence that

8    he --

9      A.  That and the fact that he made numerous

10   comments about age about other people.

11     Q.  Let me just get that question out before

12   you answer it.

13       Just that comment, the fact that he thought

14   you were younger than you actually were at the

15   time, did you regard that as evidence that he was

16   somehow opposed to you because of your age?

17     A.  Yes.

18     Q.  And why did you think the fact that he

19   thought you were younger than you actually were

20   suggestive of a bias against you?

21     A.  Because of his other comments and his view

22   about older staff members.

23     Q.  Let me just focus on comments he made about

24   your age, one you mentioned which was that he

25   thought you were actually younger than you were.


DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

28

1  Did Dr. Tsai make any other comments about your age

2  in your presence?

3    A.  Not that I recall.

4    Q.  Did Dr. Tsai ever make any comments about

5  retirement to you, with regard to you?

6    A.  No.

7    Q.  I know you said that Dr. Tsai made comments

8  about the age of other people in the department.

9  Can you give me the list of who he made those

10  about?

11    A.  Colin, Bruce Shields.  I can't remember the

12  name of the accountant that was there when I first

13  went there but she was an older woman.

14    Q.  Anybody else?

15    A.  Those are the ones that stick in my mind.

16    Q.  And what did he say about Dr. Shields' age?

17    A.  Just that it was time for him to retire.

18    Q.  And do you recall when he made that

19  comment?

20    A.  No.

21    Q.  Do you remember the context of him saying

22   that?

23    A.  He was anxious.  When Bruce stepped down as

24   chairman and they brought Jim in, Jim was anxious

25   for Bruce to finally step down and retire and ride

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

29

1   off into the sunset.

2   Q.  Was that because Dr. Tsai sort of wanted to

3   run the show without the prior chairman being

4   present?

5   A.  Probably, yeah.

6   Q.  Because -- was it true that what happened

7   was that the university hired Dr. Tsai replacing

8   Dr. Shields as --

9   A.  That's correct.

10   Q.  -- as the chairman, but leaving Dr. Shields

11   in the department?

12   A.  That's correct.

13   Q.  And Dr. Shields, he was involuntarily

14   replaced by Dr. Tsai; isn't that right?

15   A.  Yes.

16   Q.  I mean, Dr. Shields didn't want to step

17   down as chairman?

18   A.  I think he did.

19   Q.  Okay.

20   A.  I believe he did.  He had had enough of the

21   pressures of being chairman, just wanted to devote

22   himself to clinical and research affairs.

23      Q.  Did Dr. Tsai ever indicate to you that he

24   felt somewhat uncomfortable having the prior

25   chairman in the department sort of looking over his

30

1    shoulder, if you will?

2    A.  Yes.

3    Q.  Okay.  So that might be a reason for him to

4    say that, "Gee, it really would be time for him to

5    move on."  Would that be a fair statement?

6    A.  That's a fair statement.

7    Q.  Okay.  Now, you said there was also a

8    comment made by an accountant who you described as

9    an older woman.  Do you remember anything else

10   about her, other than that she was older?

11   A.  Not really.  I had just started in the

12   department.

13   Q.  And what do you remember about Dr. Tsai's

14   comments about this accountant?

15   A.  Again, that it was good for her to leave so

16   that we could get someone younger in there.

17   Q.  And if it was just at the time you started

18   that this was said, do you recall when that was?

19   A.  Probably the fall of 2006.

20   Q.  And do you know when the comment about

21   Dr. Shields was made?

22      A.  No, I don't recall.

23      Q.  Do you remember -- with regard to the

24   accountant, do you remember the exact words that

25   Dr. Tsai said?

31

1    A.   As I said, that, you know, "She was older,"

2    and that, you know, "her leaving was good because

3    we could get someone younger in that position."

4    Q.   And what was your response?

5    A.   I don't believe I had one.

6    Q.   What else --

7    A.   I didn't --

8    Q.   I'm sorry.  Go ahead.

9    A.   I didn't want to see her leave.

10    Q.   Was she terminated or did she leave

11    voluntarily?

12    A.   She left.  She retired.

13    Q.   So Dr. Tsai -- this was at the time that

14    she retired that Dr. Tsai made this comment?

15    A.   Yes.

16    Q.   So the three comments you can remember

17    about either retirement or age related to

18    Dr. Barnstable, Dr. Shields and the accountant

19    whose name you don't recall; is that right?

20    A.   Yes.

21     Q.   And those are the only comments about

22   retirement or age that you remember Dr. Tsai

23   making?

24     A.   That I can recall, yes.

25     Q.   Now, going back to the spring of 2010, you

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

32

1   said that in the meeting that you had with

2   Dr. Walker, she was happy with your work at that

3   time?

4      A.  Yes.

5      Q.  And commented that she was.  And in

6   addition, when you told her that you were not

7   planning to retire soon, she expressed relief

8   because she didn't want you to leave?

9      A.  That's correct.

10     Q.  Okay.  What happened after that; what was

11  the next thing that happened in the sequence of

12  events that led up to your departure?

13     A.  The next thing that happened was that the

14  department has been mired in red ink for about 20

15  years.

16     Q.  Okay.  So what happened after this meeting

17  in April of 2010?

18     A.  We had a budget meeting with the dean, and

19  during that budget meeting Tsai had made

20  projections of how we would turn the deficit

21   around, and we weren't doing it at the speed that

22   he said we would and to the best of my knowledge

23   they still haven't done it.

24      Q.  Can I just interrupt you for one second.

25      A.  Sure.


DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

33

1    Q.  I'm sorry.  I will let you get back to

2    that.

3         You said "we had a budget meeting."  Can

4    you tell me when that was; was that after your

5    meeting with Dr. Walker or before?

6    A.  Yes, after the meeting with Dr. Walker.

7    Q.  And who was present at the budget meeting?

8    A.  The dean, the deputy dean, the associate

9    dean, Tsai, myself.

10   Q.  So the dean at that point was who?

11   A.  I can picture him.  I can't think of his

12   name.

13   Q.  That's all right.  If it comes to you, you

14   can tell me.

15        When you say "the dean," you're talking

16   about the dean of the medical school?

17   A.  Yes.

18   Q.  The deputy dean was Dr. Walker?

19   A.  Walker.

20   Q.  Dr. Tsai and yourself.  And how about

21   Dr. Leffell, was he present too or no?

22      A.  No, he was not.  Carrie Capezzone was.

23      Q.  What was discussed at that budget meeting?

24      A.  The budget for the department, the fact

25   that we continued to be in the red and the

34

1    suggestion that the YMG be brought in to do a

2    review of the department.

3      Q.  And who made that suggestion?

4      A.  The dean.

5      Q.  So Dr. Tsai and Dr. Walker didn't suggest

6    that?

7      A.  No.

8      Q.  It was the dean that suggested that.  And

9    did the dean ever give you an indication that he

10   was opposed to you because of your age?

11     A.  No.

12     Q.  And do you know the dean's approximate age

13   at that point?

14     A.  The dean is probably in his 50s.

15     Q.  And YMG is the Yale Medical Group?

16     A.  Yes.

17     Q.  Do you remember anything else that came out

18   of that budget meeting -- was that in April or May

19   of 2010?

20     A.  May or June.

21    Q.  Okay.  So other than the suggestion that

22    YMG be brought in to analyze your department, do

23    you remember anything else coming out of that

24    meeting?

25    A.  No.

35

1    Q.  And what was your reaction to the prospect

2    of having YMG come in and analyze what was going on

3    in your department?

4    A.  My reaction was that their goal was to end

5    up taking over the department.

6    Q.  Okay.  And why do you think they had wanted

7    to do that?

8    A.  Because that had been their track record

9    with other departments that they went in to review.

10    Q.  And was that something you favored or

11    didn't favor?

12    A.  I didn't favor.

13    Q.  And why was that?

14    A.  Because I believed and I believe that we

15    were doing the best we could under the

16    circumstances with the faculty that we had.

17    Q.  So what happened -- strike that.

18        As of that meeting in May or June of 2010,

19    when it was recommended that YMG be brought in to

20    analyze why your department was continuing to

21   function as it was, was there any suggestion that

22   you would be terminated?

23      A.  No.

24      Q.  Did you have any concerns about that?

25      A.  No, I did not.

36

1    Q.  And if YMG was taking over the department,

2    if they were to do that, would it be contemplated

3    that you would remain in your position --

4    A.  Yes.

5    Q.  -- or was that something that you didn't

6    know?

7    A.  I would remain as the administrator, yes.

8    Q.  And what happened next in the sequence of

9    events after that budget meeting?

10   A.  Well, YMG did their review.  Tsai began to

11   make comments that I was in trouble.  Cynthia

12   Walker began to make comments that I was in

13   trouble.  And on August 23rd, they announced that I

14   was being removed as administrator.

15   Q.  And how long did the review take?

16   A.  I'm going to say they worked about six

17   weeks on it.

18   Q.  So during the time when the review was

19   being undertaken, both Dr. Tsai and Dr. Walker told

20   you that things weren't looking good for you in

21   terms of what they heard back on the review?

22      A.   That's correct.

23      Q.   Let me ask you this:  Do you know who at

24   YMG actually performed the review?

25      A.   I'm not sure of her last name now.  Sally


DEL VECCHIO REPORTING SERVICES, LLC
            (203) 245-9583

37

1   Chesney was the principal person that conducted the

2   review.

3      Q.  Do you remember anybody else being

4   involved?

5      A.  Some of her assistants, but I don't know

6   them by name.

7      Q.  And do you know Sally Chesney's age?

8      A.  No, I don't.

9      Q.  Is she in her 40s, 50s, 60s; do you have

10   any idea?

11      A.  I'm going to say she's in her 50s, late

12   40s, 50s.

13      Q.  And is Sally Chesney someone you knew from

14   your experience at the university?

15      A.  Yes.

16      Q.  How did you know her?

17      A.  When I worked at the Yale Medical Group,

18   Sally and I were peers.

19      Q.  Okay.  And how long a period of time were

20   you peers?

21          MS. SYLVESTER:  Do you want to go off

22      the record for a minute?

23          MR. NOONAN:  Sure.

24          (Off the record.)

25   BY MR. NOONAN:


          DEL VECCHIO REPORTING SERVICES, LLC
              (203) 245-9583

38

1    Q.  We had a break.  How long --

2    A.  I'm going to say it must have been about

3    eight years.

4    Q.  Okay.  And when you say you were peers,

5    what do you mean by that?

6    A.  I was the associate director for finance,

7    she was the associate director for reimbursement,

8    we both reported to the same individual.

9    Q.  And who was that?

10    A.  Marianne Dess-Santoro.

11    Q.  How do you spell Dess-Santoro, by the way?

12    A.  D-E-S-S, hyphen, S-A-N-T-O-R-O.

13    Q.  And how did you get along with Ms. Chesney

14    at that point?

15    A.  Good.

16    Q.  Were you social friends at all, as you were

17    with Carrie Capezzone?

18    A.  No.

19    Q.  Just if you would, just try to hesitate

20    just a bit before you start your answer.

21      A.  Okay.

22      Q.  And I take some responsibility for that.  I

23   think my voice sometimes trails off.  I don't mean

24   to do that to you.

25          Did you ever have any problems with

39

1   Ms. Chesney at all during your working relationship

2   with her?

3      A.  No.

4      Q.  Did she ever give you reason to believe

5   that she was -- she thought less of you because of

6   your age?

7      A.  No.

8      Q.  Did she comment on anyone else's age, that

9   you can recall?

10      A.  No.

11      Q.  So before the break, you were saying during

12   the time that Ms. Chesney and her staff were doing

13   a review of your department, you had input from

14   Dr. Tsai and Dr. Walker that things weren't looking

15   good and you might be, I think you said the quote

16   was, "in trouble."

17      A.  That's correct.

18      Q.  What did you interpret "in trouble" to mean

19   at that point?

20      A.  That I'd be terminated.

21    Q.  And when you had these discussions with

22    Dr. Walker and Dr. Tsai during this time frame,

23    were they group meetings among the three of you or

24    were they separate interactions?

25    A.  Both.

40

1    Q.  Let me try to break them down then by

2    meeting, if you can.  Can you sort of go

3    chronologically with when the first such meeting

4    you had where you were informed that the review

5    didn't look good and you might be in trouble; can

6    you tell me roughly when that was and who was

7    present?

8    A.  The first one was -- I can't remember when,

9    but was just Dr. Tsai and myself in his office.

10   Q.  And what do you remember Dr. Tsai saying

11   about the review?

12   A.  I asked him how the review was going, he

13   said, "It doesn't look good, I think you're in

14   trouble."

15   Q.  And what was your response?

16   A.  I'm not sure that I had one.  I think my

17   feeling was that we would get through it.

18   Q.  And do you recall how long after the review

19   had started when this conversation took place?

20   A.  Probably about three weeks into the review.

21    Q.   And when was the next time you had a

22    discussion with either Dr. Tsai or Dr. Walker about

23    the YMG review?

24    A.   It was a preliminary review from my annual

25    review.

41

1    Q.  And was this with Dr. Tsai alone or with

2    multiple --

3    A.  This was with Tsai and Walker.

4    Q.  So the idea was to meet with you in

5    preparation for preparing your performance review?

6    A.  Yes.  And I was criticized for having

7    prepared it, whereas originally, when Jackie Boyden

8    was the deputy dean, she always had us prepare your

9    own self-eval.  And Cynthia and Tsai criticized me

10   for that.

11   Q.  And was this the first evaluation in which

12   Dr. Tsai and Dr. Walker were going to be reviewing

13   your performance?

14   A.  The first one?

15   Q.  Right.

16   A.  No.  No.  There had been previous reviews.

17   Q.  And how had you gone about those reviews?

18   A.  The same way.

19   Q.  So you would prepare your own review, in

20   effect?

21    A.  Prepare a self-evaluation and present it to

22  Tsai.  Tsai and Walker would then make

23  recommendations.

24    Q.  How many reviews had you had with Dr. Tsai

25  up to 2010?

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

42

1    A.   Probably three.  Three before 2010, yes.

2    Q.   And was Dr. Walker also involved in those

3    meetings prior to 2010, or was it just Dr. Tsai?

4    A.   She was involved in one or two of them.

5    Previous to that it was Jackie Boyden.  I can't

6    remember when Cynthia started.

7    Q.   So aside from criticizing you for preparing

8    your own self-evaluation, what else do you remember

9    about that meeting with Dr. Tsai and Dr. Walker

10   which was preliminary to your performance review?

11   A.   Predominantly that all the sudden I was

12   getting this horrendous review based on the

13   information from this report.

14   Q.   Based on the information that was coming in

15   on the YMG report?

16   A.   That's correct.

17   Q.   And do you remember any specifics about the

18   criticisms at that time?

19   A.   That the department had lost faith in me

20   and credibility as the administrator.

21    Q.  Do you remember any other comments?

22    A.  No.  Oh, yes, I do -- that I was

23   responsible for faculty leaving.

24    Q.  And was there anyone mentioned in

25   particular or was that just more in general?


DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

43

1    A.  Well, there were two that had left recently

2   and I'm being blamed for their leaving.

3    Q.  And who were they?

4    A.  Rob Bernardino and I struggled this morning

5   to try to think of the other one.  I can't think of

6   his name.  I can tell you their specialties.  I

7   can't remember their names.

8    Q.  Tell me the other individual's specialty.

9    A.  One was glaucoma and the other -- and Rob

10   is plastics.

11    Q.  So Dr. Bernardino was plastics?

12    A.  Yes.

13    Q.  And was there any discussion as to why it

14   was thought you were responsible for those two

15   doctors leaving the department?

16    A.  Dr. Bernardino believed that the front desk

17   staff were directing patients away from his

18   practice to a private practice in town.  He had no

19   proof of this.  And yet, Tsai and Walker and

20   Leffell believed I should act upon it.  Well, I had

21    nothing to act on.

22        Q.   So did you --

23        A.   I did call human resources in, and they

24    agreed with me that we had no proof to terminate or

25    discipline any of the front staff.


              DEL VECCHIO REPORTING SERVICES, LLC
                      (203) 245-9583

44

1   Q.  And did you ever talk with any of the front

2   desk staff to find out their view of

3   Dr. Bernardino's charge?

4   A.  Yes, I did.

5   Q.  And who did you talk to there?

6   A.  Kathy Debroisse, who was the supervisor of

7   the front desk staff.

8   Q.  And who was the person who was alleged to

9   be directing patients away to another physician?

10  A.  You know, I can't remember her name in

11  particular.  But Kathy was named by name, and so I

12  discussed it with her.

13  Q.  Was she the person who was supposed to be

14  directing people away?

15  A.  Supposedly, yes, allegedly.

16  Q.  And what did she have to say about the

17  allegations?

18  A.  She said they weren't true.

19  Q.  Do you remember anything else being

20  mentioned at this preliminary performance review

21    meeting with Dr. Tsai and Dr. Walker --

22    A.  No.

23    Q.  -- other than the department had lost faith

24    in you as the administrator and that there was a

25    feeling you had been responsible for two faculty

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

45

1   members leaving?

2   A.  No.

3   Q.  Now, was there any discussion during that

4   meeting of your possible termination?

5   A.  Cynthia's comment was -- at the end of the

6   meeting, was that this will be continued.

7   Q.  Meaning the discussion over your

8   performance review?

9   A.  Yes.

10   Q.  And by the conclusion of that meeting, were

11   you concerned that you might lose your job?

12   A.  Yes.

13   Q.  Was there any further discussion along the

14   lines of you might be in trouble?

15   A.  No.

16   Q.  When was the next time you talked with

17   either Dr. Tsai or Dr. Walker about either the YMG

18   review or your performance review?

19   A.  August 23rd.

20   Q.  And that's the time you were terminated?

21   A.  Yes.

22   Q.  Okay.

23   A.  Well --

24   Q.  I'm sorry.  Go ahead.

25   A.  Terminated from that position.

46

1    Q.  Right.  Not terminated from the university?

2    A.  That's correct.

3    Q.  And who was present at that meeting?

4    A.  Dr. Tsai and Dr. Walker.

5    Q.  And what do you remember being said at that

6    meeting?

7    A.  It was very brief.  They simply said

8    that -- that based on the report, that I was being

9    removed as administrator and given the option for a

10   temporary position in another department.

11   Q.  Do you remember anything else being said?

12   A.  No.  That was the gist of the meeting.

13   Q.  Okay.  And the idea of the temporary

14   position was to allow you to have a job while you

15   were looking for a job?

16   A.  Yes.

17   Q.  Was there ever any further discussion about

18   the findings of the YMG report?

19   A.  I was asked if I could see the report.  I

20   was told they would look into it.

21    Q.  And did you ever see a copy of the report?

22    A.  No, I did not.

23    Q.  Have you up to this point?

24    A.  No, I have not.

25    Q.  And other than the time that Dr. Tsai

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

47

1    talked with you about the fact that the report was

2    not going well, did you get any other information

3    about the YMG report?

4    A.  No, I did not.

5    Q.  And did you ever talk with Sally Chesney

6    about the report?

7    A.  No.

8    Q.  Why not?

9    A.  It would have been inappropriate.

10   Q.  And did you -- following your reassignment

11   to the temporary position, did you consider filing

12   any sort of grievance at the university?

13   A.  I did not know that a grievance policy for

14   M&P employees existed.  That was never explained to

15   me.

16   Q.  Did you ever get a copy of the M&P manual?

17   A.  No, I did not.

18   Q.  You're aware one exists?

19   A.  No, I am not.

20   Q.  And how long were you employed by the

21   university?

22   A.  Thirteen.

23   Q.  Thirteen years?

24   A.  Yes.

25   Q.  And you were always an M&P employee?

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

48

1    A.  Yes, I was.

2    Q.  And when did you first learn of the ability

3    to file an M&P grievance?

4    A.  When I started this lawsuit.

5    Q.  And who told you about that?

6    A.  The comment came back through

7    correspondence between my attorney and the

8    university's attorney.

9    Q.  Okay.

10    A.  In the initial paperwork, it said, you

11    know, he could have done this.

12    Q.  At that point did you investigate at all

13    whether you had the ability to fire a grievance?

14    A.  No.  I was no longer employed by the

15    university.

16    Q.  As you understood your employment at the

17    university, was it at will?

18    A.  No, I didn't understand that.

19    Q.  Okay.  What did you think about your

20    employment at the university?  Did you have a

21    contract?

22    A.  No.

23    Q.  So there was -- typically -- do you know

24    what I mean by "at will"?

25    A.  Yes, I do.


        DEL VECCHIO REPORTING SERVICES, LLC
            (203) 245-9583

49

1    Q.   Typically, there's either an employment

2    contract -- which could be a union contract but

3    wouldn't need to be -- or the employee is at will,

4    meaning the employee can leave or the employer can

5    ask the person to leave, essentially for any reason

6    or no reason.

7         What did you think your employment was with

8    the university; did you think you had a contract?

9    A.   No, I did not.

10   Q.   So it was your understanding, then, I take

11   it, that the university had the right to ask you to

12   leave whenever the university made that decision?

13   A.   Yes.

14   Q.   As long as it was not an illegal reason?

15   A.   Yes.

16   Q.   I think in legal parlance that would be

17   called an at will employee.

18        Now, one of the things that you did say

19   that you were told about the review that was done

20   by YMG, was that the department had lost -- the

21   members of the department had lost faith in you as

22   an administrator.  Do you know how that conclusion

23   was reached?

24      A.   No.  I don't know anything about the

25   report.

50

1    Q.   Okay.  So I take it you wouldn't be in a

2    position to either agree with the report or

3    disagree with the report; is that a fair statement?

4    A.   Well, I would disagree with the report.

5    Q.   Even though you haven't seen it?

6    A.   That's correct.

7    Q.   Would you think that if there was a

8    department where the employees had lost faith in

9    the administrator, that that would be a reason why

10   people would want to remove that administrator?

11   A.   Yes.

12   Q.   And do you know whether Ms. Chesney

13   interviewed members of your department?

14   A.   Yes, I do.

15   Q.   Do you know how many?

16   A.   The claim is that they interviewed

17   everybody in the department.

18   Q.   When you say "the claim is," do you have

19   any reason to believe that isn't true?

20   A.   No.  I don't have a reason to believe it's

21    not true.

22        Q.   And if the vast majority of people in the

23    department were to tell the YMG investigators that

24    they had -- the employees had lost faith in you as

25    an administrator, that would be one reason for the

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

51

1   higher-ups to consider replacing you.  Would that

2   be a fair statement?

3      A.  Yes.

4      Q.  I do have a copy of the report and it says

5   that they interviewed 71 --

6           MS. SYLVESTER:  We've never seen that.

7        I just went through your discovery that was

8        produced.  That hasn't produced to us.  He's

9        never seen it.  He can't comment on something

10       he hasn't seen.

11          MR. NOONAN:  I'm not going to ask him

12       about it.  I'm just going to ask him things.

13       I'm not going to ask him to comment on the

14       report.

15   BY MR. NOONAN:

16      Q.  But it indicates that there were 71 people

17   interviewed.

18          How many department employees do you think

19   there were?

20      A.  There were at least 45 non-faculty, and

21   then 71 would seem accurate; the rest would be

22   faculty.

23      Q.  So in other words, 71 including faculty is

24   what you're saying?

25      A.  Yes.


            DEL VECCHIO REPORTING SERVICES, LLC
                (203) 245-9583

52

1    Q.  And do you know whether Ms. Chesney and her

2    associate also observed the practice by being there

3    and sort of watching what was going on?

4    A.  I do not know.

5         MS. SYLVESTER:  I'm going to object to

6         you asking any more questions with regard to

7         the report.  We haven't seen it.  It hasn't

8         been presented to us as part of discovery.

9         He hasn't reviewed it.  We have no context

10        for it.

11        MR. NOONAN:  That's okay.  I'm not

12        going to ask you about the report.  I'm just

13        going to ask you about things -- what he

14        observed.

15        MS. SYLVESTER:  I don't have any

16        problem with observation questions.  But

17        anything having to do with the report that he

18        hasn't had an opportunity to review, that we

19        haven't had an opportunity to review, that

20        would have been appropriate to be provided as

21      part of discovery, was not provided, based on

22      what I reviewed already, we're going to

23      object to.

24   BY MR. NOONAN:

25   Q.  Do you know whether the staff and


       DEL VECCHIO REPORTING SERVICES, LLC
              (203) 245-9583

53

1   physicians informed Ms. Chesney and her associates

2   that you often were noncommunicative to faculty and

3   staff in the department?

4      A.   I wouldn't know what they said to her.  I

5   haven't seen the report.

6      Q.   Okay.  Would that be something that you

7   think would be a cause for concern about an

8   administrator, if the employees felt like the

9   administrator simply wouldn't communicate with

10   them?

11     A.   Yes.

12     Q.   And do you think that that was true, that

13   there were people who believed that you in fact

14   didn't communicate?

15     A.   No, I do not believe it.  I was told as

16   much after I was let go by faculty and staff.

17     Q.   And who in particular told you that?

18     A.   The administrative assistant to the

19   chairman was number one and my own staff, the

20   finance staff.

21     Q.  And who were they?

22     A.  Maria Rodriguez was the associate

23   administrator.  Alice Caple was the accountant and

24   Sarah Gelo was the associate -- the administrative

25   assistant to the chairman.


DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583