75

1    Q.  Now, when patients checked out, were there

2    appointment and business cards available to give to

3    them?

4    A.  Yes.

5        (Off the record.)

6    BY MR. NOONAN:

7    Q.  While you were the administrator of the

8    ophthalmology department, were the technicians

9    given tasks other than direct patient-care tasks?

10   A.  No.

11   Q.  Do you remember that one of the things the

12   technicians were doing was to obtain

13   precertifications for procedures they were

14   performing?

15   A.  That changed while I was administrator.

16   That went to the surgical coordinators.  That was

17   originally the way it was, but then it changed.

18   Q.  And were all the technicians cross-trained

19   to perform all the procedures?

20   A.  Yes.  Yes.

21     Q.   Was that something that --

22     A.   In Yale's system, there were two levels of

23     technicians, and then after the last strike and all

24     of these positions got reevaluated, they all became

25     Es.  So they were all at the top of their level and

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

76

1   they were all cross-trained to do each other's

2   jobs.

3       Q.  Do you know whether the technicians'

4   schedules were designed to match the physicians'

5   schedules?

6       A.  Yes.

7       Q.  And if they weren't, that's something that

8   would be a cause for concern?

9       A.  Yes.

10      Q.  And if it turned out that the review

11  concluded that that wasn't being done, that would

12  be something that you think senior management would

13  legitimately have a concern about?

14      A.  Uh-huh.

15      Q.  Does that mean yes?

16      A.  Yes.

17          MR. NOONAN:  Off the record.

18          (Off the record.)

19  BY MR. NOONAN:

20      Q.  Now, let me shift gears on you a little bit

21    and ask you about what you did after leaving the

22    ophthalmology department.

23        Where did you go first?

24    A.  Financial operations.

25    Q.  And who were you working with there?


DEL VECCHIO REPORTING SERVICES, LLC
        (203) 245-9583

77

1    A.  I was working for Jackie Tucker.

2    Q.  And for how long a period of time did you

3    do that?

4    A.  It was supposed to be three months, then

5    Jackie got it extended for another three months and

6    then extended again for another month.  So all

7    told, it went from August of 2010 to March 31st of

8    2011.

9    Q.  And then you started over at the VNA

10   immediately after that?

11   A.  No.  Then Carrie worked out -- I came as a

12   temporary employee.  I was officially terminated

13   but I was brought back as a temporary employee on a

14   day-to-day basis, in internal medicine.

15   Q.  When you say "Carrie," is that Carrie

16   Capezzone?

17   A.  Yes.  She worked out a deal with Jonathan

18   Tamir.

19   Q.  And who is that?

20   A.  He was the administrator for internal

21    medicine.

22    Q.  And how long did you have that position?

23    A.  I could have stayed there forever.

24    Q.  So they kind of --

25    A.  Until May 18th.


         DEL VECCHIO REPORTING SERVICES, LLC
              (203) 245-9583

78

1    Q.  May 18th of?

2    A.  2011.

3    Q.  So you were in internal medicine for

4    roughly two months?

5    A.  Yes.

6    Q.  When you say you could have stayed there

7    forever, what do you mean by that?

8    A.  Well, as a temporary employee, there was no

9    expectations, and as a retiree, I could only work

10   up to 990 hours a year at Yale as a retiree.

11   Q.  So I guess you had seven months working in

12   financial operations?

13   A.  Yes.

14   Q.  At the end of that time, did you retire

15   from Yale?

16   A.  Well, they terminated me.

17   Q.  Right.

18   A.  On March 31st.

19   Q.  But that didn't take away your retirement?

20   A.  I then requested an exit review with human

21   resources, because I wanted to know what would

22   happen to my retirement benefits if I found another

23   position, and they said it would be bridged and

24   everything.  But there were a lot of questions I

25   asked that they that they couldn't answer, so they

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

79

1    said that they would get back to me.  That was like

2    on a Wednesday.  I had just started -- Thursday was

3    the 31st of March, took Friday off, Monday I came

4    in in internal medicine as a temp and Wednesday had

5    this meeting in human resources.

6         And on Friday morning they called me and

7    they said, oh, you're eligible to retire.  And so

8    at that point, you know, we discussed the options

9    and I retired.  What that did for me is it allowed

10   them to -- when I was just terminated, they only

11   paid out my vacation time.  Being retired, they had

12   to pay out my sick time.

13   Q.  So did you retire as of March 31st of 2011?

14   A.  Yes, I did.

15   Q.  Then that allowed the university to hire

16   you back on a temporary basis?

17   A.  Yes.

18   Q.  And are you collecting a pension now --

19   A.  Yes.

20   Q.  -- from your service in the university.

21      And how much is that?

22    A.  $1800 a month.

23    Q.  Is that the only retirement you're

24  collecting?

25    A.  Yes.


DEL VECCHIO REPORTING SERVICES, LLC
              (203) 245-9583

80

1    Q.  How long will that run?

2    A.  The rest of my life.

3    Q.  Okay.  Good.  Does that have any increases

4    associated with it?

5    A.  No.

6    Q.  So you're not collecting Social Security at

7    this point?

8    A.  No, I am not.

9    Q.  You probably can't, right, if you're

10   working?

11   A.  You can.  It's a reduced amount and then

12   you're limited on how much you can work.

13   Q.  Right.  That's what I mean.  In terms of

14   your present job, you would probably not be allowed

15   to collect Social Security?

16   A.  That's right.

17   Q.  And what were you doing for Jackie Tucker

18   in financial operations for several months?

19   A.  A variety of jobs.  Predominantly a review

20   of the accounts payable system, to clean up

21   duplicate vendors and that sort of thing in the

22   database.  I also worked on setting up a financial

23   statement review for the clinical departments.

24      Q.  Did you interact with Dr. Walker at all in

25   that position?

81

1    A.  Yes.

2    Q.  And how so?

3    A.  Well, I shouldn't say "interact."  I mean,

4    I saw Cynthia on several different occasions and we

5    talked, but I didn't interact with her in a

6    business sense.

7    Q.  Okay.  You might see her, but it wasn't --

8    you weren't reporting to her?

9    A.  That's correct.

10   Q.  Was she the one, though, that ultimately

11   had to approve your hiring in the financial

12   operations area?

13   A.  Yes.

14   Q.  So she was the one that offered you the

15   position, initially?

16   A.  That's correct.  She said, you know, "Your

17   choices are be done today or you take this

18   position."

19   Q.  And was she the one who extended you for

20   another three months after --

21     A.  Yes.

22     Q.  -- the first stint?  And was she the one

23   who also extended you for another month after that?

24     A.  Yes.

25     Q.  Did you think your age played any role in

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

82

1   those decisions?

2       A.  No.

3       Q.  In other words, offering you the job in the

4   first place and then extending it twice, you

5   wouldn't have regarded as discrimination against

6   you?

7       A.  No.

8       Q.  In fact, she was trying to help you, right?

9       A.  Yes.

10      Q.  And prior to the time that she, Dr. Walker,

11  gave you that help, had you suggested to anybody

12  that you were the victim of age discrimination?

13      A.  No, I did not.

14      Q.  And do you know whether Dr. Walker also had

15  to approve your being hired in the internal

16  medicine department on a temporary basis?

17      A.  I do not know.

18      Q.  That certainly was not an act of

19  discrimination?

20      A.  No.

21   Q.  Again, it was the university trying to help

22   you, correct?

23   A.  Yeah.

24   Q.  Now, in your answers to interrogatories,

25   there's reference to you, if I understand it

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

83

1    correctly, working at OptiCare in Waterbury?

2    A.  No.  That's where -- I had applied for a

3    position there.

4    Q.  And did you get a position there and --

5    A.  No.

6    Q.  I didn't know if maybe you got that and

7    turn the it down in favor of the VNA.

8        So is that the only two places you applied

9    for work then, once you left Yale, was OptiCare and

10   VNA Northwest?

11   A.  No.  There were several places, but those

12   are the two that -- where I had interviews.

13   Q.  I see.  And with regard to your claim for

14   emotional distress, have you had any treatment for

15   that?

16   A.  No.

17   Q.  How about even talking to your family

18   practitioner about that?

19   A.  Yes, I did.

20   Q.  And who was that?

21    A.  Dr. Karen Dufour at the time.

22    Q.  And is she no longer your practitioner?

23    A.  No.  Because I'm all the way up in

24    Litchfield now, and she's in Orange.  It would have

25    been too inconvenient to truck all the way down

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

84

1   there for a doctor's appointment.

2   Q.  So you live up in Litchfield now, too?

3   A.  I live in Naugatuck.

4   Q.  Okay.  Is that a change from when you

5   worked at Yale?

6   A.  No.

7   Q.  Okay.  You stayed in your same residence?

8   A.  Yes.

9   Q.  And how many times did you consult with

10  Dr. Dufour about your emotional distress from

11  leaving your employment?

12  A.  Two or three times.

13  Q.  How about your current practitioner; have

14  you talked with him or her about it?

15  A.  No.

16  Q.  And do you know roughly when it was that

17  you talked to Dr. Dufour about your emotional

18  distress?

19  A.  It would have been the summer of 2010,

20  going into the fall.

21     Q.  And do you remember anything that

22   Dr. Dufour suggested to you or gave you related to

23   treatment?

24     A.  Yes, she gave me Lexapro.

25     Q.  And did you in fact take that?


DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

85

1    A.  Yes.

2    Q.  And for how long?

3    A.  Until about the time that I started VNA.

4    Q.  So that was what, a period of -- what,

5    seven or eight months?

6    A.  Yes.

7    Q.  And did the Lexapro help?

8    A.  Yes.

9    Q.  And do you still have any emotional

10   distress?

11   A.  Only today.

12   Q.  I don't have any Lexapro to give you.  I'm

13   sorry if I'm the cause of emotional distress.  But

14   I know it's a necessary evil with regard to a

15   lawsuit, is the deposition.

16        When was the last time you felt like you

17   had emotional distress because of the termination?

18   A.  When I finally got the position at VNA.

19   That would have been May of 2011.

20   Q.  So the emotional distress, in essence, was

21   a concern about the future and whether or not you'd

22   find employment?

23   A.  Yes.

24   Q.  And during that time period, 2010 and 2011,

25   did you have any other health concerns?


DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

86

1    A.  No.  Just -- I'm diabetic.  That's the only

2    other one.

3    Q.  And do you remember, did you have visits

4    with Dr. Dufour that were solely addressed to your

5    emotional distress as opposed to your general

6    condition?

7    A.  No.  No, I did not.

8    Q.  So in other words, you would talk about the

9    emotional stress if you were seeing her or

10   something else?

11   A.  That's correct.

12       (Off the record.)

13   BY MR. NOONAN:

14   Q.  I take it you did get the letter of August

15   23, 2010 in which your reassignment was announced?

16   A.  Yes.

17   Q.  Did you get that during the meeting or was

18   that after the meeting?

19   A.  At the meeting.

20   Q.  And you have seen that?

21    A.  Yes.

22    Q.  Okay.  And is there any part of that -- as

23  a matter of fact, if you want to look at it, you're

24  welcome to.

25       Is there any part of that letter, any of


       DEL VECCHIO REPORTING SERVICES, LLC
           (203) 245-9583

87

1    the criticisms that are mentioned, that you agree

2    with?

3        A.   That I agree with?

4        Q.   Yes.

5        A.   No.

6        Q.   If the concerns addressed in that letter

7    were accurate, would you agree that management

8    could legitimately consider reassignment of the

9    administrator?

10       A.   If they were accurate, yes.

11            MS. SYLVESTER:  Just for sake of

12       organization, why don't we make that an

13       exhibit.

14            MR. NOONAN:  Have you got an extra

15       copy?

16            MS. SYLVESTER:  I'll just take it out

17       of here.

18            (Off the record.)

19

20

21

22                              .

23

24

25


            DEL VECCHIO REPORTING SERVICES, LLC
                (203) 245-9583

88

1          CERTIFICATE

2          I hereby certify that I am a Notary

3    Public, in and for the State of Connecticut, duly

4    commissioned and qualified to administer oaths.

5          I further certify that the deponent

6    named in the foregoing deposition was by me duly

7    sworn, and thereupon testified as appears in the

8    foregoing deposition; that said deposition was

9    taken by me stenographically in the presence of

10   counsel and reduced to typewriting under my

11   direction, and the foregoing is a true and accurate

12   transcript of the testimony.

13         I further certify that I am neither of

14   counsel nor attorney to either of the parties to

15   said suit, nor am I an employee of either party to

16   said suit, nor of either counsel in said suit, nor

17   am I interested in the outcome of said cause.

18         Witness my hand and seal as Notary

19   Public this ____ of _____, 2013.

20

21     _____

22     Melissa J. Kelly, RMR, CRR

23     Licensed Shorthand Reporter #00307

24

25  My Commission expires:  September 30, 2013


        DEL VECCHIO REPORTING SERVICES, LLC
          (203) 245-9583

89

1              INDEX

2  EXAMINATION                    PAGE

3  DIRECT BY MR. NOONAN....................... 4

4

5        (No exhibits were marked.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

90

1        I have read the foregoing 87

2        pages and hereby acknowledge the

3        same to be a true and correct

4        record of the testimony.

5

6

7

8

9        _____

10        MARTIN J. DONOVAN

11

12

13

14

15

16  Subscribed and sworn to

17  Before me this _____ day of _____, 2013.

18

19

20  _____

21      Notary Public

22

23   My Commission Expires:

24

25


DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583