UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

MARTIN J. DONOVAN

VS.              3:12 CV00549VLB

YALE UNIVERSITY

VOLUME II

Continued deposition of MARTIN J. DONOVAN,

taken in accordance with the Connecticut Practice

Book at the law offices of William S. Palmieri,

129 Church Street, New Haven, Connecticut, before

Deborah Gentile, RPR, a Registered Professional

Reporter and Notary Public, in and for the State of

Connecticut on March 5, 2013, at 1:28 p.m.

DEBORAH GENTILE, RPR

DEL VECCHIO REPORTING SERVICES, LLC
PROFESSIONAL SHORTHAND REPORTERS
117 RANDI DRIVE
MADISON, CT 06443
203 245-9583

Hartford                          Stamford

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

KATHRYN R. SYLVESTER, ESQUIRE
Law offices of William S. Palmieri, LLC
129 Church Street, Suite 405
New Haven, Connecticut 06510
Tel:  203-562-3100
Fax:  203-909-6006
Email:wpalmieri@hotmail.com

ON BEHALF OF THE DEFENDANT:

PATRICK M. NOONAN, ESQUIRE
Donahue, Durham & Noonan, PC
741 Boston Post Road
Guilford, Connecticut 06437
Tel:  203-458-9168
Fax:  203-458-4424

93

## INDEX OF EXAMINATIONS

PAGE

DIRECT EXAMINATION BY MR. NOONAN          95

## INDEX OF EXHIBITS

DEFENDANT'S EXHIBITS

1 - August 23, 2010 Letter to Mr. Donovan     95

2 - Summary of the audit done by YMG          95

(Reporter's note:  Exhibits retained by counsel.)

Del Vecchio Reporting
(203) 245-9583

94

1   STIPULATIONS

2

3   IT IS HEREBY STIPULATED AND AGREED by and

4   between counsel representing the parties that each

5   party reserves the right to make specific objections

6   at the trial of the case to each and every question

7   asked and of the answers given thereto by the

8   deponent, reserving the right to move to strike out

9   where applicable, except as to such objections as

10  are directed to the form of the question.

11  IT IS FURTHER STIPULATED AND AGREED by and

12  between counsel representing the respective parties

13  that proof of the official authority of the Notary

14  Public before whom this deposition is taken is

15  waived.

16  IT IS FURTHER STIPULATED AND AGREED by and

17  between counsel representing the respective parties

18  that the reading and signing of this deposition by

19  the deponent is not waived.

20  IT IS FURTHER STIPULATED AND AGREED by and

21  between counsel representing parties that all

22  defects, if any, as to the notice of the taking of

23  the deposition are waived.

24         Filing of the Notice of Deposition with

25  the original transcript is waived.

Del Vecchio Reporting
(203) 245-9583

95

1       (Exhibits 1-2 were marked for I.D.)

2       MARTIN J. DONOVAN, having previously been

3  duly sworn, was deposed and testified as follows:

4

5       DIRECT EXAMINATION (Continued)

6  BY MR. NOONAN:

7    Q   Mr. Donovan, we marked as an exhibit the

8  letter of August 23, 2010 -- which is addressed to

9  you and signed by Dr. Tsai and Dr. Walker -- that's

10  been marked as Exhibit 1.  That's the letter you

11  were talking about before the break?

12    A   Yes.

13    Q   And what you indicated is that if the

14  information contained in that letter were accurate,

15  then you would think that those would be appropriate

16  reasons for terminating you as the department

17  administrator; is that correct?

18    A   That's correct.

19    Q   Then Exhibit 2, that's a summary of the

20  audit done by YMG; is that right?

21    A    Yes.

22    Q    And as I understand it, you got a copy of

23  that during the process that you went through at the

24  Connecticut Commission on Human Rights and

25  Opportunities?

          Del Vecchio Reporting
              (203) 245-9583

96

1    A   That's correct.

2    Q   The -- is there anything on Exhibit 2 with

3  which you agree?

4    A   No.

5    Q   However, if those things were accurate,

6  you would agree that reassigning you from your

7  position as the administrator of the department

8  would have been appropriate?

9    A   Yes.

10    Q   Are you aware of anyone else in the

11  ophthalmology department complaining about age

12  discrimination during the time you were there?

13    A   No.

14    Q   Was there anyone else that you think, in

15  fact, was discriminated against because of age --

16    A   No.

17    Q   -- during the time you were there?  And

18  specific to Dr. Tsai and Dr. Walker, are you aware

19  of them discriminating against anyone else on the

20  basis of age?

21     A   No.

22     Q   Who is Mary Schwall?

23     A   Mary Schwall was the clinical practice

24 specialist.

25     Q   What was her function?

Del Vecchio Reporting
(203) 245-9583

97

1    A    Reimbursement.  Review claims, make sure

2  that we were getting the most reimbursement from the

3  insurance companies that we could, and also, if

4  there were missing pieces of information, making

5  sure those pieces were followed up on and

6  resubmitted.

7    Q    So sometimes it would develop that the

8  department would submit bills to an insurance

9  company and the insurance company would kick them

10  back saying, "You haven't given us enough

11  information" --

12    A    Exactly.

13    Q    -- "we need another piece of paper."

14  Something like that.  Her job was to process the

15  charges?

16    A    Yes.

17    Q    She left at some point; is that right?

18    A    That's correct.

19    Q    When was that?  Do you recall?  Was it in

20  early 2010 or was it 2009?

21    A   It could have been 2010.

22    Q   Was there some problem found with regard

23  to her duties after she left?

24    A   Yes, we discovered that there were three

25  hundred some odd thousand of claims that had not

Del Vecchio Reporting
(203) 245-9583

98

1  been followed up on.

2      Q   When you say "we discovered," who actually

3  discovered it?

4      A   The YMG audit brought it to my attention.

5      Q   When you say "we discovered it," it was

6  really YMG that found it?

7      A   Well, yes.

8      Q   How long after Mary Schwall left was it

9  determined that there was this $300,000 of charges

10  that had not been properly pursued?

11      A   Time frame I'm not sure of, but it was

12  during the audit that they discovered it.

13      Q   And the audit was in either May or June?

14      A   In the summer.

15      Q   And Mary had left either in the beginning

16  of 2010 --

17      A   Right.

18      Q   -- or at the end of 2009?

19      A   2010.

20      Q   Early 2010.  So these $300,000 of charges

21  were not found for several months?

22     A    Yes.

23     Q    Do you think that would be a legitimate

24  concern of senior management, the $300,000 of

25  charges that had not been properly pursued for

99

1 several months?

2    A   Yes, it should be.  But there was no way

3 under the current Yale system to find that out.

4    Q   How did YMG find it out?

5    A   Because they assigned one of their people

6 as the temporary clinical practice specialists until

7 we replaced Mary.  And actually, we weren't going to

8 replace her; we were going to continue with the YMG

9 person.

10    Q   So prior to the YMG investigation which

11 found these $300,000 of charges which had not been

12 processed, what had you done to look through Mary

13 Schwall's unfinished work to see what needed to be

14 done with regard to the things she was doing?

15    A   We reviewed the reports that she had, and

16 she did not adequately provide us all of the

17 information.

18    Q   When you say "we reviewed," who did that

19 review?

20    A   Practice manager and myself.

21    Q   So you and she were not able to find this

22 information?

23    A   That's correct.

24    Q   But the YMG people were able to find it?

25    A   Well, because they had access to

Del Vecchio Reporting
(203) 245-9583

100

1  information we didn't have.

2    Q   You mean there's things that you couldn't

3  have looked at of Mary Schwall's that they looked

4  at?

5    A   I'm saying that they have access to claim

6  information that I don't have.

7    Q   Right.

8    A   Or didn't have.

9    Q   Why couldn't you look at that if you

10  wanted to?  Are you barred from looking at that?  Or

11  are you saying you simply didn't look at it?

12    A   All right.  I didn't look at it.

13    Q   But when someone came in and looked at it,

14  they found $300,000 of charges that had not been

15  pursued; is that right?

16    A   That's correct.

17    Q   That would be $300,000 that the department

18  would have lost?

19    A   That's correct.

20    Q   Do you think that would be a legitimate

21 concern about an administrator?

22    A    Yes, if they had access to the

23 information.

24    Q    You agreed you had access to the

25 information --

101

1     A    No, I did not agree to that.  In talking

2  to my fellow administrator, not an administrator in

3  that University would have access to that

4  information and would be able to answer the question

5  where you are leading it.

6     Q    What administrators did you talk to about

7  this issue?

8     A    Jonathan Tamir, who was the vice chair and

9  administrator for the department of internal

10  medicine.

11    Q    He told you what?

12    A    He said, "There's no way you would have

13  known that."

14    Q    Did he ever work in your department?

15    A    No.

16    Q    Who else did you talk with?

17    A    Sandra Stein.

18    Q    Who is she?

19    A    She's the administrator for diagnostic

20  radiology.

21   Q   Did she ever work in your department?

22   A   No.

23   Q   What information did she provide?

24   A   Same thing.  That's not something you

25   would be able to find out.

Del Vecchio Reporting
(203) 245-9583

102

1    Q    Did you talk to -- with anyone else about

2  this?

3    A    No.

4    Q    Could can you explain how it is that the

5  people from YMG were able to find this out?

6    A    I can't explain that.

7    Q    But they were able to come in to your

8  department to find something that you didn't find?

9    A    Yes.

10   Q    Why did Ms. Schwall leave your department?

11   A    She said she needed more money, better

12  hours, and she went to a retina -- a private retina

13  practice.

14   Q    Did you ever tell her that you thought you

15  were the victim of age discrimination?

16   A    She left before all that started.

17   Q    Did you ever hear any concerns about the

18  amount of time you spent conversing with Sarah Gelo?

19   A    No.

20   Q    No one ever raised that issue with you?

21    A   No.

22    Q   You don't remember Dr. Tsai talking with

23  you about that?

24    A   No.

25    Q   How much time during the average day did

Del Vecchio Reporting
(203) 245-9583

103

1  you spend talking with Sarah Gelo?

2      A    Just about work and, you know, as

3  necessary.

4      Q    Any idea how much time you spent in her

5  cubicle in an average day?

6      A    No more than necessary.

7      Q    How much time is that?  An hour, an hour

8  and a half, three hours?  Any idea?

9      A    Whatever it would take to discuss issues

10  that we were working on.

11      Q    Are you able to estimate the time you

12  spent with her?

13      A    No.

14      Q    Would it be as much as an hour or two a

15  day?

16      A    Maybe an hour.

17      Q    And did you also go out at lunchtime with

18  her?

19      A    Yes.

20      Q    You don't remember Dr. Tsai coming to you

21   and registering a concern about that issue?

22      A   Dr. Tsai very early on asked about going

23   to lunch with her, yes.

24      Q   How come you didn't mention that before

25   when I asked you about Dr. Tsai expressing concern?

104

1    A   Well --

2    Q   You didn't remember it then?

3    A   Yeah.

4    Q   What did Dr. Tsai say to you when he

5  expressed a concern about the time of you were

6  spending with Sarah Gelo?

7    A   He didn't express a concern about amount

8  of time.  He asked about going to lunch with her.

9    Q   What did he say?  What did you say?

10    A   He wondered if that was a good practice

11  for the administrator.

12    Q   What did you say?

13    A   I said, "You know, we work together, we go

14  out to lunch.  There's nothing more to that."

15    Q   Did you think it was a good idea for you

16  to be going out to lunch with one of the employees?

17    A   No different than going out to lunch with

18  any colleague.

19    Q   But she wasn't on the same level as you,

20  correct?

21    A    No.

22    Q    She indirectly reported to you?  She was

23  someone that worked underneath you?

24    A    Yes.

25    Q    You didn't think that as a person who was

Del Vecchio Reporting
(203) 245-9583

105

1 running the practice it could cause issues with

2 other employees --

3     A   No, I did not.

4     Q   -- you were singling one employee out to

5 have lunch with?

6     A   I had lunch with various employees.

7     Q   How many times did you have lunch with

8 Sarah Gelo compared to other employees?

9     A   Well, you know, we would take lunch is not

10 really an accurate term.  We would take a mental

11 health break and take a walk around the green

12 through the old campus and back to the office.

13     Q   How often would you do that?

14     A   Maybe two to three times a week.

15     Q   And how many other employees did you take

16 on this walk through the old campus --

17     A   Over the years, a variety of employees.

18     Q   How many did you do it two or three times

19 a week?

20     A   None.

21     Q   There was none that you did it once a

22  week, right?

23     A   No, there was -- yes, there were others

24  that I'd take maybe once a week.

25     Q   You'd take them on this walk around the

106

1  campus?

2    A   Well, different walks, but yes.

3    Q   And how old is Sarah Gelo, roughly?

4    A   Forty-six.

5    Q   And how do you know that, you know her

6  exact age?

7    A   Only because she was born the year I

8  graduated high school.

9    Q   So she's roughly 20 years older -- 18

10  years older, I guess?

11    A   Yes.

12    Q   Which other employees did you frequently

13  take on walks during the lunch hour?

14    A   A gentleman who's now retired, Hudson.

15    Q   How often did you go with him?

16    A   For a while it was daily, but it varied

17  over the years.

18    Q   I'm talking about just at the time when

19  you were the administrator of the ophthalmology

20  department.

21    A   None.

22    Q   So there were no other ophthalmology

23  department employees on walks during lunch hour; is

24  that right?

25    A   Not that I recall.

Del Vecchio Reporting
(203) 245-9583

107

1    Q    Would you agree that during the workday

2 that you spent more time talking with Sarah Gelo

3 than with other employees?

4    A    No, I wouldn't agree with that.

5    Q    Do you know whether you ever fell asleep

6 during staff meetings?

7    A    No.

8    Q    Do you think that ever happened?

9    A    No.

10    Q    With regard to Sarah Gelo -- by the way,

11 you are still friendly with her, right?

12    A    Yes.

13    Q    Now, you mentioned that YMG had gotten

14 involved in reviewing other departments besides

15 yours.  Do you know which other departments?

16    A    I know the one that sticks in my mind is

17 surgery, and I believe pathology.

18    Q    And was Sally Chesney involved in those?

19    A    To the best of my knowledge.

20    Q    Are you aware of any others?

21     A   No.

22     Q   Do you know whether the department

23  administrators ended up being terminated from their

24  positions in either of those departments?

25     A   No, they did not.

Del Vecchio Reporting
(203) 245-9583

108

1   Q   And were you aware that the YMG review

2   recommended that you be removed as clinical

3   administrator?

4   A   No, I was not.

5   Q   Do you think that Sally Chesney was

6   motivated by age discrimination?

7   A   No.

8   Q   Do you know, by the way, with regard to

9   the surgery and pathology reviews that Ms. Chesney

10  did, whether anyone was terminated in those

11  departments?

12  A   I wouldn't have access to that

13  information.

14  Q   Were you aware of a perception within the

15  department that you spent a lot of time on your

16  computer looking at the Internet?

17  A   No.

18  Q   Was there ever a time that you turned your

19  desk around so that your computer --

20  A   No, that was done while I was on vacation.

21     Q   Let me just finish the question.  Was

22   there ever a time that your desk was turned around

23   so that your screen would not be visible from those

24   who were passing by?

25     A   No.  No.  My desk was situated so that you

Del Vecchio Reporting
(203) 245-9583

109

1   could walk in.  I had my back to the door the way

2   the office was set up, and then when I was on

3   vacation it got turned around.

4      Q   So someone turned your desk around without

5   you authorizing it?

6      A   That's correct.

7      Q   Did you turn it back?

8      A   No.

9      Q   Do you know who turned your desk around?

10     A   Ken Fong and Sarah.

11     Q   Did they ever tell you why they did that?

12     A   No, just that it looked better.

13     Q   When you say Sarah, you mean Sarah Gelo?

14     A   Yes.

15     Q   Now, were you ever informed that there was

16  a concern about a delay on your part in implementing

17  a new fee schedule in the department?

18     A   I'm chuckling because that entire thing

19  about the fee schedule is not true.

20     Q   Okay.

21    A   Pam Berkheiser initiated the new fee

22  schedule at the time Dr. Tsai wanted it.  He got

23  information from Kathy Debroisse that was incorrect.

24    Q   Can you give me some more detail?  Just

25  tell me what happened.

Del Vecchio Reporting
(203) 245-9583

110

1    A    At a faculty meeting we discussed

2  implementing a new fee schedule.

3    Q    Was that decided at the meeting that that

4  would happen?

5    A    Pardon?

6    Q    Was that decided at the meeting that that

7  would be implemented?

8    A    Yes.  Yes.

9    Q    Do you know when that was?

10    A    No, I don't recall, but we immediately did

11  it at that time.

12    Q    When you say we --

13    A    It had to be 2010 because I believe Pam

14  was gone by the time Tsai made an issue that it

15  wasn't done.  But it was done.  He was wrong.

16    Q    Who implemented that fee schedule?  Was

17  that Pam Berkheiser, or you, or somebody else?  Pam

18  and I agreed to it.  It was her job to make sure

19  that Mary implemented it, and it was done.

20    Q    Who actually did it?  Was it Mary Schwall

21  that did it?

22      A    Yes.

23      Q    How did you know when she did it?  Did she

24  tell you she did it?

25      A    Our fees increased.

Del Vecchio Reporting
(203) 245-9583

111

1    Q    Your fees might have increased because you

2  have more collections.

3    A    No.  You do a variance analysis every

4  month that tells you the amount of variance, the

5  increases due to fees and how much is due to volume.

6  It was clear that it was done.

7    Q    The way you knew it was done was by the

8  variance analysis?

9    A    Absolutely.

10    Q    And you think the person who actually

11  implemented it was Mary Schwall?

12    A    She would be the person to implement it.

13    Q    You didn't supervise her implementing it?

14    A    No, you wouldn't.  You wouldn't stand over

15  her and watch her implement it.

16    Q    How did you get along with Pam Berkheiser,

17  by the way?

18    A    Very well.

19    Q    Did she ever suggest that one of the

20  problems in the department was that you didn't know

21  how to run a clinical practice?

22      A   No.

23      Q   Do you recall anyone in the department

24  expressing concerns about an affair going on between

25  two employees in the department?

112

1    A    Yes.

2    Q    And who were they?

3    A    Ken Fong.

4    Q    Who was he having an affair with?

5    A    I can't remember her name.

6    Q    What was her -- Ken Fong was the

7    photographer, if I recall?

8    A    That's right.  And she was a technician.

9    Q    And how was this brought to your

10    attention?

11    A    I actually saw them together outside of

12    the office.

13    Q    Where was that?

14    A    In the parking garage.  It could be any

15    number of places.

16    Q    When you say you saw them together, what

17    were they doing together?

18    A    Pardon?

19    Q    What were they doing together?

20    A    They would ride in together, they would go

21 home together, you know.  Pam brought it to my

22 attention.  She said, you know ...

23     Q    Was that -- when Pam brought it to your

24 attention, what did she say about it?

25     A    Nothing more than, you know, Ken and -- I

113

1  can't -- like I said, I can't think of her name --

2  were having an affair.

3     Q    Was either of them married?

4     A    Ken was.

5     Q    And the technician?

6     A    I don't believe she was.

7     Q    Were others in the department talking

8  about the affair that was going on?

9     A    I would imagine.

10    Q    Nobody mentioned it to you?

11    A    Not to me.

12    Q    Did Pam Berkheiser tell you that?

13    A    Pam did.  But other than that, no one else

14  came running to me and said, "Jamie "-- Jamie was

15  her first name.

16    Q    And did Pam say that this was a -- subject

17  to frequent conversation among other employees in

18  the department?

19    A    No.

20    Q    Did you look into that situation at all?

21   A   There's nothing to look into.  What they

22 do outside the office isn't my business.

23   Q   And were they seen to be going to lunch

24 together every day?

25   A   I wouldn't know that.

Del Vecchio Reporting
(203) 245-9583

114

1    Q    Were you aware that they were eating lunch

2 together very frequently within the department but

3 behind closed doors?

4    A    I know that when they ate lunch together

5 in the department, yes, they would use Ken's office.

6    Q    And his door would be closed during this

7 period of time?

8    A    Yes.

9    Q    Did you ever think that it was -- it would

10 be appropriate for you to talk with the two

11 employees about the propriety of that?

12    A    No.  It was their lunch break.

13    Q    Did you -- in early 2010, did you have a

14 meeting with Carolyn Slayman about the budget?

15    A    About the research budget, yes.

16    Q    And do you recall anything of that

17 meeting?

18    A    She gave me recommendations of how to

19 structure a compensation package for a new

20 researcher we were bringing in.

21     Q   Do you remember anything else about that

22  meeting?

23     A   No.

24     Q   Did Dr. Tsai ever indicate to you that

25  anyone had suggested to him that he should terminate

115

1  you as the administrator?

2    A   Yes.

3    Q   When did he mention that?

4    A   I don't remember when he mentioned it.  I

5  think it was in the 2010 time frame after the audit

6  started, and he said that it was Dr. Leffell who

7  made that recommendation.

8    Q   This was after some of the early

9  information was coming in to the dean's office about

10  the YMG evaluation?

11    A   Yes.

12    Q   What do you remember Dr. Leffell saying

13  about that subject?

14    A   He made the comment to me that David --

15  Dr. Leffell -- felt that I should be removed as the

16  administrator and that Pam should also be removed as

17  the practice manager.

18    Q   Do you remember him explaining why?

19    A   It was predominantly because of the

20  deficit.  Tsai had made promises about the deficit

21  that were just unachievable.

22      Q   Do you think that Dr. Tsai was in effect

23  blaming you to cover the unreasonable projections he

24  had made?

25      A   Yes.

116

1    Q   Do you think he would have done that to

2  whoever was in your position; that is, he would have

3  blamed that person?

4    A   Yes.

5    Q   In other words it wouldn't have mattered

6  whether you were 40 or 60, right, if he was looking

7  for a scapegoat?  Is that a fair statement?

8    A   Fair statement.

9    Q   In terms of Dr. Tsai's motivation, you

10  think the motivation was to cover his own backside

11  rather than a concern about your age.  Would that be

12  a fair statement?

13    A   I believe James Tsai was age-motivated and

14  would do anything to cover his own butt.

15    Q   But in terms of this particular situation

16  where the deficit was increasing and you think he

17  had made unreasonable promises to the dean's office,

18  Dr. Tsai really wouldn't care how old the

19  administrator was, correct?

20    A   That's correct.

21     Q    So basically he took the position he took,

22  in your mind, because he was trying to cover his

23  backside?

24     A    Yes.

25     Q    And how about Dr. Leffell?  Do you have