UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MARTIN J. DONOVAN | : | |
| PLAINTIFF, | : | |
| VS. | : | NO. 3:12-cv-00549 (VLB) |
| YALE UNIVERSITY | : | |
| DEFENDANT. | : | SEPTEMBER 30, 2013 |

PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT

I. RESPONSE TO FACTS ASSERTED BY DEFENDANT

1.-2. Admit.

3. Deny. T18-22, 30-31.

4. Deny. T18-22, 30-31.

5. -6. Admit.

7. Deny. A; T., generally.

8. -10. Admit that these statements are contained in the report, never shown to plaintiff. Deny that the statements are accurate or truthful. A; T4, 12-13, 17-18, 18-23, 26-29, 30-33, 44-45, 54-57, 60-65, 66-76, 109-111, 117-118.

11. Deny. A; T4, 12-13, 17-18, 18-23, 26-29, 30-33, 44-45, 54-57, 60-65, 66-76, 109-111, 117-118.

12. Deny that the statements are accurate or truthful. A; T4, 12-13, 17-18, 18-23, 26-29, 30-33, 44-45, 54-57, 60-65, 66-76, 109-111, 117-118; Def. Ex. 4A, 4B, 4C.

13. Deny. A; T4, 12-13, 17-18, 18-23, 26-29, 30-33, 44-45, 54-57, 60-65, 66-76, 109-

**111, 117-118.**

**14. Deny. A; T4, 12-13, 17-18, 18-23, 26-29, 30-33, 44-45, 54-57, 60-65, 66-76, 109-111, 117-118; Def. Ex. 4A, 4B, 4C.**

**15. Deny. Defendant did not "grant" extensions or accommodate plaintiff in any way. Defendant retained plaintiff as an employee because of his "valuable contributions", just as it admits in its letter. Admit that in the absence of age discrimination, the defendant was able to admit the plaintiff's valuable contributions to the workplace and refrained from unlawfully and baselessly terminating him and falsely claiming that he was incompetent. A; T4, 12-13, 17-18, 18-23, 26-29, 30-33, 44-45, 54-57, 60-65, 66-76, 109-111, 117-118; Def. Ex. 4A, 4B, 4C.**

**16. Admit that Defendant retained plaintiff as an employee because of his "valuable contributions", just as it admits in its letter. Admit that in the absence of age discrimination, the defendant was able to admit the plaintiff's valuable contributions to the workplace and refrained from unlawfully and baselessly terminating him and falsely claiming that he was incompetent. Admit that termination occurred on March 31, 2011. A; T4, 12-13, 17-18, 18-23, 26-29, 30-33, 44-45, 54-57, 60-65, 66-76, 109-111, 117-118; Def. Ex. 4A, 4B, 4C.**

**17. -18. Admit.**

**19. -22. Deny. These are legal conclusions without factual assertions. A; T4, 12-13, 17-18, 18-23, 26-29, 30-33, 44-45, 54-57, 60-65, 66-76, 109-111, 117-118; Def. Ex. 4A, 4B, 4C.**

**II. DISPUTED ISSUES OF MATERIAL FACT**

**______The following facts are set forth under oath in the Plaintiff's Affidavit of Illegal Discriminatory Conduct, April 1, 2011, filed April 8, 2011 (hereinafter, "A") and in Plaintiff's Deposition, March 5, 2013 (hereinafter "T").**

**During all times mentioned in this action, the plaintiff, Martin Donovan was and is an adult citizen of the United States residing in, Connecticut. The plaintiff was born on December 23, 1948. A; T4.**

**At all times relevant to the instant complaint, the defendant Yale University was and is an employer located in New Haven, employing more than one hundred persons. A.**

**At all times referenced herein, the Yale Medical School and the Yale Medical Group were and are departments of the defendant University. A.**

**The defendant Yale has adopted, ratified, sanctioned or otherwise accepted as its own the actions, omissions, words and conduct of the Yale Medical School, the Yale Medical Group, their agents, officers or employees. The defendant University has thereby incurred liability for the for the acts, omissions, statements and conduct of the said departments and their agents, officers or employees. A.**

**The plaintiff is a highly skilled and exceedingly well qualified individual with a strong educational and business background. A.**

**The plaintiff was employed by the defendant in the Yale-New Haven Medical Center for 32 years. For the first 20 years of the plaintiff's employment, the plaintiff worked in the Yale-New Haven Hospital. For the past twelve years to his**

**termination, the plaintiff was by the defendant in the Yale University School of Medicine. A.**

**Initially, the plaintiff was Director of Finance for the Yale Medical Group, ("YMG") of the defendant's School of Medicine. The YMG is the administrative, billing and collecting arm for the School's various clinical practices. A.**

**During the plaintiff's eight years as Director of Finance, the plaintiff played a significant role in turning the YMG organization from a deficit organization to one that operated with a surplus. A.**

**Due to the excellence of the plaintiff's work, in February, 2006, the plaintiff was asked to become the interim Administrator for the Department of Ophthalmology & Visual Science in addition to the plaintiff's role in the YMG. A.**

**The plaintiff did this from February, 2006 until August, 2006. Due to the excellence of the plaintiff's work and the plaintiff's proficiency at this position, the plaintiff was asked to take the position of Administrator on a permanent basis. On October 1, 2006, the plaintiff joined the newly appointed chairman of the Department, James C. Tsai, M.D. A.**

**The plaintiff's annual reviews have always been excellent, and the plaintiff's working relationships with all staff have always been excellent. In the plaintiff's annual reviews, it was noted that "Marty is genuinely respected by Faculty and Staff". A.**

**The Department has been in deficit for approximately 20 years. The goal of Dr. Tsai was to turn the deficit into a surplus. As the result of the plaintiff's hard**

**work, the deficit was decreasing annually, although not at the rate Tsai promised to the Dean's Office of the defendant. A.**

**In March 2010, the Billing Manager, Mary Schwall, left the defendant University. After she left, it was discovered that Ms. Schwall had hidden $300,000 worth of invoices, and failed to act on the collection of these invoices. Once this was discovered the plaintiff immediately informed Dr. Tsai. A.**

**Under the plaintiff's direction, YMG staff immediately began working the previously hidden invoices so that the funds due from the secreted invoices could be collected. A.**

**As the plaintiff's Department was exceeding previous years clinical collections and was nearly 20% ahead of the previous year, there were no indications that Schwall was hiding invoices and that they were not being collected. The plaintiff informed the defendant of this, and it had no reply. A.**

**In May, 2010, the Assistant Dean for Finance of the defendant, Carrie Capezzone, contacted the plaintiff and informed the plaintiff that at a meeting of the defendant it was stated that the plaintiff was planning on retiring. A; T22-23.**

**The Assistant Dean for Finance of the defendant was the plaintiff's superior. A.**

**The plaintiff was shocked and alarmed, as the plaintiff had no intention of retiring, and had never stated to anyone that he was even considering retirement. A; T22-23.**

**Assistant Dean Capezzone contacted the plaintiff and asked the plaintiff**

**when he was going to retire. The plaintiff stated in no uncertain terms that he was not planning to, nor did he intend to retire. The plaintiff told Capezzone that the defendant's claim that the plaintiff was planning on retiring was categorically untrue. The plaintiff informed Assistant Dean Capezzone that he had never stated to anyone that he was even considering retirement. Id.**

**The plaintiff asked Assistant Dean Capezzone who in the defendant claimed that the plaintiff was considering retiring. Capezzone would not reveal to the plaintiff where or from whom this statement came. Id. Several days later, the plaintiff was summoned to meet Capezzone's boss, the Deputy Dean for Finance and Administration of the defendant, Cynthia Walker. A.**

**Deputy Dean for Finance and Administration of the defendant, Cynthia Walker is the head of the Finance and Administration department. T12-13. Deputy Dean Walker reports directly to the Dean of the defendant's Yale School of Medicine. The Dean of the School of Medicine reports directly to the President of the defendant University. A.**

**During this meeting, Walker questioned the plaintiff about the plaintiff's supposed intention to retire. A; T18-21. The plaintiff informed Walker in no uncertain terms that he was not planning to, nor did he intend to retire. Id. The plaintiff told Walker that the defendant's claim that the plaintiff was planning on retiring was categorically untrue. Id. The plaintiff informed Deputy Dean Walker that he had never stated to anyone that he was even considering retirement. Id. The plaintiff informed Walker that he intended to continue working until he was**

**seventy (70) years old; he was then sixty-two (62) years old. Id.; T4.**

**Shortly after this meeting, in which Deputy Dean Walker inquired about the plaintiff's fictitious plans to retire, Walker stated that the defendant had "lost confidence in the plaintiff as a leader." A.**

**During this same time, Dr. Tsai also subjected the plaintiff to age discriminatory conduct:**

**Q. Now, how about Dr. Tsai, did he ever say anything to you that caused you to believe that he was acting out of age discrimination?**

**A. During my time with Dr. Tsai, there were numerous conversations in which he made remarks about the age of either faculty, me, staff. We had an assistant dean -- assistant chairman, vice chairman of the department, who was head of the research operation, and he announced he was leaving to go to another school.**

**Q. And who was that, by the way?**

**A. Colin Barnstable -- and Colin is younger than me. And Tsai made the comment, "Well, you know, he's getting too old for his research to be valid." And I made the comment, I said, "You know, Colin is younger than me." And he said, "Oh,**

**27**

**you're not in your 60s." So ...**

**Q. And what did you say to that?**

**A. At the time I was. I said "Yes, I am."**

**T26-27.**

**Tsai's attitude toward persons in their 60's, such as the plaintiff, was that they were too old to do their jobs properly and effectively, and "ashould just retire." T27-29.**

**Q. Okay. Now, you said there was also a comment made by an accountant who you described as an older woman. Do you remember anything else about her, other than that she was older?**

**A. Not really. I had just started in the department.**

**Q. And what do you remember about Dr. Tsai's comments about this accountant?**

**A. Again, that it was good for her to leave so that we could get someone younger in there.**

**. . .**

**Q. Do you remember -- with regard to the**

**accountant, do you remember the exact words that Dr. Tsai said?**

**31**

**A. As I said, that, you know, "She was older," and that, you know, "her leaving was good because we could get someone younger in that position."**

**T30-31.**

**Commencing after the false claims that the plaintiff was intending to retire, and the plaintiff's strident assertions to the contrary, the defendant began to falsely and unfairly criticize and scrutinize the plaintiff's work. AT43.**

**The defendant falsely accused the plaintiff of to failing to investigate the allegations that staff were handing out the business cards of a physician who once worked in the practice, but had since left. A; T44-45.**

**This is completely false. The plaintiff had immediately investigated the allegations, and found them to be baseless. A.**

**When the allegations were first brought to the plaintiff's attention, the Practice Manager, Pamela-Jean Berkheiser, and the plaintiff met with the front desk personnel and inquired whether this was being done. It was not. A.**

**The plaintiff instructed staff that if patients called or asked for information regarding physicians who were no longer part of the practice, they were simply to say that the physicians now practice elsewhere in the New Haven area. A.**

**As part of his investigation of this allegation, the plaintiff interviewed the Clinical Supervisor and instructed her that at no time were any of her staff to give out information regarding physicians currently in competition with the Department. A; T60-65.**

**To further address the allegations, the plaintiff brought the defendant's own Human Resources Department into the investigation. A representative from that department of the defendant, Elena McHugh, met with two of the physicians making the accusations, Dr. Nils Loewen and Dr. C. Roberto Bernardino. Neither of them offered proof that anyone was handing out business cards. A.**

**The plaintiff's thorough and diligent investigation, in conjunction with defendant's Human Resources Department, revealed that the claims were untrue.**

**The defendant's own Human Resources Department determined that there was no evidence to substantiate the claims. A.**

**Nevertheless, the plaintiff was falsely blamed for Dr. Bernardino's leaving the Department. The defendant falsely claimed that the departure was due to the plaintiff's handling of the claims that staff were handing out a competitor's business cards, which the defendant knew to be unsubstantiated. A.**

**The defendant further falsely claimed that fee schedule changes were not implemented, resulting in lost revenue to the Department. A; T109-111. This, too, is totally false statement. The plaintiff verified with the former Practice Manager that the changes were indeed implemented. Id.**

**The defendant further falsely alleged that the plaintiff allowed the Practice**

**Manager, Pam Berkheiser, to leave at 4:00 p.m. daily. This too was untrue. A; T6-65.**

**The false claims of the defendant were pretextual reasons to conceal the true, discriminatory nature of the defendant's conduct. A. Several physicians and other employees with whom the plaintiff worked stated in verbally and in writing that the plaintiff was excellent at his job. T54-57. Others stated that the plaintiff had been railroaded and mistreated by Tsai and the defendant. T55-57.**

**On July 23, 2010, after the unlawful, age related statements about the plaintiff's fictitious intent to retire, the defendant ordered the plaintiff into a meeting with Tsai and Walker. A.**

**At that meeting, Tsai and Walker claimed that there was concern for the plaintiff's performance, but no specifics were explained. Tsai and Walker claimed to have a "report" about the plaintiff's work at the defendant. When the plaintiff asked to see the report and about specific information, the plaintiff was not allowed to see any report. When the plaintiff asked when the plaintiff would be able to see the supposed report, the plaintiff was told by that they would look into it. A.**

**The report was valueless and done by a nonprofessional from within the University. T117-118. In the past, the defendant had used the same person to create a report about a department to serve its own purposes. Id.**

**Each of the claims of weakness or inadequacy on the part of the plaintiff are false, and were created by defendant as pretext to terminate the plaintiff. T60-**

76. The administration was not weak; nearly all administrators are the same now as when the plaintiff was employed. Id. In each instance, the plaintiff addressed or attempted to address every problem at the workplace. Id. Often, Tsai himself prevented the plaintiff from acting, and protected employees from termination that the plaintiff, as administrator, wanted to terminate. Id.

When presented with the question whether Walker was simply trying to turn around a department in financial straits, the plaintiff responded:

Q Is that also what Dr. Walker was trying to do?

A I would say that, except that then things don't add up together. You would have to take me down a long road from excellent reviews, you're doing your job, to all of a sudden you are a complete incompetent.

Q What intervened between those two things --

A Was that discussion about retirement.

T117.

Prior to the unlawful, age related statements about the plaintiff's fictitious intent to retire, the plaintiff was never informed of any concerns about the plaintiff's work performance. the plaintiff's performance reviews were always excellent. A.

Prior to the unlawful age based conduct of the defendant, and the plaintiff's strong protestations that he had no intent to retire, the defendant never disciplined the plaintiff. The defendant had never even complained about the plaintiff's work performance, his managerial style or the plaintiff's interactions with staff and other employees of the defendant. A.

As the plaintiff states:

> A I believe the report is what they used as their response to get rid of me. But I think, had I gone into Cynthia's office and said, "I am going to retire," none of this conversation would have taken place.

T118.

After the defendant's statements about the plaintiff's claimed retirement and his objections thereto, however, Tsai informed the plaintiff that the defendant has "no confidence" in the plaintiff and that the plaintiff was "in a lot of trouble". A.

After the statements, Walker stated that the plaintiff should be concerned about his job. A.

Shortly after meeting with Tsai and Walker, the plaintiff had a meeting with Dr. M. Bruce Shields, Chairman Emeritus, of the defendant. At that meeting, Dr. Shields asked if the plaintiff was coming to meet with him to ask for a letter of recommendation. The plaintiff told him the plaintiff didn't know that the plaintiff

**needed one.**

**On August 23, 2010, the defendant issued the plaintiff a written warning. A.**

**In that written warning, the defendant removed the plaintiff from the plaintiff's position as Clinical Administrator. The defendant demoted the plaintiff to a temporary assignment with the Medical School Financial Operations Department of the defendant. A.**

**The defendant stated that "At the end of the 90-day reassignment, your employment with Yale University will terminate." A. The defendant, however, did not terminate the plaintiff at that time. A; Letter from Walker and Tsai, Def. Ex.4B, 4C.**

**The defendant took this action against the plaintiff on the basis of his age, and in retaliation for his opposition to the defendant's efforts to force him to retire. A.**

**Despite its false claims to the contrary, the defendant acknowledged the plaintiff's "valuable contributions" to special projects of the defendant. In stark contradiction of its claimed reasons for the plaintiff's termination, the defendant accurately lauded the plaintiff's work performance, and extended the plaintiff's termination date to February 28, 2011. A; Letter from Walker and Tsai, Def. Ex.4B, 4C.**

**Once again, contradicting its false and pretextual reasons to terminate the plaintiff, recognizing the excellence of the plaintiff's work, the defendant again extended the plaintiff's termination date to March 31, 2011. A; Letter from Walker**

**and Tsai, Def. Ex.4B, 4C..**

**On March 31, 2011, the defendant terminated the plaintiff's employment. A; Def. Answer, ¶¶ 53, 54. Tsai and Walker were responsible for the plaintiff's termination. T17-18.**

**On April 8, 2011, nine days after the defendant terminated the plaintiff, the plaintiff filed his Affidavit of Illegal Discriminatory Conduct in the CHRO and the EEOC. See, Def. Ex. 2A.**

**Again contradicting its pretextual reasons therefor, and again recognizing the plaintiff's invaluable contributions, the defendant forced the plaintiff to accept a "casual" position, at a greatly reduced wage. Id.; Def. Ex.**

**The defendant has a history of discrimination on the basis of age. The defendant treated the previous Administrator to hold the plaintiff 's former position, who was approximately the plaintiff's age, in same unlawful manner. A.**

**The reasons given by the defendant for the plaintiff's demotion and termination are pretextual. The true reason for the conduct of the defendant is because of the plaintiff's age and in retaliation for his opposition to the defendant's conduct. A.**

**THE PLAINTIFF**

**BY____________/S/_______________**
**WILLIAM S. PALMIERI**
**Law Offices of William S. Palmieri, L.L.C.**
**Federal Bar No. ct14361**
**129 Church Street, Suite 405**
**New Haven, CT 06510**
**PHONE: (203) 562-3100**
**FAX: (203) 909 6006**
**EMAIL: wpalmieri@hotmail.com**

**CERTIFICATION**

**I hereby certify that on this date a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.**

**Patrick M. Noonan, Esq.**
**Donahue, Durham & Noonan, P.C.**
**741 Boston Post Road**
**Guilford, CT 06437**

**__________/s/_____________**
**WILLIAM S. PALMIERI**