54

1    Q.  The --

2    A.  And I also received several e-mails from

3    faculty that said we had worked well together.  And

4    Rob Bernardino, who had long since left the

5    department and I continue to be friends and

6    communicate back and forth, so ...

7    Q.  And who from the faculty besides

8    Dr. Bernardino did you --

9    A.  Daniel Salchow, S-a-l-c-h-o-w.

10    Q.  I'm sorry.  S-a-l --

11    A.  -- c-h-o-w.

12    Q.  And what did -- any other faculty members

13    communicate to you?

14    A.  Not that I recall.

15    Q.  And you're saying that this is after you

16    left the department?

17    A.  Yes.

18    Q.  And what did Dr. Salchow tell you in those

19    e-mails?

20    A.  He said that we always had had a good

21   working relationship.

22      Q.  Did he say anything else about your tenure

23   at the department?

24      A.  You know, the time that we were together he

25   thought was very productive.  Dr. Jimmy Lee said

55

1   the same thing.

2      Q.  And you still have those e-mails?

3      A.  I think I do.

4      Q.  Would you provide them to your lawyer so

5   that she can provide them to us?

6      A.  I'll see if I have them, yes.

7      Q.  If you have them, right.

8         And do you know the context in which

9   Dr. Salchow and Dr. Lee e-mailed you to discuss

10   this instance?

11      A.  Right after they heard that I had been let

12   go.

13      Q.  Just to kind of comment on your departure?

14      A.  Yes.

15      Q.  And what did Sarah Gelo say about your

16   departure?

17      A.  I don't think I can repeat that.

18      Q.  Go ahead.

19      A.  She felt I was railroaded and she felt that

20   Tsai had stabbed me in the back.

21     Q.  Did she make any comments about Tsai being

22     opposed to older people?

23     A.  No.

24     Q.  How about Alice Caple, what did she tell

25     you when you departed?


DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

56

1    A.   She was also very disappointed, felt I was

2    excellent to work for.

3    Q.   Was that something she e-mailed you or

4    something she told you?

5    A.   Something it seems to me, told me.

6    Q.   And I forgot to ask about Sarah Gelo.  Was

7    that an e-mail or was that oral communication?

8    A.   That was oral.  We continue to be friends.

9    Q.   Do you still talk with her?

10   A.   Yes, I do.

11   Q.   Is she someone you feel is trustworthy?

12   A.   Yes.

13   Q.   You also mentioned Maria Rodriguez?

14   A.   Yes.  Maria was my associate administrator.

15   Q.   Did you have an e-mail from her or was that

16   on oral communication?

17   A.   Verbal conversation.

18   Q.   And what did she say?

19   A.   Again, that I was excellent to work for.

20   Q.   Out of the 70 or so employees, were there

21    any employees beyond Dr. Salchow, Dr. Lee, Sarah

22    Gelo, Alice Caple and Maria Rodriguez who made

23    comments to you on your departure?

24    A.  Erica Fritz.

25    Q.  Erica?


DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

57

1    A.  Fritz.

2    Q.  And what was her role?

3    A.  Erica is the resident coordinator.

4    Q.  And did she send you an e-mail or did she

5    talk to you?

6    A.  No.  She came to my office while I was

7    cleaning out and said that, you know, once again

8    they had driven a good administrator out of the

9    department.

10   Q.  And is there anybody else who made comments

11   about your departure?

12   A.  No.

13   Q.  Did any of these people give any hint that

14   they thought that there was age discrimination

15   behind your departure?

16   A.  No.

17   Q.  If there was an administrator who was not

18   appropriately disciplining staff when that was

19   needed, would that be a reason for management to

20   want to replace that administrator?

21    A.  Yes.

22    Q.  And if the administrator was not providing

23    appropriate staff coverage for all hours of the

24    practice, would that be something that would cause

25    the management to have concerns about the

58

1   administrator's competence?

2      A.   Uh-huh.  Yes.

3      Q.   Do you recall that the people who were in

4   charge of the medical records and who would

5   basically cover for each other often took lunch

6   together so that the medical records would be

7   unattended for lunchtime?

8      A.   I was not aware of that.  That would have

9   been the practice manager.

10     Q.   But ultimately, you supervised the practice

11   manager, right?

12     A.   Ultimately.

13     Q.   So it would be part of your job to run the

14   department, right?

15     A.   Yes.

16     Q.   And were you aware that some of the

17   physicians started their sessions at 8:00 o'clock

18   in the morning?

19     A.   Yes.

20     Q.   And were you aware that some of the

21    technicians who were assigned to those physicians

22    were starting at 9:00 o'clock in the morning?

23       A.  I don't believe that's a true and accurate

24    statement at all.  It would be a good day that the

25    faculty showed up on time.


DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

59

1    Q.   Was it part of your responsibility to make

2    sure that new employees got appropriate training?

3    A.   That is something that I would assign to

4    the practice manager, yes.

5    Q.   And who was that, by the way?

6    A.   Pam Berkheiser.

7    Q.   And was it your job to make sure that the

8    employees got the appropriate training?

9    A.   Yes.

10   Q.   And if they weren't getting appropriate

11   training, would that be something that would

12   properly be of concern to management?

13   A.   Yes.

14   Q.   How would you describe your management

15   style while you were the administrator of the

16   ophthalmology department?

17   A.   My management style is not to -- I don't

18   nitpick.  I don't -- I'm not one to sit there and

19   tell someone how to do their job and what to do.  I

20   expect -- I explain the job, what my expectations

21   are and I expect them to carry it out.

22      Q.   Would you characterize it as kind of hands

23   off?

24      A.   Yes.

25      Q.   If the faculty members in the department

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

60

1   expressed concerns about the administrator's

2   inability to address issues which were brought to

3   his attention repeatedly, would that be a valid

4   reason to have concerns about that administrator?

5      A.  That would be a valid reason, but that's

6   not true.

7      Q.  When you say it's not true, you mean that

8   factually, you don't think that occurred?

9      A.  That's correct.

10     Q.  But you don't know whether the faculty

11  reported that to the people, do you?

12     A.  That's correct, I don't.

13     Q.  Because I take it these interviews of the

14  department members that were being conducted by

15  Sally Chesney and her staff were done privately?

16     A.  Yes.

17     Q.  And did you agree that that was the way to

18  do it?

19     A.  Yes.

20     Q.  If it was believed that an administrator's

21   knowledge of clinical operations was weak, would

22   that be a reason for management to have concerns

23   about leaving the administrator in place?

24      A.  Uh-huh.  Yes.

25      Q.  I take it you would not agree that your

61

1   knowledge of clinical operations was weak?

2   A.  That's correct, I would not.

3   Q.  Were there any difficulties with the

4   performance of the residency program coordinator

5   when you were there as the administrator?

6   A.  Yes, there were.

7   Q.  In what way?

8   A.  She originally was one of the right-hand

9   people to Bruce Shields when he was the chairman.

10  Tsai moved her out of that position and just into

11  residency coordinator.

12  Q.  And how --

13  A.  Tsai complained a lot about her

14  performance, but when I went to do anything about

15  it, Tsai would stop me because she had connections

16  with a lot of our donors and he didn't want to cut

17  off that stream of donations.

18  Q.  And what is it that you wanted to do about

19  her performance?

20  A.  I wanted to write her up and at some point

21   either finally terminate her from the department or

22   from the university.  But when Tsai would talk

23   about it behind closed doors he's say, yeah, that's

24   what we've got to do, but then he would come to me

25   and say she's knows Rocky, she knows this one, she

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

62

1   knows that one, and he would stop me.

2     Q.  And is any of that in writing or just

3   verbal communications?

4     A.  Just verbal conversations.

5     Q.  How about the R.N. supervisor, were there

6   any issues with her performance?

7     A.  Yes, there were.

8     Q.  What was her name, by the way?

9     A.  I'm terrible with names.

10    Q.  What do you recall about the difficulties

11  with her performance?

12    A.  There was a perceived alcohol problem, but

13  it couldn't be proven.

14    Q.  And what, if anything, did you do about

15  that?

16    A.  We counselled with her, we talked to her,

17  but ultimately, she was never drunk on the job and

18  it didn't appear that she drank on the job.

19    Q.  What were the problems with her

20  performance?

21    A. The biggest problem that they perceived was

22    that she wasn't there 'till the end of the clinical

23    day.

24    Q. And why was that?

25    A. Because she had set hours that she felt she

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

63

1  worked -- she came in early, she worked them and

2  then she would leave.  She always made sure she had

3  coverage but, you know, Tsai always felt that it

4  was a problem.

5     Q.  And what did you do about that in terms of

6  changing her hours?

7     A.  We changed her hours.  We told her this was

8  the times that she had to be there.

9     Q.  And then did she in fact stay?

10    A.  Yes, then she stayed.

11    Q.  If there were a problematic employee and

12  the administrator didn't deal with the issue, that

13  would be a reason for management to want to make

14  the change in the administrator?

15    A.  Yes, it would.

16       But with regard to her, there was an

17  incident which would have involved a HIPAA,

18  violation to do anything to her.  And Tsai felt

19  that I should violate HIPAA in order to discipline

20  her.  And I couldn't do it and I wouldn't do it.

21    Q.  Can you describe what you mean by this

22    would involve a HIPAA violation?

23    A.  Apparently she was in a late evening

24    accident in which she hit a deer.  Glass got into

25    her eye.  She showed up or she called one of the

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

64

1  residents who was on call that night to take a look

2  at her eye.  They did.  Apparently she appeared

3  inebriated when she came in.  The resident, instead

4  of keeping this confidential as he should, went

5  around telling everyone about it.  Tsai wanted her

6  removed, but it wasn't during work, and to say that

7  we knew about it would be a violation of HIPAA and

8  actually would have gotten the resident into quite

9  a bit of trouble for violating HIPAA.

10     Q.  So did Dr. Tsai want her removed simply

11  because she had had the accident with the deer?

12     A.  Yes.

13     Q.  Or was he concerned about how it affected

14  her performance?

15     A.  I'm not sure which it was, but he wanted

16  her removed.

17     Q.  And you --

18     A.  She's still there.

19     Q.  And if you -- as of the time you left, were

20  you actually able to make her performance better or

21   not?

22   A.  I felt I did.

23   Q.  But if management felt you hadn't, that

24   would be a reason for management to bring in a

25   different administrator; would you agree with that?

65

1    A.  Yes.

2    Q.  Do you remember being involved in any

3    meetings with Sally Chesney and her staff during

4    the review process?

5    A.  Yes.

6    Q.  How many meetings did you have with them?

7    A.  I'm going to say at least three.  One was

8    my one-on-one meeting with her.

9    Q.  With Sally Chesney?

10   A.  As part of the review.

11   Q.  And what did the others involve?

12   A.  Just the logistics of how she was going to

13   conduct the review.  She never revealed to me

14   anything that she was finding out.

15   Q.  And you didn't expect her to, did you?

16   A.  No, I did not.  I expected to see the

17   report.

18   Q.  And what was the job of the practice

19   manager?

20   A.  To run the clinical practice, to manage it.

21   Q.   Would it have been appropriate for her to

22   spend most of her time filling in at the front

23   desk, answering phones, greeting patients, things

24   like that?

25   A.   No.


DEL VECCHIO REPORTING SERVICES, LLC
        (203) 245-9583

66

1    Q.  If that had been going on under the

2    supervision of a practice administrator, would that

3    be a reason for management to be concerned about

4    that practice administrator's ability to run the

5    practice?

6    A.  Yes.

7    Q.  And if Ms. Berkheiser had been spending 60

8    percent of her time filling in at the front desk,

9    is that something you believe you would have known

10   about?

11   A.  I would have known about it.  I would have

12   corrected it.

13   Q.  And she ultimately left the department

14   before you did?

15   A.  Yes, she did.

16   Q.  Was that because she was unhappy with the

17   way the department was being run?

18   A.  Absolutely.

19   Q.  What were her -- do you remember her

20   specific complaints about the way the practice was

21   being run?

22      A.  Specifically, no matter what she tried to

23   do, Tsai would overrule her.

24      Q.  Did she feel that you were also part of the

25   problem that you recall?

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

67

1    A.  No.  We continue to maintain a good

2    friendship.

3    Q.  Now, how about the front desk supervisor,

4    what was her job?

5    A.  Her job was to manage the clerical staff in

6    the clinic.

7    Q.  Was she someone who spent most of her time

8    directly at the front desk working at it, as

9    opposed to supervising?

10   A.  Predominantly her job was to supervise the

11   front desk.

12   Q.  So if she were spending most of her time

13   actually working the front desk, you would think

14   that's inappropriate?

15   A.  I would have thought that was

16   inappropriate.

17   Q.  If that were going on, then that's

18   something you would have suggested is --

19   A.  That is correct.

20   Q.  Would have been a problem that the

21    administrator should have fixed?

22       A.   That is correct.  I would have addressed

23    it.

24       Q.   Do you recall knowing what faculty and

25    staff felt about the front desk supervisor's work

68

1   in the department?

2     A.  Yes, I do.

3     Q.  And what do you recall hearing?

4     A.  The majority of the staff felt that she was

5   hard, she was tough, she expected a lot from her

6   staff.  I think she was friends with all of them,

7   but she ran a tight ship.

8     Q.  Were you aware that the faculty and staff

9   thought of the front desk supervisor as abrasive,

10   unfriendly and indiscrete when discussing sensitive

11   employee issues?

12    A.  No, I was not aware of that.

13    Q.  If you knew -- if there was an

14   administrator that had a supervisor in his

15   department that was acting in that fashion, it

16   would be the administrator's job to address that,

17   correct?

18    A.  Absolutely.

19    Q.  Wouldn't you agree it's the administrator's

20   job to find out about problems like that?

21    A.  That's correct.

22    Q.  And you're not aware of that being an issue

23  at all?

24    A.  No, I'm not.

25    Q.  How about the clinical R.N. supervisor;

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

69

1   what was your understanding of what her direct

2   reports thought of her?

3     A.   Their biggest concern was that she was

4   not -- she didn't have a good ophthalmology

5   background.

6     Q.   And what did you do about that?

7     A.   Well, I'm not a clinical person, so I

8   couldn't teach her.

9     Q.   Did you suggest training for her; did you

10   make opportunities available?

11     A.   We recommended several different courses at

12   the university for management, and we told her to

13   work with the faculty to broaden her clinical

14   expertise.

15     Q.   And did she in fact do that?

16     A.   Yes.

17     Q.   So by the time you left, was it your

18   understanding that the people who reported to her

19   felt that she had improved and that they now

20   respected her because of her technical skills and

21   clinical knowledge?

22      A.  As I said earlier, yes, I believe we helped

23   move -- bring her along.

24      Q.  By the way, what was her name, the clinical

25   R.N. supervisor?


DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

70

1    A.  I can't recall.

2    Q.  How about the front desk person, I forgot,

3    did you give me her name or no?

4    A.  Kathy Debroisse.

5    Q.  Okay.  You mentioned her.

6         If it were case that in a department the

7    clinical R.N. supervisor was not at all respected

8    by her direct reports or the faculty because of a

9    lack of technical skills and a lack of desire to

10   learn them, would that be something the

11   administrator should find out?

12   A.  Absolutely.

13   Q.  And address?

14   A.  Absolutely.

15   Q.  And if that wasn't done, that would be a

16   reason for management to want to look to make a

17   change in the administrator.  Fair statement?

18   A.  If the administrator was -- if it was

19   brought to his attention and he didn't do anything,

20   yes.

21    Q.  But isn't it the administrator's job to

22    find out what's going on in the department?

23    A.  Yes.

24    Q.  So when you say if it's brought to his

25    attention, it's something that the administrator

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

71

1    should go out and find out what's going on, right?

2    A.   Well, other than to stand right by her and

3    find out what's going on, there's no way for the

4    administrator to find that out.  The administrator

5    has to rely on the people that report to him.

6    Q.   If the clinical supervisor had weak

7    management skills, would that be something the

8    practice administrator should discover and address?

9    A.   When you say "the practice

10   administrator" ...

11   Q.   Well, the administrator of the department.

12   A.   Yes, and I did.

13   Q.   But if management thought you had not done

14   that, that would be a reason for management to want

15   to make a change in the administrator position?

16   A.   Yes.

17   Q.   What was the job of the photography

18   manager?

19   A.   Photography manager takes care of all the

20   photographs of the eye for the faculty.

21    Q.  Is the --

22    A.  He also maintained equipment.  He was our

23  IT person.  He was our telecommunications person.

24    Q.  Was the photography manager actually

25  managing anyone?

DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

72

1    A.  No.

2    Q.  So why was he called the photography

3    manager?

4    A.  I didn't write the report.  He wasn't

5    photography manager as far as I was concerned.

6    Q.  Okay.  So you didn't -- is there someone

7    that was known as the photography manager?

8    A.  No.  There was a photographer.

9    Q.  Okay.  There was just one photographer?

10   A.  That was it.

11   Q.  Okay.  And what was --

12   A.  Wait a minute.  At the end, we did hire a

13   second one.

14   Q.  So was there someone that was given the

15   title of photography manager?

16   A.  No.

17   Q.  Who was the person you were referring to;

18   you said it was a man.

19   A.  Ken Fong.

20   Q.  If a review was done of a department and it

21    was concluded that the overall operations

22    management was extremely weak at all levels, would

23    that be a reason for management to want to replace

24    the administrator and get a new team in there?

25      A.  Yes.


          DEL VECCHIO REPORTING SERVICES, LLC
               (203) 245-9583

73

1    Q.  I take it you wouldn't agree with the

2    conclusion that overall the clinical operations

3    management was weak at all levels?

4    A.  I wouldn't, considering -- with the

5    exception of the administrator and the practice

6    manager, everyone else is still there, so how weak

7    was it?

8    Q.  Would you agree that a clinical

9    administrator needs to have a firm understanding of

10   what is required to run an efficient, productive

11   practice?

12   A.  Yes.

13   Q.  And would you agree that a clinical

14   administrator must be able to effectively delegate

15   responsibility for daily operations?

16   A.  Yes.

17   Q.  Would you agree that the clinical

18   administrator must be able to immediately address

19   issues that can negatively affect physician

20   productivity or patient care?

21    A.  Yes.

22    Q.  And would you agree that the clinical

23    administrator must be completely engaged in the

24    development of best practices and quality assurance

25    procedures when systems fail?


DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583

74

1    A.  Yes.

2    Q.  Were you aware of any concerns about

3    patients waiting excessive amounts of time?

4    A.  Yes.

5    Q.  And what did you hear about that?

6    A.  This was discussed at great length with

7    Dr. Tsai, about the faculty coming up and starting

8    their scheduled times on time.  Faculty would show

9    up at 9:00 o'clock for an 8:00 o'clock start.

10   Since the faculty doesn't report to the

11   administrator, Tsai did nothing about it.

12   Likewise, in the afternoon, if sessions were

13   supposed to start at 1:00, some of the faculty

14   wouldn't show up until 2:00 o'clock and then be mad

15   that technicians were leaving at 5:00 and they

16   still had patients waiting.

17   Q.  Did you hear any complaints that the front

18   desk staff was generally unprofessional and

19   unfriendly?

20   A.  No.  I find that statement kind of

21   insulting, because they're not.

22     Q.  If they were, that would be something the

23   administration would address?

24     A.  If they were, I would address that

25   immediately.  But they weren't.


DEL VECCHIO REPORTING SERVICES, LLC
(203) 245-9583