117

1  any reason to believe that he was motivated by age

2  discrimination?

3     A   No.

4     Q   He just trying to get a department that

5  had been running a deficit turned around; is that

6  right?

7     A   Yes.

8     Q   Is that also what Dr. Walker was trying to

9  do?

10    A   I would say that, except that then things

11 don't add up together.  You would have to take me

12 down a long road from excellent reviews, you're

13 doing your job, to all of a sudden you are a

14 complete incompetent.

15    Q   What intervened between those two

16 things --

17    A   Was that discussion about retirement.

18    Q   And the other thing that happened between

19 those positive reviews and the termination of you as

20 the practice administrator was the YMG audited the

21  department, right?

22      A    That's correct.

23      Q    So one of the possibilities here is that

24  the people who were making the decision to replace

25  the administrator were motivated by what was found

Del Vecchio Reporting
(203) 245-9583

118

1  in the audit.  Would you agree with that?

2    A   The only comment I'll make to that, an

3  audit performed by nonprofessionals.

4    Q   Right.  But I'm just --

5    A   That audit isn't worth the paper it's

6  written on.

7    Q   But Sally Chesney is someone that YMG has

8  used to conduct similar audits, right?

9    A   That's correct.  That doesn't make her

10  necessarily an authority.

11    Q   Fair enough.  You don't think she was

12  motivated by age discrimination?

13    A   No, I do not.

14    Q   So she honestly believed what is written

15  in her report, as far as you know, correct?

16    A   Yes.

17    Q   As far as you know, the people upstream

18  from her made their decision based on her report,

19  correct?

20    A   I believe the report is what they used as

21  their response to get rid of me.  But I think, had I

22  gone into Cynthia's office and said, "I am going to

23  retire," none of this conversation would have taken

24  place.

25      Q   Right.  Because you would have left as the

119

1 administrator and there would have been no need for

2 them to remove you as administrator?

3    A   That's correct.

4    Q   But in terms of the reason that Dr. Tsai

5 and Dr. Walker ultimately decided to terminate you

6 as the administrator, that followed on the heels of

7 the YMG report, correct?

8    A   That's correct.

9    Q   And you had previously worked with

10 Dr. Leffell, right?

11    A   That's correct.

12    Q   And did you report directly to him when

13 you worked with him?

14    A   Yes, I did.

15    Q   What was your job at that point?

16    A   I was the director of finance for the YMG.

17    Q   In doing that, were you basically acting

18 as an accountant, keeping the books of that --

19    A   Yes.

20    Q    -- entity?

21        And --

22    A   And interacting with the departments about

23  assessment rates and fees charged to them.

24    Q   Now, after you were removed as the

25  administrator and you were given the succession of

Del Vecchio Reporting
(203) 245-9583

120

1  three-month appointments, then a one-month

2  appointment, and then the temporary job, did the

3  University do anything else by way of helping you in

4  your career?

5    A   No.

6    Q   Did you get any outplacement services?

7    A   Yes.

8    Q   What did that consist of?

9    A   A firm in Shelton that helped me rewrite

10  my resume.

11    Q   What, the University hired that firm to

12  help you with that?

13    A   They paid for it, yes.

14    Q   Did they also -- did this firm in Shelton

15  give you guidance on sort of how to apply for jobs

16  and where to look and that kind of thing?

17    A   Yes.

18    Q   Did they direct you towards the job --

19    A   No.

20    Q   -- that you ultimately took?  They

21  directed you to a number of other jobs that you

22  ultimately did not take?

23      A    No, they didn't direct me to any jobs.

24      Q    They just gave you advice on how to apply

25  and how to fix up your resume, that kind of thing?

121

1    A   Yes.

2    Q   Did you find that helpful?

3    A   Yes.

4    Q   I take it you didn't believe that the

5 University was discriminating against you on basis

6 of age when they gave you that support?

7    A   I believe the University was covering

8 their tracks, just as I believe that all of a sudden

9 that we discovered I was eligible for my pension

10 was -- came out of the clear blue.

11    Q   Now, that had nothing to do with Dr. Tsai

12 or Dr. Walker, right?

13    A   That's correct.

14    Q   It's a different department?

15    A   That's correct.

16    Q   It's a totally different department?

17    A   Yes.

18    Q   As far as you know, they had nothing to do

19 with whatever information was transferred to you by

20 the HR department.  Did Dr. Walker and Dr. Tsai have

21  anything to do with what the HR department told you

22  about retirement?

23     A   I'm not sure what you're asking.

24     Q   That's okay.  If you are not sure, I

25  should try again.  It probably wasn't a good

122

1 question.

2      What I'm asking is this: Did Dr. Tsai and

3 Dr. Walker have anything to do with the information

4 you got from the HR department about your

5 retirement?

6    A   No.

7    Q   When you say the University was covering

8 their tracks with the HR department giving you

9 information about the retirement, what do you mean

10 by that?

11     A   I just find it interesting that on -- as I

12 said earlier, on Wednesday when I met with HR, we

13 had no answers about my pension.  Then by Friday all

14 of a sudden I was eligible.  They sat there and

15 said, "We weren't -- we didn't realize that you --

16 that you calculated based on the year you started

17 plus your age."

18     Q   Do you know which segment of HR deals with

19 retirement issues?

20    A   Yes, benefits.

21     Q    When you talked with the HR people, who

22  were you talking with?

23     A    I was talking with placement.

24     Q    So that would be a different group of

25  people than deals with the benefits?

Del Vecchio Reporting
(203) 245-9583

123

1   A   Yes.

2   Q   So can you --

3   A   But they admitted -- they admitted -- they

4 said we should know more about this.

5   Q   So what they did between Wednesday and

6 Friday was go and talk to the people they needed to

7 talk to to find out; isn't that right?

8   A   Right.

9   Q   That isn't age discrimination; is it?

10   A   No the age discrimination is Walker and

11 Tsai.

12   Q   The only reason I ask you those questions

13 is you suggested there was something nefarious about

14 the HR folks in benefits that you talked to not

15 knowing the answer on Wednesday but getting the

16 answer by Friday.  There's nothing conspiratorial

17 about that; is there?

18   A   I believe there is.

19   Q   Really?

20   A   Yes.

21   Q   I mean, you went in there Wednesday, you

22   asked them some questions, the people in HR said, "I

23   don't know but I'm going to find out for you."  They

24   found out in two days and you think some --

25   A   I believe they went back to Walker, number

Del Vecchio Reporting
(203) 245-9583

124

1  one, and said, "He's asking these questions," you

2  know.  There is no basis in that report at that time

3  because I had never seen it --

4    Q   The HR people never saw it either, right?

5    A   To the best of my knowledge.

6    Q   So the HR people wouldn't even have known

7  about the report, as far as you know, correct?

8    A   Yes.

9    Q   And you really don't --

10    A   No, the HR people did know about the

11  report.

12    Q   How do you know that?

13    A   Because they told me they did.  And when I

14  asked them to -- about a copy, they said, "We will

15  look into getting you a copy."

16    Q   Do you know whether the HR people in fact

17  talked to Dr. Walker after you talked to them --

18    A   No, I do not.

19    Q   Your supposition that they talked to

20  Dr. Walker is just speculation on your part?

21   A   Yes.

22   Q   Did you ever talk with anyone in the HR

23 department about any concerns you had about your

24 position or concerns about age discrimination?

25   A   I have to answer that in two parts.  I

Del Vecchio Reporting
(203) 245-9583

125

1  talked to human resource in the med school about the

2  position.

3    Q   And who was that that you talked with?

4    A   Anna Maria Hummerstone and Carrie

5  Capezzone.

6    Q   And that was at a meeting you had

7  together?

8    A   Yes.

9    Q   And Anna Maria Hummerstone --

10    A   Hummerstone.

11    Q   Where does she work?

12    A   She's in the med school.  She's the

13  director of HR for the med school.

14    Q   When was this meeting?

15    A   May/June of 2010.

16    Q   So this was after you were aware that

17  the --

18    A   Yes.

19    Q   -- YMG review was going poorly and that

20  your position might be in jeopardy?

21    A    Yes.

22    Q    Is that why you met with them?

23    A    Yes.

24    Q    What do you remember about that meeting?

25    A    I discussed with them at the time a lot of

126

1   the job that I -- that we did in the department that

2   had nothing to do with running the department.  You

3   know, things that Tsai had us -- by "us," Sarah,

4   myself -- working on that had nothing to do with the

5   department of ophthalmology.

6       Q    What were those things?

7       A    Tsai envisions himself as somewhat of a

8   womanizer, and he would go on trips for the

9   department, meet women, and then have us do research

10  about their backgrounds.  See if they had Facebook

11  pages and that sort of thing.  Spend an inordinate

12  amount of time on that.

13      Q    He had you and Sarah Gelo do this?

14      A    Yes.

15      Q    Were these women that were other doctors?

16      A    I have no idea.

17      Q    Did you do -- you did the research on

18  them, you would find that out?

19      A    They could have been doctors but usually

20  they were not.

21   Q   So how many times did you do this?

22   A   Quite often.  An exact number I can't give

23 you, but quite a bit of the time.

24   Q   Are you able to give me any estimate?  Is

25 this something you did once a month, once a year,

Del Vecchio Reporting
(203) 245-9583

127

1  three times --

2    A   Sometimes it could be daily.

3    Q   What information did he ask you to find on

4  these people?

5    A   We would check and see if we could find

6  addresses, Facebook pages.

7    Q   And some of these people were physicians?

8    A   Yes.

9    Q   And the ones who were not, what occupation

10  were they, do you recall?

11    A   I wouldn't know their occupations.

12    Q   Well, if you didn't know their

13  occupations, did you know they weren't physicians?

14    A   No, I didn't know that.

15    Q   So some you knew were doctors and others

16  you simply didn't know the occupation?

17    A   Yes, that's correct.

18    Q   Was there anybody else who was assigned to

19  checking out this information on people Dr. Tsai had

20  met --

21    A    No.

22    Q    -- other than yourself and Sarah Gelo?

23    A    No.

24    Q    What did you do with the information you

25 discovered?

Del Vecchio Reporting
(203) 245-9583

128

1    A    Just provided it to Tsai.

2    Q    Did Dr. Tsai ever indicate why he wanted

3 this information?

4    A    Yes.  Dr. Tsai was unhappy at home.

5    Q    Did he tell you that?

6    A    Yes.

7    Q    When Dr. Tsai told you this, was this in

8 the presence of Sarah Gelo too?

9    A    Yes.

10    Q    Do you know whether or not Dr. Tsai

11 actually contacted any of the people for whom you

12 obtained this information?

13    A    Yes, I do.

14    Q    And how many did he, in fact, contact?

15    A    That I don't know.  But I do know on a

16 couple of occasions of people that he did contact.

17    Q    How do you know that he contacted them?

18    A    He told me.

19    Q    Do you know which ones they were?

20    A    No, I do not.

21    Q   And what did he tell you about his

22  contacting them?

23    A   He would discuss, you know, going to meet

24  them, you know, telephone calls.

25    Q   Did he tell you anything about what he was

Del Vecchio Reporting
(203) 245-9583

129

1 meeting them for?

2    A   Yes.

3    Q   I'm asking what he said, not what you

4 thought.  But what he said.

5    A   Yes, he did.

6    Q   And this was on how many different

7 occasions that he mentioned he was going to meet --

8    A   This was numerous occasions.  I cannot put

9 a number on the number of times that Jim Tsai told

10 me about liaisons he wanted to have.

11    Q   I wasn't talking about liaisons that he

12 wanted to have but ones that he actually had.  I

13 think you said there were a couple of occasions?

14    A   A couple that I know of.

15    Q   Do you know who they were?

16    A   No.

17    Q   What did he tell you about those two

18 particular people?

19    A   Meeting them in Boston and spending the

20 weekend with them.

21    Q   So one was in Boston?

22    A   To the best of my knowledge, yes.

23    Q   And where was the other meeting?

24    A   That I don't recall.

25    Q   But you think he met one other person that

Del Vecchio Reporting
(203) 245-9583

130

1  he mentioned to you?

2      A    At least.

3      Q    You say that you told Carrie Capezzone

4  about this?

5      A    Yes.

6      Q    And Anna Maria Hummerstone?

7      A    Yes.

8      Q    What was their response?

9      A    They wanted to know if I wanted to file a

10  sexual harassment grievance against him.

11     Q    And what was your response?

12     A    I said I did not.

13     Q    When was this meeting that you had with

14  them?

15     A    May/June of 2010.

16     Q    Okay.  Why did you decide not to file a

17  complaint against Dr. Tsai --

18     A    I didn't want to cause him the

19  embarrassment.

20     Q    And did --

21    A    And --

22    Q    Go ahead.

23    A    And in a -- in Yale University, the word

24 of the chairman will always trump the word of an

25 administrator.

Del Vecchio Reporting
(203) 245-9583

131

1    Q    You didn't think that Dr. Tsai's liaisons

2    with these people had anything do with your

3    termination, did you?

4    A    No.

5    Q    Did you ever talk to anyone else about the

6    issue of Dr. Tsai asking you to find contact

7    information for these women?

8    A    No.

9    Q    Do you remember talking about anything

10   else at that meeting with Ms. Hummerstone and

11   Ms. Capezzone, other than what you described?

12   A    No, just what I described.

13   Q    So you didn't talk to them about what you

14   should do in your situation where you've been told

15   that the review is not going well and that your job

16   may be in jeopardy?

17   A    No, I did not.

18   Q    Did you ever talk to anybody in the HR

19   department about that, either the central HR or the

20   med school HR?

21   A   Yes, I did.

22   Q   Who was that?

23   A   Sandra Greer was one of them and Jackie --

24 I'm drawing a blank.  I'm sorry.

25   Q   It's okay.  But it was somebody in HR?

Del Vecchio Reporting
(203) 245-9583

132

1    A   Yes.

2    Q   They were in central HR, not in med

3 school?

4    A   Yes.

5    Q   When was that meeting?

6    A   At various times.  Not meetings, telephone

7 calls.

8    Q   Was that during the time frame when you

9 knew your job was at risk?

10    A   Yes.

11    Q   What do you remember about those telephone

12 conversations?

13    A   Basically looking for advice in applying

14 for other positions within the University.

15    Q   And what did they tell you?

16    A   Sandra was very helpful and pointed me

17 towards several different positions.

18    Q   When you were talking with her, did you

19 suggest that the dissatisfaction with you might be

20 related to your age?

21    A   No.

22    Q   I take it you didn't tell the med school

23 HR department that you thought your -- the way you

24 were being perceived was a result of your age?

25    A   No.

Del Vecchio Reporting
(203) 245-9583

133

1    Q    Why did you talk to Ms. Capezzone and

2  Ms. Hummerstone about Dr. Tsai requesting that you

3  get information on Facebook pages and addresses for

4  female colleagues?

5    A    I knew the job was -- you know, based on

6  Tsai telling me that I was in trouble, I wanted to

7  pursue, you know, different courses of action that I

8  should take.  Anna Maria said to me, "If and when

9  you decide to pursue this, I will pursue it

10  vigorously, regardless of the fact that he's a

11  chairman."

12    Q    So when you raised this issue with them,

13  for how long a time had you been getting

14  information, contact information, on women for

15  Dr. Tsai?

16    A    I wouldn't say it was during the entire

17  time Tsai and I worked together, but I'm going to

18  say it was at least three, four years.

19    Q    The first time you raised this issue with

20  anyone was at the time when you heard your job might

21  be in jeopardy?

22    A   Right.

23    Q   The reason you did that is because you

24  thought by raising this that might in some way help

25  cement your position, prevent you from being

Del Vecchio Reporting
(203) 245-9583

134

1  terminated?

2   A   Yes.

3    Q   Was there anything else that Dr. Tsai did

4  during the time you worked with him that you thought

5  was inappropriate?

6   A   No.

7    Q   Do you have any recollection of talking

8  with Elena McHugh about your job?

9   A   Yes.

10    Q   When was that?

11   A   Again, during that same period of time.

12    Q   So after you knew your job was at

13  jeopardy?

14   A   Yes.

15    Q   What position was she in?

16   A   The HR rep generalist for our department.

17    Q   So she was in the central HR office?

18   A   Yes.

19    Q   And how many times did you talk with her?

20   A   Elena and I had a monthly meeting, but

21  during this period of time we probably met weekly.

22     Q   So you were talking with her throughout

23  the course of your employment about other employees?

24     A   If not with her, with whoever was at that

25  position, yes.  We had a regular standing monthly

135

1  meeting.

2    Q   But there was a time when you talked to

3  Elena McHugh about your personal job?

4    A   About my personal situation, yes.

5    Q   How many times did you meet with her on

6  that?

7    A   Two, three.

8    Q   Do you remember what was said at those

9  meetings?

10    A   Basically that HR would help me in any way

11  they could.

12    Q   In terms of talking with her, did you tell

13  her that you were concerned you might be terminated?

14    A   Yes.

15    Q   You went to her seeking advice?

16    A   Yes.

17    Q   What did she tell you?

18    A   That HR would work with me to try to find

19  another position.

20    Q   Do you remember anything more than that --

21   A   No.

22   Q    -- in terms of your discussions with

23 Elena McHugh?

24   A   We also discussed in those meetings some

25 of the accusations that were coming out about the

Del Vecchio Reporting
(203) 245-9583

136

1 faculty. And Elena and I met with two faculty

2 members who were making the accusations that we were

3 doing nothing about the front desk giving out

4 referrals to other -- you know, the private doctors.

5 And both doctors sat there in front of Elena and

6 said they had no evidence, they had no proof.

7    Q   Which doctors were they?

8    A   Jimmy Lee was one, and by this time

9 Bernardino was gone, and the other -- I just

10 happened to check the faculty listing the other

11 day -- is now gone and I don't remember his name.

12    Q   They said they didn't have proof --

13    A   That's right.

14    Q   -- that the front desk was doing --

15    A   That's correct.

16    Q   Did you talk with Elena McHugh ever about

17 your feelings that you might be the victim of age

18 discrimination?

19    A   No.

20    Q   Did you ever talk with anyone else at

21   the -- in either HR department, other than Elena

22   McHugh, Ms. Hummerstone, and Sandra Greer, about

23   your job?

24      A   No.

25      Q   And if I understood it correctly, with

Del Vecchio Reporting
(203) 245-9583

137

1  respect to all the people that you dealt with at HR

2  on your situation, you felt that they were trying to

3  help you?

4      A   Yes.

5      Q   You never felt that they were

6  discriminating against you on the basis of age?

7      A   No.

8      Q   You are aware that if you wanted to deal

9  with a complaint of age discrimination one of the

10  places you could have gone was to the HR department,

11  correct?

12      A   No, I wasn't aware of that.

13      Q   You were aware that you could talk to them

14  about sexual harassment claim --

15      A   Yes.

16      Q   -- because they told you about that.  Do

17  you mean to tell me that as someone who's been at

18  Yale for a long time that you were unaware that if

19  there was a claim about age discrimination, you

20  didn't know you could go to HR?

21   A   No, I did not.

22   Q   Where do you think you would go?

23   A   Pardon?

24   Q   Where do you think you would go in the

25   University if you wanted to talk to somebody about a

Del Vecchio Reporting
(203) 245-9583

138

1 discrimination claim?

2    A   I would have gone to Anna Maria.

3    Q   In HR?

4    A   Yes.

5    Q   So you simply decided not to pursue a

6 claim for age discrimination?

7    A   Yes.

8    Q   It wasn't that you didn't know where to

9 go, you just decided you would not do it, correct?

10    A   Yes.

11        MR. NOONAN:  If we could go off the record

12 for a minute.

13        (A discussion was held off the record.)

14        MR. NOONAN:  I don't have any other

15 questions.  But I do want to thank you, Mr. Donovan,

16 for your time here today and your patience with me.

17        (Deposition concluded at 2:37 p.m.)

18

19

20

21

22

23

24

25

Del Vecchio Reporting
(203) 245-9583

139

1

2        J U R A T

3

4      I have read the foregoing 47 pages and

5 hereby acknowledge the same to be a true and correct

6 record of the testimony.

7

8

9

10      _____

11        MARTIN J. DONOVAN

12

13

14 Subscribed and sworn to

15 _____.

16 Before me this _____ day of _____, 2013.

17

18

19

20

21 _____

22 Notary Public

23 My Commission Expires:

24

25

## CERTIFICATE

I hereby certify that I am a Notary Public,

in and for the State of Connecticut, duly

commissioned and qualified to administer oaths.

I further certify that the deponent named in

the foregoing deposition was by me duly sworn, and

thereupon testified as appears in the foregoing

deposition; that said deposition was taken by me

stenographically in the presence of counsel and

reduced to typewriting under my direction, and the

foregoing is a true and accurate transcript of the

testimony.

I further certify that I am neither of

counsel nor attorney to either of the parties to

said suit, nor am I an employee of either party to

said suit, nor of either counsel in said suit, nor

am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public

this_____ day of _____, 2013.

Deborah Gentile
Notary Public


My commission expires:  October 31, 2016


Del Vecchio Reporting
(203) 245-9583

DEPOSITION OF: MARTIN J. DONOVAN

TAKEN ON: MARCH 5, 2013

SENT TO: KATHRYN R. SYLVESTER

INSTRUCTIONS FOR READING AND SIGNING OF DEPOSITION

1. To Witness: Please read the enclosed copy of your deposition.

2. After reading the deposition, appear before a notary public and sign before him/her on the page indicated and have the notary sign where indicated.

3. If there are any corrections to be made in the transcript, please do not make them on the transcript. Please use the attached form for listing any and all corrections and then have the notary sign along with your signature on the bottom of the sheet where indicated.

4. Do not make changes just to restate your testimony.

5. Please return signature page and correct page

   ONLY to:

    DEL VECCHIO REPORTING SERVICES
    117 RANDI DRIVE
    MADISON, CT  06443
      Thank you.


       Del Vecchio Reporting
        (203) 245-9583

CORRECT PAGE

NAME OF CASE:

MARTIN J. DONOVAN VS. YALE UNIVERSITY

NAME OF WITNESS:

MARTIN J. DONOVAN

PAGE LINE     NOW READS          SHOULD READ

Del Vecchio Reporting
(203) 245-9583