**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MARTIN DONOVAN, | : | |
| PLAINTIFF, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 3:12-CV-00549 (VLB) |
| | : | |
| YALE UNIVERSITY, | : | |
| DEFENDANT. | : | FEBRUARY 24, 2014 |

MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT [Dkt. #33]

I.      Introduction

        The Plaintiff, Martin Donovan ("Donovan"), brings this employment

discrimination action against Defendant Yale University ("Yale") for alleged

violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §

621, et seq., and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat.

§ 46a-58(a), et seq., and for intentional infliction of emotional distress.  Currently

pending before the Court is the Defendant's Motion for Summary Judgment.  For

the reasons that follow, the Defendant's Motion for Summary Judgment is

GRANTED.

II.     Factual Background

        The following facts relevant to the Defendant's Motion for Summary

Judgment are undisputed unless otherwise noted.  Where the Plaintiff has

objected to Defendant's facts but has failed to support his objection with a

1

citation to specific and admissible evidence in the record, or where the record does not support Plaintiff's denials, those facts are deemed to be admitted.[1]

Martin Donovan was employed by Yale University for 32 years.  [Dkt. 54-8, Donovan Aff. ¶4.  From October, 2006 to August 23, 2010, Donovan held the position of Clinical Administrator of the Department of Ophthalmology & Visual Science (the "Department").  [Dkt. 34-3, D's 56(a)1 Stmt. ¶ 1.  During the time of Donovan's employment as Clinical Administrator, Cynthia Walker was the Deputy Dean of Finance and Administration at the Yale School of Medicine, and James Tsai, M.D. was the Chairman of the Department of Ophthalmology.  [Dkt. 34-5, Walker Aff. ¶2; Dkt. 34-6, Tsai Aff. ¶2].  Donovan reported to Walker and Tsai. [Dkt. 54-2, Donovan Depo. 12:16-24].

A meeting took place between Donovan and Walker on March 26, 2010; the parties disagree as to the content of the meeting.  Walker attests that she met with Donovan to ask him about the increase in the Department of Ophthalmology's budget deficit, which Donovan was unable to explain.  [Dkt. 34-

---

[1] **The Court notes that the Local Rules of this District expressly provide that each statement of material fact in a party's Local Rule 56(a)1 or (a)2 statement, as well as each denial in a summary judgment opponent's Local Rule 56(a)2 statement, "must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial."  D. Conn. L. Civ. R. 56(a)3.  The Local Rule further clarifies that "[a]ll material facts set forth in [a moving party's 56(a)1] statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party."  D. Conn. L. Civ. R. 56(a)1. Where a party fails to appropriately deny material facts set forth in the moving party's 56(a)1 statement, and where those facts are supported by evidence in the record, those facts are deemed to be admitted.  *See SEC v. Global Telecom Servs. L.L.C.*, 325 F. Supp. 2d 94, 109 (D. Conn. 2004); *Knight v. Hartford Police Dep't*, 3:04CV969 (PCD), 2006 WL 1438649 (D. Conn. May 22, 2006).**

5, Walker Aff. ¶3].  While Donovan does not deny that they discussed the budget deficit, he asserts that he and Walker predominantly discussed Donovan's plans for the Department, staff changes he wished to make, and roadblocks he was hitting with human resources in making them.  [Dkt. 54-2, Donovan Depo. 20:17-20].

Plaintiff also testified that, at the end of the meeting, "there was a comment made about a rumor going around the school that I was planning to retire."  [Dkt. 54-2, Donovan Depo. 21:2-5].  He attests that he informed Walker that he was not planning to retire, that the claim that he intended to retire was categorically untrue, and that he had never stated to anyone that he intended to retire.  [*Id.*; dkt. 54-8, Donovan Aff. ¶22].  Donovan testified that Walker told him that "when she saw me on her schedule for the day, she thought I was coming over to announce my retirement," and Donovan had replied that he planned to work until he was seventy.  [Dkt. 54-2, Donovan Depo. 21:12-18].  He affirmed that Walker's response was "Oh, fine.  We didn't want to lose you."  [*Id.* at 21:20].  Donovan has testified that the sole basis for his belief that Walker was motivated by age discrimination are her comments regarding retirement during this meeting; he has further affirmed that he and Walker had no further discussions about either retirement or Donovan's age.  [*Id.* at 19:21-25, 22:2-5].  A few weeks before this meeting with Walker, Donovan has affirmed that he learned from the Assistant Dean for Finance, Carrie Capezzone, who was a "good friend … of many years" that the subject of Donovan's intent to retire had come up in a meeting; Donovan asked Capezzone the source of this rumor, but Capezzone did not reveal the

3

source and Donovan "let it go."  [*Id.* at 22:6 – 23:25; dkt. 54-8, Donovan Aff. ¶¶14-18].

A few weeks later on April 5, 2010 Walker (the Deputy Dean of Finance and Administration at the Yale School of Medicine), Tsai (the Chair of the Ophthalmology Department), the Dean of the Yale School of Medicine, the Deputy Dean for Clinical Affairs, and Donovan had a budget meeting.  [Dkt. 34-3, D's 56(a)1 Stmt. ¶4; Dkt. 54-3, Donovan Depo. 32:18 – 33:9].  Donovan has affirmed that the Ophthalmology Department had been in deficit for approximately twenty years.  [Dkt. 54-8, Donovan Aff. ¶10.  Following the meeting, Walker, Tsai, the Medical School Dean, and the Deputy Dean for Clinical Affairs decided that a complete review of the Department of Ophthalmology should be undertaken.[2] [Dkt. 34-3, D's 56(a)1 Stmt. ¶4; Dkt. 34-5, Walker Aff. ¶4; Dkt. 34-6, Tsai Aff. ¶3].  Sally Chesney and Beth Lynch of the Yale Medical Group conducted a review of the Department over approximately two months, beginning in April, 2010, at the request of Tsai and the Deputy Dean of Clinical Affairs for the Medical School.  [Dkt. 34-3, D's 56(a)1 Stmt. ¶5; dkt. 34-4, Chesney Aff. ¶3].  Chesney and Lynch had previously conducted similar reviews of other departments in the Yale University School of Medicine.  [Dkt. 34-5, Walker Aff. ¶4; Dkt. 54-7, Donovan Depo. 118:7-10].  During this review, Chesney and Lynch interviewed seventy-one Departmental faculty, residents, fellows, administrators, and clinical operations

---

[2] Donovan testified that "the budget for the department, the fact that we continued to be in the red and the suggestion that the [Yale Medical Group] be brought in to do a review of the department" – a suggestion made by the Medical School Dean – was discussed at this meeting.  [Dkt. 54-3, Donovan Depo. 33:23 – 34:4].

and billing staff, comprising virtually all Department employees.  [Dkt. 34-3, D's 56(a)1 Stmt. ¶6].  They also observed practice operations via walk-throughs and attendance at the waiting room, front desks, and within a physician session.  [*Id.*].

On July 23, 2010, Walker and Tsai met with Mr. Donovan to discuss the initial information being assembled in the review conducted by Chesney and Lynch of the Yale Medical Group.  Walker and Tsai informed Donovan that, based on the information known to date, it seemed likely that the report would cast him in a negative light.  [*Id.* at ¶7].  Donovan attests that when he asked to see a copy of the report, he "was not allowed to see any report."  [Dkt. 54-8, Donovan Aff. ¶37].  Walker and Tsai, on the other hand, affirm that because the assessment had not yet been finalized, they were unable to provide Donovan with a copy. [Dkt. 34-3, D's 56(a)1 Stmt. ¶7].

The final review of the Department of Ophthalmology, entitled the "Clinical Operations Assessment" (the "Assessment"),[3] identified numerous deficiencies in the Department, including the following:[4]

---

[3] The Assessment's "Goals" section states:
> Key [Yale Medical Group] and department representatives meet to
> review the financial history of the department.  Although billings
> have increased dramatically with the recent recruitment and ramp-up
> of new faculty, the increase in collections has not exceeded the
> increase in expenses, and the department continues to operate with
> a deficit.

[Dkt. 34-4, Assessment, p.2, s. II.].
[4] The Defendant has listed three additional deficiencies which this Court cannot locate in the Assessment.  Thus, the Court will discuss them separately, as the Plaintiff does not dispute their existence.  [Dkt. 34-3, D's 56(a)1 Stmt. ¶9].

- "Infrequent or absent communication at all levels," including between staff and management;  [Dkt. 34-4, Assessment, p.3, ¶2]

- "Lack of discipline for inappropriate staff behavior and sub-standard performance;" [*Id.* at p.4, ¶2]

- "Lack of appropriate staff coverage for all operating hours of the practice," including staff who cover for each other taking lunch breaks at the same time, resulting in inadequate staffing during certain times; [*Id.* at p.4, ¶2]

- "Evidence and perception of uneven work assignments among similar staff;" [*Id.* at p.4, ¶2]

- "Insufficient training for new employees … and lack of continuing education opportunities for technical staff;" [*Id.* at p.4, ¶2]

- Inappropriate use of some employees' time, including that the Practice Manager (the second highest non-physician manager) spent 60% of her time filling in at the front desk, during which time she greeted patients and answered phones, and improper staffing ("[t]he Practice is not properly staffed for all operating hours"); and [*Id.* at p.5, ¶6; p.8, ¶3]

- "Underperforming and unfriendly staff that have not been properly disciplined." [*Id.* at p.8, ¶3]

[Dkt. 34-3, D's 56(a)1 Stmt. ¶9].  The Assessment further reported that "[o]verall, clinical operations management is extremely weak at all levels: Clinical Administrator [Donovan's position], Practice Manager, Clinical Supervisor, Front

**6**

Desk Supervisor and Photography Supervisor."  [*Id.* at ¶9; dkt. 34-4, Assessment, p.8, ¶3].

The Assessment stated that the Plaintiff, as the Department's Clinical Administrator, was "not well respected by faculty or staff."  [Dkt. 34-4, Assessment, p.4 ¶5].  It recommended that Donovan be replaced as the Clinical Administrator of the Department of Ophthalmology, and recommended the replacement of other administrators as well.  [Dkt. 34-3, D's 56(a)1 Stmt. ¶10; dkt. 34-4, Assessment, pp. 8, ¶4; 9 ¶5; 10 ¶7].  Sally Chesney attests that Mr. Donovan's age was not a factor in the Assessment's recommendation to replace him as Clinical Administrator, and Donovan testified that he did not believe Chesney was motivated by age discrimination in making the Assessment's recommendation.  [Dkt. 34-3, D's 56(a)1 Stmt. ¶11; dkt. 54-6, Donovan Depo. 108:1-7; dkt. 54-7, 118:11-16].

Although not included in the Assessment, Walker and Tsai point to three additional issues with Donovan's management discovered during Chesney's and Lynch's review of the Department:[5] first, "inadequate oversight of the billing staff, leading to a delay of more than three months in processing $300,000 of charges," apparently discovered and corrected by Ms. Chesney during her review; second, failure to institute a new self-pay patient collection schedule that should have been implemented in April 2010, but was not implemented until mid-July when the failure was discovered by Tsai; and third, failure to secure appropriate coverage

---

[5] *See supra*, footnote 4.  Donovan acknowledges these issues were cited by the Defendant.

for the Practice Manager, who routinely left work at 4:00 when the Department

had patients until 5:00 pm.  [Dkt. 34-5, Walker Aff. ¶7; dkt. 34-6, Tsai Aff. ¶6].

Donovan admits that these issues were cited and brought to his attention

(indeed, they appear in the termination letter issued to him on August 23, 2010,

discussed *infra*), but denies their accuracy and veracity, and argues that after his

meeting with Walker when she inquired about his intent to retire, Yale began to

falsely and unfairly criticize and scrutinize Donovan's work.  As to the first and

third issue, Donovan has not, however, supported his denials with admissible

evidence in the record, or has cited to material that is nonresponsive.[6]  As to the

fee schedule issue, Donovan affirms that "[t]his is a totally false statement.  I

verified with the former Practice Manager that the changes were indeed

implemented."  [Dkt. 54-8, Donovan Aff. ¶35].  Donovan testified that it was the

---

[6] Of the $300,000 billing issue, which was discovered after the departure in March
2010 of a billing manager who had hidden $300,000 of invoices and failed to act
on their collection, Donovan affirms that he informed Dr. Tsai of this issue
immediately after discovering it, directed staff to immediately work on the
previously hidden invoices so the funds could be collected, and asserts that "[a]s
my Department was exceeding previous years clinical collections and was nearly
20% ahead of the previous year, there were no indications that [the billing
manager] was hiding invoices and that they were not being collected.  I informed
the respondent of this, and it had no reply."  [Dkt. 54-8, Donovan Aff. ¶¶11-13].
This evidence, however, does not address the veracity of Yale's claim that
Donovan inadequately supervised the billing staff, which was apparently
discovered during the review of the Department.

As to the third issue, Donovan's alleged failure to have appropriate coverage for
the Practice Manager who routinely left work at 4:00, Donovan affirmed that the
Practice Manager was routinely in by 7:00 am, usually departed around 5:00 pm,
and "[a]ny early departures were for approved purposes, such as for medical
appointments."  [Dkt. 54-8, Donovan Aff. ¶35].  This denial is non-responsive as it
does not address Donovan's alleged failure to find coverage for the Practice
Manager on days when she left early and the Department still had patients.

Practice Manager's "job to make sure that [a billing manager] implemented [the changes], and it was done" immediately, and that he knew the changes had been made because "our fees increased" as demonstrated by a monthly variance analysis, which indicated that "[i]t was clear that it was done." [Dkt. 54-6, 110:17-25, 111:1-15]. Donovan has submitted no additional evidence as to this issue. Donovan also attests that Yale "falsely accused me of failing to investigate the allegation that staff were handing out the business cards of a physician who once worked in the practice, but had since left." [Dkt. 54-8, Donovan Aff. ¶25]. In support of his claim that this allegation was false, Donovan has attested that he "immediately investigated the allegations, and found them to be false." [*Id.* at ¶26]. In support, however, Donovan offers only inadmissible hearsay and conclusory statements that the allegation was unfounded.[7]

On August 23, 2010, one month after Donovan's meeting with Walker and Tsai, Donovan was informed in a meeting that he was being terminated from his position as Clinical Administrator. [Dkt. 34-3, D's 56(a)1 Stmt. ¶12]. Donovan was 61 years old.[8] He was temporarily assigned to the Medical School Financial Operations office for ninety days so that he could remain employed while looking

---

[7] Donovan affirmed that he and the Practice Manager met with the front desk personnel and "inquired whether this was being done. It was not." [Dkt. 54-8, Donovan Aff. ¶27]. Donovan also asserted that he brought Yale's human resources department into the investigation, that a representative from that department met with two physicians making the accusations, and that neither of the physicians offered proof that business cards were being distributed. [*Id.* at ¶29]. He further asserts that Yale's human resources department determined that there was no evidence to substantiate the claim. [*Id.* at ¶31]. This evidence, however, is hearsay; it constitutes out of court statements offered for the truth of Donovan's assertion that no business cards were being handed out, and it is unsupported by any other evidence in the record.

[8] Donovan's birthdate is December 23, 1948. [Dkt. 54-2, Donovan Depo. 4:21].

for a new position.  [*Id.*].  On the same date, Donovan was provided with a letter

memorializing his termination from this position.[9]  [Dkt. 34-5, 8/23/10 Letter p.1].

The letter, signed by Tsai and Walker, stated in part as follows:

> [i]nformation has come to light over the past four months that
> has raised serious concerns about your performance as
> clinical administrator.  As a result of these performance
> deficiencies, we are issuing you this written warning and
> removing you from your role as Clinical Administrator for
> Ophthalmology.  During the next 90 days, you will be
> temporarily reassigned to Medical School Financial Operations
> … during which time you may conduct a job search.  At the
> end of the 90-day reassignment, your employment with Yale
> University will terminate.

[Dkt. 34-5, 8/23/10 Letter p.1].  The letter continued:

> In March 2010, you submitted an FY11 budget that showed an
> increased deficit despite improved faculty productivity.  You
> were unable to provide a coherent explanation of the
> department's finances to the YSM Dean's Office.  As a result,
> the Yale Medical Group was asked to undertake a
> comprehensive assessment of the Ophthalmology clinical
> practice.  Findings from interviewing 71 faculty, residents,
> fellows and staff and also observations from the Chair and
> Deputy Dean included the following: [inadequate oversight of
> billing staff, failure to timely implement a new self-pay patient
> collection schedule, failure to attend a manager course dealing
> with the labor agreement despite Department staff
> deficiencies, allowing staff to operate in an undisciplined way
> which negatively affected coverage and operations, failure to
> foster effective communication which led to confusion about
> the organizational structure of the Department, and inability to
> interpret a faculty productivity report].

[Dkt. 34-5, 8/23/10 Letter p.2].  The letter concluded:

> The examples above demonstrate your gross mismanagement
> of the faculty practice and unsatisfactory work performance.

---

[9] Both parties acknowledge the existence of and cite to this letter, but neither
quotes directly from it.  Because it is relevant to the issues at hand, the Court
notes its contents.

> **As a result, your responsibilities for operational and financial management of the Ophthalmology practice have been removed, and your temporary reassignment to Medical School Financial Operations is effective immediately.**

[*Id.*].

Donovan's temporary position with Medical School Financial Operations was extended an additional ninety days by letter signed by Walker on November 15, 2010.  [Dkt. 34-5, 11/15/10 Letter (p.12)].  This letter states

> **[b]ased on your valuable contributions to the clinical accounts receivable and other projects, I am pleased to inform you that your last day at Yale has been extended to February 28, 2011. I appreciate your help with these special projects as you continue to search for a permanent position.**

[*Id.*].  His temporary position was extended for a second time until March 31, 2011, again by letter from Walker noting Donovan's "continued contributions" and his continued search for a permanent position.  [Dkt. 34-5, 2/21/11 Letter].  Walker affirms that Donovan's temporary position was twice extended due to the Plaintiff's difficulty securing other employment.  [Dkt. 34-3, D's 56(a)1 Stmt. ¶14].  Donovan denies that this was the reason for the extension of his temporary position and instead asserts that he was retained solely because of his "valuable contributions;" however, he has failed to cite to evidence in the record supporting this denial other than the letters from Walker and has testified that Walker was "trying to help" him by extending his end date with Yale.  [Dkt. 54-5, Donovan Depo. 82:3-9].

After his termination from temporary employment on March 31, 2011, Donovan was again employed by Yale as a temporary per diem employee in the

Department of Internal Medicine until May 18, 2011.  [Dkt. 34-3, D's 56(a)1 Stmt. ¶16; dkt. 54-5, Donovan Depo. 77:11-25].  On May 19, 2011 Donovan became employed by the Visiting Nurse Association Northwest, with no period of unemployment between leaving Yale and beginning with this organization.  [Dkt. 34-3, D's 56(a)1 Stmt. ¶17].  Although the Plaintiff was terminated, Donovan was eligible to and retired from Yale effective March 31, 2011, collecting a pension from that point on.  [*Id.* at ¶18].  Donovan filed a complaint with the Connecticut Commission on Human Rights and Opportunities ("CHRO") dated April 1, 2011, notarized April 7, and received by the CHRO on April 8, 2011, alleging age discrimination in violation of the ADEA and CFEPA.  [*Id.* at ¶2].

Tsai and Walker contend and affirm that their decision to terminate Donovan as Clinical Administrator was due to the ongoing unsatisfactory performance of the Department and the deficiencies in the Plaintiff's performance as Clinical Administrator.  [*Id.* at ¶12].  The Plaintiff, on the other hand, maintains that the reason for his termination was age-related, not performance-related. Donovan contends that his annual reviews have "always been excellent" and his "working relationships with all staff have always been excellent."  [Dkt. 54-8, Donovan Aff. ¶9].

Donovan contends and attests that, shortly after the meeting in late March 2010 with Walker in which Walker asked him about his retirement plans based on a Department rumor, and before the July 23, 2010 meeting with Tsai and Walker, Yale began to "falsely and unfairly criticize and scrutinize [his] work," including falsely accusing Donovan – as noted earlier – of failing to investigate allegations

that staff were handing out the business cards of a physician who had left the practice, which Donovan claims he promptly investigated, and failing to implement fee schedule changes, which Donovan claims were implemented.  [*Id.* at ¶¶24-25, 33-34].

Donovan further asserts that, "during [his] time with Dr. Tsai, there were numerous conversations in which he made remarks about the age of either faculty, me, staff."  [Dkt. 54-3, Donovan Depo. 26:13-15].  In support, he points to two incidents.  In the first, a vice chairman of the Ophthalmology Department, "who was head of the research operation, [ ] announced he was leaving to go to another school."  [*Id.* at 26:15-19].  Of this employee, who Donovan contends is younger than he is, Donovan testified that:

> A:  Tsai made the comment, 'Well, you know, he's getting too old for his research to be valid.'  And I made the comment, I said, 'You know, [the employee] is younger than me.'  And he said, 'Oh you're not in your 60s.'  So …
>
> Q:  And what did you say to that?
>
> A:  At the time I was.  I said 'Yes, I am.'
>
> Q:  So Dr. Tsai thought you were younger than you actually were?
>
> A:  Yes.

[*Id.* at 26:21 – 27:7].  Donovan does not specify when this incident occurred.  The second incident related to the retirement of a female accountant.  Donovan testified that, in the fall of 2006 when he "had just started in the department," Tsai commented "that it was good for her to leave so that we could get someone younger in there:"

> **Q:  Do you remember – with regard to the accountant, do you remember the exact words that Dr. Tsai said?**
>
> **A:  As I said, that, you know, 'She was older,' and that, you know, 'her leaving was good because we could get someone younger in that position.'**

**[*Id.* at 30:7 – 31:3].**

Donovan asserts that prior to the late March, 2010 meeting with Walker in which the rumor of his retirement was mentioned, he "was never informed of any concerns about [his] work performance" and his "performance reviews were always excellent."  [Dkt. 54-8, Donovan Aff. ¶38].  After this meeting, however, Donovan attests that Tsai informed him (presumably at the July 23, 2010 meeting with Walker and Tsai regarding the Assessment) that the respondent "has no confidence in me and that I was 'in a lot of trouble.'"  [*Id.* at ¶40].

## III.    <u>Legal Standard</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).  "If there is any evidence in the

record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

## IV.   Analysis

### a.   Age Discrimination in Employment Act

The ADEA provides that "[i]t shall be unlawful for an employer … to discharge any individual or otherwise discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  This protection extends to employees forty years of age or older.  29 U.S.C. § 631(a).

The Second Circuit analyzes claims of discriminatory treatment pursuant to the ADEA using the three-pronged burden-shifting framework set forth in *McDonnell Douglas Corp., v. Green*, 411 U.S. 792 (1973), and as slightly modified by *Gross v. FBL Financial Services*, 557 U.S. 167 (2009).  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 105 (2d Cir. 2010).[10]  Under *McDonnell Douglas*, "the Plaintiff bears the initial burden of establishing a prima facie case of discrimination."  *Id.* at 106; *McDonnell Douglas*, 411 U.S. at 802.  If the Plaintiff is able to establish a prima facie case, the burden then shifts to the Defendant to articulate "some legitimate, nondiscriminatory reason" for the employer's action.  *McDonnell Douglas*, 411 U.S. at 802; *Gorzynski*, 596 F.3d at 106.  If an employer articulates such a reason, "the Plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination."  596 F.3d at 106.  Notably, prior to the Supreme Court's holding in *Gross*, a Plaintiff could prevail if the evidence, viewed in the light most favorable to the Plaintiff, would permit a jury to find "that her dismissal was motivated *at least in part* by age discrimination."  *Gorzynski*, 596

---

[10] The Supreme Court noted in *Gross* that it "has not definitively decided whether the evidentiary framework of *McDonnell Douglas* ... is appropriate in the ADEA context."  *Gross*, 557 U.S. at 175 n. 2.  Nonetheless, the Second Circuit has concluded that post-*Gross* the *McDonnell Douglas* framework is still applicable to ADEA claims.  *Gorzynski*, 596 F.3d at 106 (finding post-*Gross* that "we remain bound by, and indeed see no reason to jettison, the burden-shifting framework for ADEA cases that has been consistently employed in our Circuit").

F.3d at 106 (quoting *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 114 (2d Cir. 2007)).  *Gross*, however, altered the third prong of the *McDonnell Douglas* analysis by eliminating this mixed-motive standard and instead requiring a Plaintiff to prove "by a preponderance of the evidence … that age was the 'but-for' cause of the challenged employer decision," and not just a contributing or motivating factor.  *Gross*, 557 U.S. at 177-78; *Gorzynski*, 596 F.3d at 106; *Sullivan v. Brodsky*, 380 F. App'x 21 (2d Cir. 2010).

The Defendant argues that summary judgment must be granted in its favor because the Plaintiff has failed to make out a prima facie case of age discrimination, and because, even if he has made out a prima facie case, he cannot rebut Yale's legitimate, nondiscriminatory reasons for his termination.

### i.  <u>Prima Facie Case of Discrimination</u>

To establish a prima facie case of age discrimination, a Plaintiff must show (1) that he was within the protected age group, (2) that he was qualified for the position, (3) that he experienced an adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination.  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010).  This burden is "not a heavy one."  *Id.*  It is undisputed that Donovan was within the protected age group and that he experienced an adverse employment action, thus satisfying the first and third prongs of this analysis.  The parties dispute whether Donovan has met the second and fourth prongs of his prima facie case.

The Defendant first argues that Donovan was unqualified for the job of Clinical Administrator, asserting that the deficiencies enumerated previously and Donovan's unsatisfactory performance, including that the Plaintiff was unable to explain the increase in the Department's deficit, rendered him unqualified for his position.  Donovan counters that his 32 year exemplary employment history with Yale proves that he was qualified for the position.

To draw the inference of minimal qualification for employment, "all that is required is that the Plaintiff establish basic eligibility for the position at issue, and not the greater showing that he satisfies the employer." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001).  In other words, "the qualification necessary to shift the burden to Defendant for an explanation of the adverse job action is minimal; Plaintiff must show only that he possesses the basic skills necessary for performance of [the] job." *Id.* (citation and internal quotation marks omitted).  "As a result, especially where discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw." *Id.* at 92.

Thus, to satisfy the qualification element of his prima facie case, Donovan must only show that he possessed the basic skills necessary for performance of the job.  Here, although no job description has been submitted, the evidence would permit a rational jury to conclude that Mr. Donovan was minimally qualified for the Clinical Administrator position.   It is undisputed that Donovan was employed with Yale for 32 years, and had been employed as the Clinical Administrator of the Department of Ophthalmology for four years at the time of

his termination.  Prior to that, Donovan served as the Director of Finance for the Yale Medical Group for eight years.  [Dkt. 54-8, Donovan Aff. ¶¶5-6].  Although Yale has identified alleged issues with Donovan's *performance* of his position, it has not established that Donovan was not *minimally* qualified to hold the position given his work history.  Donovan has satisfied his burden of demonstrating his minimal qualifications for the Clinical Administrator position.  *See, e.g., Slattery*, 248 F.3d at 91 (holding that it was error to find that plaintiff had not established a prima facie case merely because employer was dissatisfied with plaintiff's performance and noting that "Plaintiff must show only that he possesses the basic skills necessary for performance of the job" (internal quotation marks and brackets omitted)); *Hasemann v. United Parcel Serv. of Am., Inc.*, 3:11-CV-554 VLB, 2013 WL 696424 (D. Conn. Feb. 26, 2013) (VLB) (finding that the Plaintiff was minimally qualified in the absence of direct evidence because the Plaintiff had been employed by the Defendant for twenty-five years when terminated).

The Defendant also argues that Donovan has failed to demonstrate that he was terminated amidst circumstances giving rise to an inference of discrimination because the remarks by Tsai and Walker regarding the Plaintiff's retirement and/or age are stray remarks with no probative value.  As will be discussed *infra*, the Plaintiff has failed to rebut the Defendant's legitimate, non-discriminatory reasons for his termination, and thus the Court assumes for purposes of this motion that Donovan has satisfied this prong of his prima facie case.  *See Attard v. City of New York*, 451 F. App'x 21, 24 (2d Cir. 2011) (noting that a district court may assume, arguendo, that a plaintiff has made out a prima

facie case in order to analyze the second two elements of the burden shifting *McDonnell Douglas* analysis).

### ii.  Legitimate, Non-discriminatory Reason

As set forth in depth earlier, the Defendant has articulated legitimate, nondiscriminatory reasons for terminating Donovan's employment as the Department's Clinical Administrator, namely his performance deficiencies as set forth in the independent Assessment of the Department of Ophthalmology and discovered during Chesney and Lynch's review of the Department, as well as the Department's financial status.  These Department deficiencies included:

- Infrequent or absent communication at all levels, including between staff and management;
- Lack of discipline for inappropriate staff behavior and sub-standard performance;
- Lack of appropriate staff coverage for all operating hours of the practice;
- Evidence and perception of uneven work assignments among similar staff;
- Insufficient training for new employees … and lack of continuing education opportunities for technical staff;
- Inappropriate use of some employees' time, including that the Practice Manager (the second highest non-physician manager) spent 60% of her time filling in at the front desk, during which time she greeted patients and answered phones, and improper staffing;
- underperforming and unfriendly staff that have not been properly disciplined; and
- "extremely weak" clinical operations management at all levels, including the Clinical Administrator position.

Deficiencies specific to Donovan included that he was not well respected by faculty or staff; that he inadequately supervised billing staff, leading to a delay of

more than three months in processing $300,000 of charges; that he had failed to timely institute a new self-pay patient collection schedule; and that he failed to have appropriate coverage for the Practice Manager, who routinely left work at 4:00 when the Department had patients until 5:00 pm.

Donovan disputes the veracity of these articulated reasons but conceded during his deposition that the types of weaknesses identified in the Assessment may provide cause for concern and grounds for an administrator's replacement, including employees' loss of faith in an administrator; failure to communicate with employees; failure to appropriately discipline staff; failure to provide appropriate staff coverage for all hours of the practice; failure to make training available to employees; inability to address issues which faculty brought to an administrator's attention; and weak knowledge of clinical operations.  [Dkt. 54-3, Donovan Depo. 50:22 – 51:3, 53:6-11; dkt. 54-4, Donovan Depo. 57:17 – 58:2, 59:7-13, 59:25 – 60:6, 60:20-24].  Donovan also agreed that the following occurrences would be valid reasons for concern about an administrator's ability to run a practice: the Practice Manager spending the majority of her time filling in at the front desk, answering phones, and greeting patients; and a department review establishing that the overall operations management was extremely weak at all levels.  [Dkt. 54-4, Donovan Depo. 65:21 – 66:12, 67:12-16, 72:20-25].

The Court finds that the Defendant has articulated legitimate and nondiscriminatory reasons for Donovan's termination as Clinical Administrator, namely, his weak performance.  *See, e.g.*, *Sutherland v. New York State Dept. of Law*, No. 99–9086, 2000 WL 730413, at *3 (2d Cir. June 2, 2000) (demonstrated

poor job performance is "no doubt ... a legitimate nondiscriminatory reason for ... termination."); *Bogues v. Town of Trumbull*, 383 F. Supp. 2d 348, 356 (D. Conn. 2005) ("An employer's dissatisfaction with the quality of an employee's work is a legitimate nondiscriminatory reason").

### iii.  Pretext

Because Yale has produced evidence that it demoted and terminated Donovan for legitimate, nondiscriminatory reasons, Donovan must "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Ben-Levy v. Bloomberg, L.P.*, 518 F. App'x 17, 19 (2d Cir. 2013) (internal quotation marks and citation omitted).  In other words, the Court must determine, by looking at the evidence the parties have proffered, whether Donovan has "raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that [his] age was a 'but for' cause" of Yale's decision to terminate him as Clinical Administrator.  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010).   An employer's reason "cannot be proved to be a pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (internal quotation marks and citation omitted); *Attard*, 451 F. App'x at 24 (quoting same).

Donovan has attempted to demonstrate that Yale's reasons were pretextual first by referencing three separate remarks by Walker and Tsai – his superiors

and the Yale employees who made the decision to terminate his employment –
regarding age or retirement.  During his meeting with Walker in March or early
April 2010,[11] Walker asked Donovan about his intent to retire, which was allegedly
based on a rumor that he planned to do so.  Donovan testified that Walker told
him that when she saw his name on her schedule, she thought he was going to
announce to her his retirement.  Donovan, who had no intention of retiring,
rebutted the rumor, telling Walker it was untrue and that he had never stated to
anyone that he intended to retire.  He also informed her that he planned to work
until the age of 70, nine years in the future.  Donovan testified that Walker's
response was "Oh, fine.  We didn't want to lose you."  Donovan and Walker had
no further discussions about age or retirement after this meeting, and Donovan
testified that this conversation provided the basis for his belief that Walker
harbored age-discriminatory animus against him.

The Plaintiff also points to two remarks by Dr. Tsai that he alleges
demonstrate Tsai's discriminatory animus and his bias against older workers.
Tsai's first comment, uttered in 2006 when Donovan had just started in the
Department, was that it was "good" for a retiring female accountant to leave "so
that we could get someone younger in there."  While this comment appears
clearly age-adverse, it was not directed at the Plaintiff and it occurred four years
prior to Donovan's termination in 2010.  Tsai's second comment was directed at a
vice chairman of the Ophthalmology Department who Donovan contends was

---

[11] The Defendant has asserted in its 56(a)1 statement and the Plaintiff has not
disputed that this meeting took place on March 26, 2010.  In its motion, however,
the Defendant asserts that this meeting took place in April 2010.

younger than Donovan and who had announced his departure from Yale to go to another school.

> **A:  Tsai made the comment, 'Well, you know, he's getting too old for his research to be valid.'  And I made the comment, I said, 'You know, [the employee] is younger than me.'  And he said, 'Oh you're not in your 60s.'  So …**

> **Q:  And what did you say to that?**

> **A:  At the time I was.  I said 'Yes, I am.'**

> **Q:  So Dr. Tsai thought you were younger than you actually were?**

> **A:  Yes.**

[Dkt. 54-3, Donovan Depo. 26:21 – 27:7].  It is reasonable to infer that Tsai made this comment 2009 or 2010, as Donovan noted that he was in his sixties at the time the conversation took place.

"[A]ll comments pertaining to a protected class are not equally probative of discrimination."  *Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007).  "Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff."  *Silver v. N. Shore Univ. Hosp.*, 490 F. Supp. 2d 354, 362 (S.D.N.Y. 2007).  "The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be."  *Tomassi*, 478 F.3d at 115.  Accordingly, a court should not first categorize remarks "either as stray or not stray and then disregard[] [them] if they fall into the stray category," but rather should assess the remark's "tendency to

show that the decision-maker was motivated by assumptions or attitudes relating to the protected class," in the context of all the evidence presented. *Id.*

Courts have found the following factors relevant to such a determination: "(1) who made the remark, i.e., a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decisionmaking process." *Silver*, 490 F. Supp. 2d at 363 (citations omitted).  "In the absence of a clearly demonstrated nexus to an adverse employment action, stray workplace remarks are insufficient to defeat a summary judgment motion." *Almonord v. Kingsbrook Jewish Med. Ctr.*, No.04–CV–4071(NGG), 2007 WL 2324961, at *9 (E.D.N.Y. Aug. 10, 2007) (citing *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998)).

It is well established that "the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination." *Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001).  *See also Danzer*, 151 F.3d at 56 ("[s]tray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination.").  "When, however …, other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." *Danzer*, 151 F.3d at 56.

Here, in the absence of other indicia of discrimination in the record, a reasonable juror could not find Walker's query about Donovan's intent to retire to be indicative of discriminatory animus.  This exchange, even when viewed in the light most favorable to Mr. Donovan, does not demonstrate discriminatory animus.  First and foremost, Walker's question was not indicative of her beliefs about older workers.  Second, Donovan has offered no proof in the record that this question was anything but innocuous.  Instead, he admits that Walker expressed relief when she heard he was not leaving.  Donovan has also testified that Walker's "comments about my work performance in that meeting were excellent."  [Dkt. 54-2, Donovan Depo. 19:15-20].  Further, Donovan learned of the rumor that he intended to retire a few weeks before his meeting with Walker, from his friend and coworker, Carrie Capezzone, which suggests that Walker queried Donovan about his intentions because the rumor of his retirement had been going around the Department for several weeks.  No reasonable juror could conclude that Walker's innocuous question about Donovan's intent to retire, without more, demonstrated that she harbored discriminatory animus toward Mr. Donovan, especially when her reply – as relayed by Donovan – belied such a conclusion.  Further undermining Donovan's argument is the fact that Walker was 53 years old[12] at the time of her meeting with Donovan and 54 at Donovan's termination, making her a member of the same ADEA-protected class as was Donovan.  Donovan has simply not shown any nexus between Walker's query about his intentions and his termination nearly five months later, where the

---

[12] Walker's date of birth is July 25, 1956.  [Dkt. 34-5, Walker Aff. ¶11].

intervening Assessment revealed various deficiencies in the Plaintiff's performance of his position.

Tsai's remarks, even if they betray an ageist disposition, do not accompany any other indicia of discrimination in the record and are thus properly categorized as stray remarks.  Tsai's first remark, made in 2006, a full four years before Donovan's termination, is nothing more than an isolated remark whose probative value is low based on its temporal remoteness to Donovan's termination.  Donovan has not demonstrated a nexus between this comment and his termination four years later.  Tsai's second remark is on its face perhaps more probative of his alleged bias than his first, but still constitutes a stray remark where Donovan has failed to demonstrate that the deficiencies and recommendations enumerated in the independent Assessment were motivated by age bias.  Moreover, the context in which this statement was spoken is absent.  Although the comment on its face appears to be biased, it was directed at the departure of the "head of the research operation," and it is unclear to the Court whether Tsai's comment refers to the validity of research performed at some point in the past and whose relevance was no longer at its height given the intervening years, or whether Tsai believed that the employee's current or near-current research was invalid solely because the researcher was in his sixties.  The context of this comment, given the dynamic nature of medical research, is crucial in the absence of other indicia of discrimination.  *See, e.g., Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 89, 93–94 (2d Cir. 2001) (affirming summary judgment despite statements by major company executive expressing desire for

a "younger workforce," and where plaintiff's work began to decline post-promotion).

Donovan further attempts to connect Tsai's and Walker's allegedly discriminatory motives and his termination by arguing that prior to his discussion with Walker regarding his non-intention to retire, his performance reviews were excellent but "it was shortly after that meeting that then my work and my credibility as the department administrator began to become in question." [Dkt. 54-2, Donovan Depo. 19:15-20]. Although Donovan acknowledges that both the budget meeting with Walker, Tsai, the Dean of the Yale School of Medicine, and the Deputy Dean for Clinical Affairs, and Chesney's and Lynch's review of the Department – resulting in the Assessment – occurred in the period between his meeting with Walker and his termination, he alleges that the review was undertaken as a pretext to discriminate against him based on his age, and also that the deficiencies cited in the Assessment and uncovered by the review are false and inaccurate. The combination of these circumstances, Donovan alleges, proves that Yale's reasons for his termination were pretextual and served to hide Tsai's and Walker's discriminatory animus.

Donovan's assertions regarding the validity of the Assessment and the criticisms of his work performance are, however, conclusory allegations that do not support Donovan's claim of age discrimination. First, as noted, Chesney and Lynch conducted a full review of the Department of Ophthalmology at the behest of both Tsai and the Deputy Dean of Clinical Affairs for the Medical School, with whom Donovan apparently takes no issue. Chesney and Lynch interviewed

seventy-one Departmental faculty, residents, fellows, administrators, clinical operations and billing staff, which Donovan admits comprised virtually all Department employees, and conducted walk-throughs and operations observations.  The final Assessment concluded that "[o]verall, clinical operations management is extremely weak at all levels: Clinical Administrator [Donovan's position], Practice Manager, Clinical Supervisor, Front Desk Supervisor and Photography Supervisor," and recommended that Donovan, as well as other administrators, be replaced.

Donovan admits that he does not believe Chesney was motivated by age discrimination in making the Assessment's recommendation, and that throughout the eight years he and Chesney worked as peers – at which time Donovan was the associate director for finance and Chesney was the associate director of reimbursement, both reporting to the same individual – he never felt that Chesney thought less of him because of his age, nor did Chesney comment on any other employee's age.  [Dkt. 54-3, Donovan Depo. 38:1 – 39:10; Dkt. 54-6, Donovan Depo. 108:1-7; dkt. 54-7, 118:11-16].  Instead, Donovan conclusorily alleges that the "report was valueless and done by a nonprofessional from within the University," who Yale had used in the past "to create a report about a department to serve its own purposes."   [Dkt. 54-1, P's Opp. to MSJ, p. 52; dkt. 54-7, Donovan Depo. 117-118].  Donovan has pointed to no evidence whatsoever to support his allegation that Chesney or Lynch were unprofessional or that Yale used them to create reports to serve its own purposes or, indeed, how such reports were self-serving.  As such, the Court cannot credit this allegation.  *DiGirolamo v. MetLife*

**29**

*Grp., Inc.*, 494 F. App'x 120, 121-22 (2d Cir. 2012) ("Mere 'conclusory allegations or unsubstantiated speculation' by the plaintiff will not defeat summary judgment.").

Donovan also argues in opposition to the Defendant's motion that "[e]ach of the claims of weakness or inadequacy on the part of the plaintiff are false, and were created by defendant as pretext to terminate the plaintiff." [Dkt. 54-1, P's Opp. p. 52]. Donovan largely relies on conclusory and unsubstantiated statements that his performance was not weak. For instance, Donovan asserts that "[t]he administration was not weak; nearly all the administrators are the same now as when the plaintiff was employed." [*Id.*]. The Plaintiff relies, however, solely on his own testimony that he adequately performed his position, and has made no effort to identify the ages of the administrators who allegedly retained their positions or, indeed, their identities. *See, e.g.*, *Stanojev v. Ebasco Servs., Inc.*, 643 F.2d 914, 921 n. 6 (2d Cir. 1981) ("A finding of discrimination may be predicated on a showing of differentiation in treatment, whether in termination or job replacement or relocation, between Plaintiffs and other employees similarly situated and outside the protected age group."). This evidence is not probative and is conclusory. Donovan has also admitted, as discussed *supra* in section II., that weaknesses in the areas articulated in the Assessment would be grounds for replacement of an administrator.

Even if Plaintiff could prove that he performed his position satisfactorily and that his work was unfairly criticized and scrutinized, there is simply no evidence in the record that Plaintiff's performance was allegedly unfairly

criticized and scrutinized *due to age bias*.  Rather, Donovan himself admitted that

he suspected that Tsai wanted to pass the blame for the Department's deficit to

Donovan in order to save his own skin, as Tsai had made promises about the

deficit that were unachievable.  Donovan's own testimony reveals that at least

one other administrator agreed with the decision to terminate Donovan, and that

Tsai was likely acting in his own best interests.  Donovan testified that Dr. Tsai

informed him that the Deputy Dean of Clinical Affairs (who had been present at

the budget meeting with Donovan), David Lefell, M.D., had recommended after

Chesney's review had started that Donovan be terminated.  [Dkt. 54-6, Donovan

Depo. 114:24 – 116:4].  Donovan testified as follows:

> A:  [Tsai] made the comment to me that David – Dr. Lefell – felt
> that I should be removed as administrator and that [the
> practice manager] should also be removed as the practice
> manager.
>
> Q:  Do you remember him explaining why?
>
> A:  It was predominantly because of the deficit.  Tsai had made
> promises about the deficit that were just unachievable.
>
> Q:  Do you think that Dr. Tsai was in effect blaming you to
> cover the unreasonable projections he had made?
>
> A:  Yes.
>
> Q:  Do you think he would have done that to whoever was in
> your position; that is, he would have blamed that person?
>
> A:  Yes.

[*Id.*].  Even if Yale's motivations for Donovan's termination were improper, *i.e.*,

Tsai had primed Donovan to take the fall for the Department's deficiencies even

though the blame was not all Donovan's, "[i]t is well established that absent

discrimination, the employer may fire an employee for a good reason, a bad

reason, a reason based on erroneous facts, or no reason at all...."  *Hlinko v. Virgin Atl. Airways, Ltd.*, 205 F.3d 1323, 1323 (2d Cir. 1999) (internal quotation marks and citation omitted).  This colloquy indicates that Donovan himself believes that Tsai's self-serving motives, rather than age bias, were the but-for cause of Donovan's termination.

Lastly, the parties dispute the relevance of Donovan's temporary position with the Medical School's Financial Operations' Department after his termination from his Clinical Administrator position.  The Plaintiff contends that the Defendant's acknowledgment of his "valuable contributions" to the Defendant's special projects and two extensions of his termination date demonstrate that the reasons for Plaintiff's termination were pretextual.  [Dkt. 54-1, P's Opp. to MSJ, p. 58].  The Defendant, on the other hand, asserts that its conduct subsequent to the Plaintiff's termination demonstrates that Yale was not motivated by age discrimination.  Yale contends that Walker offered Donovan the position with Financial Operations and granted the two extensions to allow the Plaintiff additional time to find other employment and, after his temporary position with Financial Operations had ended, Donovan himself testified that Carrie Capezzone "worked out a deal" with the administrator of the Department of Internal Medicine to employ the plaintiff on a temporary basis, a job in which Donovan testified he could have remained "forever" had he chosen to do so.  [Dkt. 54-5, Donovan Depo. 77:11-23].  Donovan further testified his agreement that age did not play a role in Walker's decisions to offer him a position with Financial Operations and

twice extend his assignment, and that in fact Walker was trying to help him.  [Dkt. 54-5, Donovan Depo. 82:3-9].

Although both parties make much of Yale's conduct post-termination of Donovan's position as Clinical Administrator, it is unclear what this conduct demonstrates, if anything, about Yale's animus or lack thereof in terminating Donovan from the Department of Ophthalmology.  Because the probity of this evidence is low, however, in terms of Donovan's termination as Clinical Administrator in August 2010, it is not necessary for the Court to consider it. Were the Court to consider it, however, Donovan's admission that Walker appointed him to the temporary position without any ageist intent further undermines his claim that her role in terminating him was motivated by age bias.

Where Yale has articulated legitimate nondiscriminatory reasons for Donovan's termination – his performance deficiencies – Donovan was required to do *more* than demonstrate that an arguably discriminatory comment was made or that solely improper – but not discriminatory – reasons underlay his termination. Donovan has, at this stage, the burden of demonstrating that the articulated reasons for his dismissal were "false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr.*, 509 U.S. at 515.  Donovan has presented evidence of two temporal stray remarks with little or no probative value, and one arguably age-adverse remark with no articulated nexus to his termination.  He has offered conclusory allegations that the Assessment was performed by an unprofessional who he admits was not motivated by age bias, and asserts that the articulated deficiencies in his work performance were manufactured and that his work was

33

unfairly scrutinized.  The record, however, demonstrates that the three comments on which Donovan relies were uttered before Donovan participated in a budget meeting at which the Department's deficit was discussed, as was the need for a complete review of the Department.  Subsequent to this meeting, two Yale Medical Group employees who had performed similar investigations for other departments undertook an extensive review of the Department of Ophthalmology. Their completed review and completed Assessment revealed numerous deficiencies in the management of the Department and concluded that Donovan, along with other administrators, should be replaced.  Donovan has admitted his belief that the report's authors were not motivated by age discrimination and has further acknowledged that the deficiencies enumerated in the report would have been sufficient grounds for an administrator's termination.  He further admits his belief that Tsai was acting in his own best interests in terminating Donovan in order to minimize Tsai's own unreasonable promises as to the Department's long-standing budget deficit.  Although Donovan argues that the Department review was undertaken as a pretext to terminate his employment due to his age, no evidence in the record corroborates this theory.  In sum, Donovan has failed to proffer sufficient evidence such that a reasonable juror could find that Yale's articulated reasons were false, *or* that discrimination was the but-for reason for his termination.

Summary judgment is granted in favor of Defendant as to Donovan's ADEA claim.

### b.  State Law Claims

Having granted summary judgment as to the federal law claim against the Defendant, the Court declines to exercise its supplemental jurisdiction over the Plaintiff's state law claims.  "Supplemental or pendent jurisdiction is a matter of discretion, not of right.  Thus, the court need not exercise supplemental jurisdiction in every case."  *Nicholson v. Lenczewski*, 356 F. Supp. 2d 157, 165-66 (D. Conn. 2005) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 715-26 (1966)). "The federal court should exercise supplemental jurisdiction and hear a state claim when doing so would promote judicial economy, convenience and fairness to the litigants.  The court should decline to exercise supplemental jurisdiction, however, when state law issues would predominate the litigation or the federal court would be required to interpret state law in the absence of state precedent. In addition, the court may decline to exercise supplemental jurisdiction where the court has dismissed all claims over which it has original jurisdiction."  *Id.* (citing 28 U.S.C. § 1367(c)(3)); *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims").

Because the Court has granted summary judgment for Defendant Yale University on Plaintiff's ADEA claim, over which it has original jurisdiction, this Court declines to exercise supplemental jurisdiction over Donovan's remaining claims for violations of Connecticut's Fair Employment Practices Act or for intentional infliction of emotional distress, both of which arise under state law

and are analyzed under different standards.  *See Zito v. Fried, Frank, Harris, Shriver & Jacobson LLP*, 09 CIV. 9662, 2012 WL 2333303 (S.D.N.Y. June 19, 2012) (citing *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d. Cir.1994) ("Under 28 U.S.C. 1367(a)(c), a Court has the discretion to exercise supplemental jurisdiction over pendent state law claims.  If, however, 'the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.'")).

V.    **Conclusion**

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED.  The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.  The Clerk is directed to enter judgment in favor of Defendant Yale University as to Plaintiff's federal claim and to close the case.

IT IS SO ORDERED.

_____/s/_____
**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: February 24, 2014**